## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| Teja Ravi, Individually and on Behalf of | : | |
| All Others Similarly Situated | : | |
| | : | No. 20-1237C |
| **Plaintiff,** | : | Judge Firestone |
| | : | |
| v. | : | |
| | : | |
| The United States of America | : | |
| | : | |
| **Defendant.** | : | |

## Plaintiff's Supplemental Brief

## Standing to Sue under 28 U.S.C. § 2502

Mr. Ravi has standing to sue in the Court of Federal Claims as a citizen of India. Under the Reciprocity Act, 28 U.S.C. § 2502, "[c]itizens or subjects of any foreign government which accords to citizens of the United States the right to prosecute claims against their government in its courts may sue the United States in the United States Court of Federal Claims if the subject matter of the suit is otherwise within such court's jurisdiction." Ultimately, Section 2502 grants foreign plaintiffs the right to sue the United States in its courts if a reciprocal right is afforded to an American citizens in the plaintiff's country. In this matter a reciprocal right to sue the government for a breach of contract claim is afforded to Americans in India, and thus, Mr. Ravi has standing to sue in the Court of Federal claims as a citizen of India.

In India, the jurisdiction of suits filed by foreigner and foreign state is governed by section 83 and 84 of the code of civil procedure. Alien friends may sue in any Court of competent jurisdiction as if they were citizens of India. Alien friends are foreigners whose government is not at war with India. Here the U.S. is not at war at India, so it is considered a foreign friend.  Under Section 83 and 84 of the Indian Code of Civil Procedure, alien friends may sue in any Court of competent jurisdiction as if they were citizens of India. Thus, reciprocity applies and Ravi has standing the sue in Court of Federal Claims as a citizen of India.

The government may sue or be sued by virtue of Article 300 of the Indian Constitution. The government, in the name of the "Union of India" or "State", may be sued *inter alia* in the following cases:

- A breach of a contractual obligation by the government.
- The executive action has been arbitrary, mala fide, unreasonable, etc.
- The governmental action has been prejudicial to "public interest": financial losses to the exchequer, self-serving actions, partiality, etc.
- Fundamental rights have been infringed[1]

According the caselaw in this Court, it appears that this Court will be "open to foreign claimants on the basis of reciprocity given only the slightest evidence upon which such a finding can be sustained." See *Nippon Hodo Co. v. United States*, *Nippon Hodo Company v. United States*, 285 F.2d 766 (Ct. Cl.

---

[1] India's Section 9 of the Civil Procedure Code, 1908 confers jurisdiction over the civil courts to adjudicate upon all suits of civil nature, except such suits the cognizance of which is either expressly or implied barred. In other words whenever the object of the proceedings is the enforcement of civil rights, a civil court would have jurisdiction to entertain the suit unless the cognizance of the same is barred through a legislative instrument.

1961). In that case, the court further states that "[Section 2502] contemplates only that Americans enjoy equal standing with foreigners in actions against the foreign government and does not require that the scope of the actions for which the respective countries render themselves liable shall be co-extensively identical . . ." The court in that case decided that an American need only be able to sue on some type of claim.

Exhibit A is a letter from an expert in Indian Law outlining why Ravi has standing to sue in the United States. Ultimately, as the Indian government can be sued by both citizens and non-citizens for a breach of contract claim, and the evidence presented demonstrates as such, the Court should find that it is open to foreign complaints from Indian under 28 U.S.C. § 2502. Subject matter jurisdiction is satisfied, because non-citizens can sue in India for a breach of contract matter under Article 300 of the Indian Constitution.

In *Humphries vs. United States*, the Court found that in order to meet the burden of § 2502, the plaintiff could submit: (1) any statutes or caselaw on the subject; (2) an affidavit . . . from an experienced Kenyan attorney or relevant government official (i.e. the Kenyan equivalent to the United States Department of Justice); or similarly probative evidence." *Humphries v. United States*, 44 Fed. Cl. 81, 82 (1999). In this case, Plaintiff submits an affidavit from an experienced Indian attorney and multiple statutes and caselaw on the subject. Thus, this Court should find that Mr. Ravi has met his burden under the Reciprocity Act, 28 U.S.C. § 2502.

Respectfully submitted,

By: /s/*Amy E. Norris, Esq.,* (#1017140)
Amy@mwlc.org
202-830-1225
NORRIS LAW, PLLC
616 E Street N.W.
Suite 1156
Washington, DC 20004

Attorney for Teja Ravi

# EXHIBIT A

*Dated- May 21, 2021*

To,

United States Court of Federal Claims

Howard T. Markey National Courts Building

717 Madison Place, NW

Washington, DC 20439

**Subject: A letter explaining the Indian law on the question whether American citizens may bring claims against the government of India in the Indian court system**

Hon'ble Judge,

I, Anurag Bhaskar, am an Assistant Professor at Jindal Global Law School, O.P. Jindal Global University, Sonipat — a leading law school in India.

Ms. Anna Nathanson, counsel appearing for one of the petitioners, in the class action suit, Teja Ravi v. United States of America (filed on September 21, 2020), has apprised me with the facts of the case. She has also informed me about your order regarding briefing about the law in India on the question whether American citizens may bring claims against the government of India in the Indian court system and enjoy standing to pursue those claims equal to that of Indian citizens.

I understand that the issue is governed by the Reciprocity Act, 28 U.S.C. § 2502, which provides that "[c]itizens or subjects of any foreign government which accords to citizens of the United States the right to prosecute claims against their government in its courts may sue the United States in the United States Court of Federal Claims if the subject matter of the suit is otherwise within such

1

court's jurisdiction." I have written this letter to explain the law and practice in India on the said issue of *locus standi* of American citizens on the Indian soil.

I present this letter in my current role as an academic, teaching courses on Indian constitutional law, interpretation of statutes, and professional ethics. I would also like to inform the honourable court about my previous qualifications. Before starting my career as an academic, I pursued my LL.M. (2018-19) from Harvard Law School, USA, and my undergraduate degree, B.A. LL.B. (Hons.) from Dr. Ram Manohar Lohiya National Law University, India. Prior to my LLM, I clerked for a year (2017-18) with Dr. Justice D.Y. Chandrachud, Judge, Supreme Court of India. I am also affiliated with the Harvard Law School Center on the Legal Profession, USA, and have been a recipient of Indian Equality Law Fellowship at Melbourne Law School, Australia. Recently, for my scholarship on the Indian Constitution, I was conferred with the Bluestone Rising Scholar Award 2021, established at the Brandeis University, Massachusetts, USA.

I submit that an American citizen has a right to sue the Indian government in its courts under the existing constitutional as well as statutory scheme in India. In support of this position of law and practice, I have referred to the text of the Indian Constitution, few statutes, and case laws.

The cases cited in this letter are delivered either by the Supreme Court of India or the High Courts. The decision given by the Supreme Court of India on all matters is binding on all other courts, including the High Courts. The decision of a High Court on all matters is binding on the courts below, in its jurisdiction, and can also be relied upon by other High Courts. However, only the Supreme Court of India and different High Courts are the constitutional courts under the Constitution, i.e. a case related to constitutional issue can be adjudicated only by them.

## A. **Constitutional Scheme**

1. The Indian Constitution guarantees certain fundamental rights to every person, including those who are not Indian citizens. Specifically, Article 21 provides "No <u>person</u> shall be deprived of his life or personal liberty except according to procedure established by law". The Article uses the term "person", instead of Indian "citizen". The constitutional courts in India have read Article 21 in a broader manner, and have consistently held that it applies equally for protection of all foreign nationals.[1] Similarly, Articles 14[2], 20[3], 22[4], and 23[5] provide constitutional protection to all foreign nationals.

2. Once lawfully entered the territory of India, the foreign nationals have certain immediate rights for enjoyment of ordinary private life.[6] Even those who come to India merely as tourists or in any other official capacity are entitled to the protection of their lives under Article 21. In *Chairman, Railway Board v. Mrs. Chandrima Das*[7], it was held: "Just as the State is under an obligation to protect the life of every citizen in this country, so also the State is under an obligation to protect the life of the persons who are not citizens." This has

---

[1] Anwar v. State of Jammu & Kashmir, AIR 1971 SC 337; Louis De Raedt v.Union of India, (1991) 3 SCC 554; The Chairman, Railway Board v. Mrs. Chandrima Das, AIR 2000 SC 988; See, Marie Andre Lecrec v. Delhi (State Administration), (1984) 2 SCC 433.

[2] Article 14 reads: "Equality before law.—The State shall not deny to any <u>person</u> equality before the law or the equal protection of the laws within the territory of India"

[3] Article 20(1) reads: "No <u>person</u> shall be convicted of any offence except for violation of a law in force at the time of the commission of the Act charged as an offence, nor be subjected to a penalty greater than that which might have been inflicted under the law in force at the time of the commission of the offence."

[4] Article 22(1) reads: "No <u>person</u> who is arrested shall be detained in custody without being informed, as soon as may be, of the grounds for such arrest nor shall he be denied the right to consult, and to be defended by, a legal practitioner of his choice."

[5] Article 23(1) reads: "Traffic in <u>human beings</u> and begar and other <u>similar forms of forced labour</u> are prohibited and any contravention of this provision shall be an offence punishable in accordance with law."

[6] Sarbananda Sonowal v. Union of India, (2005) 5 SCC 665; Isaac Isanga Musumba v. State of Maharashtra, (2014) 15 SCC 357.

[7] AIR 2000 SC 988

been reiterated in a recent judgment: "The fundamental rights enshrined in the Constitution of India govern not only the Indian citizens but foreigners as well, as long as they are on Indian soil".[8]

3.   An American citizen, among all foreign nationals, may sue the Indian government, any state government, or any local authority, before the Supreme Court of India (under Article 32[9]) or any High Court (under Article 226[10]) on the ground that his/her/their right to life or personal liberty was violated by the State. Article 32 or Article 226 do not lay down any eligibility criteria based on citizenship of the seeker of the constitutional remedy. An American citizen can also challenge a law restricting the right to life under Article 21, on the ground that the "procedure established by law" is not "fair, just, or reasonable".[11]

4.   If any of the employees of the central or state government commits a violation of fundamental rights (including Article 21), the   government, of which they are the employees, can be held vicariously liable in damages to the person wronged by those employees.[12] In such cases, it has been held that the claim is based on the principle of strict

---

[8] Kamil Siedczynski v. Union of India, (2020) 3 CALLT 235 (HC).

[9] Article 32 reads: "(1) The right to move the Supreme Court by appropriate proceedings for the enforcement of the rights conferred by this Part is guaranteed.

  (2) The Supreme Court shall have power to issue directions or orders or writs, including writs in the nature of habeas corpus, mandamus, prohibition, quo warranto and certiorari, whichever may be appropriate, for the enforcement of any of the rights conferred by this Part."

[10] Article 226(1) reads: "Notwithstanding anything in article 32, every High Court shall have power, throughout the territories in relation to which it exercises jurisdiction, to issue to any person or authority, including in appropriate cases, any Government, within those territories directions, orders or [writs, including writs in the nature of habeas corpus, mandamus, prohibition, quo warranto and certiorari, or any of them, for the enforcement of any of the rights conferred by Part III and for any other purpose.]"

[11] Maneka Gandhi v. Union of India, AIR 1978 SC 597

[12] Nilabati Behera v. State of Orissa,  AIR 1993 SC 1960;  N. Nagendra Rao v. State of Andhra Pradesh, AIR 1994 SC 2663; Achutrao Haribhau Khodwa v. State of Maharashtra, (1996) 2 SCC 634; D.K . Basu v. State of West Bengal, AIR 1997 SC 610; Puli Raju v. Government of Andhra Pradesh,  2019 (2) ALD 657.

liability to which defence of sovereign immunity is not available and the affected person must receive an amount of compensation from the State.[13] This remedy of vicarious liability against the State is also available to foreign nationals.[14]

5.  For violation of the right to life under Article 21, the Supreme Court of India has granted compensation to Indian citizens[15], and equally to foreign nationals.[16] In *Nilabati Behera v. State of Orissa*[17], the Court held: "The right to compensation is some palliative for the unlawful acts of instrumentalities which act in the name of public interest and which present for their protection the powers of the state as shield".

6.  A foreign national also has a *locus standi* to file a public interest litigation case before the Supreme Court or High Courts.[18]

7.  Not even a presidential order declaring emergency under the Constitution can bar any person, including a foreign national, from moving to the Supreme Court or High Court for enforcement of his/her/their fundamental right under Articles 20 and 21.[19] This has been reiterated in *Justice K.S. Puttaswamy v. Union of India.*[20]

---

[13] Nilabati Behera v. State of Orissa, AIR 1993 SC 1960.
[14] The Chairman, Railway Board v. Mrs. Chandrima Das, AIR 2000 SC 988.
[15] S. Nambi Narayanan v. Siby Mathews, (2018) 10 SCC 804.
[16] The Chairman, Railway Board v. Mrs. Chandrima Das, AIR 2000 SC 988
[17] AIR 1993 SC 1960.
[18] Francis Coralie Mullin v. The Administrator, Union Territory of Delhi, (1981) 1 SCC 608
[19] Article 359(1) of the Indian Constitution reads: "Where a Proclamation of Emergency is in operation, the President may by order declare that the right to move any court for the enforcement of such of [the rights conferred by Part III (except articles 20 and 21)] as may be mentioned in the order and all proceedings pending in any court for the enforcement of the rights so mentioned shall remain suspended for the period during which the Proclamation is in force or for such shorter period as may be specified in the order"
[20] (2017) 10 SCC 1

8.  It has been held that the conferment of certain fundamental rights and basic liberties on an individual, staying on Indian soil on a student visa, cannot be taken away by an unreasonable executive order.[21] These liberties cover the right to life and personal liberty, along with all associated rights, including the right to have political views and participate in political activities.

9.  In *Kamil Siedczynski v. Union of India[22]*, a foreign student (Polish national) staying in India on a student visa till August 31, 2020, was issued a "Leave India Notice" dated February 14, 2020. The notice was issued by Foreigners' Regional Passport Office, Kolkata, acting on behalf of the Union government, on the ground that the foreign student participated in demonstrations criticizing a government decision. The Calcutta High Court struck down the notice and upheld the rights of the foreign student, by clearly holding that: "Even foreign nationals, as long as they have the right to stay in India, by virtue of a visa issued to them (in the present case, which was also renewed), cannot be turned out of India only by an administrative order, without any rhyme or reason and without a prior hearing being given to the foreigner."

10. For violation of other constitutional rights or legal rights by unreasonable or excessive administrative action, an American citizen (and all other foreign citizens) may directly approach the High Court having a particular territorial jurisdiction, under Article 226 of the Indian Constitution. The existence of a legal right is the foundation for a petition under

---

[21] Kamil Siedczynski v. Union of India, (2020) 3 CALLT 235 (HC).
[22] Ibid

Article 226 and even a bare interest may give *locus standi* to a person to file a writ petition.[23]

11. The judgment of Punjab & Haryana High Court, in *Saeid Reza Moein v. Punjabi University, Patiala*[24], recognized the right of a foreign student to invoke the extraordinary writ jurisdiction under Article 226 of the Indian Constitution, for protection of his/her rights. In this case, an Iranian citizen, who finished his studies in an Indian University, approached the High Court, as the said University was not issuing marksheet and certificate to him. The Court allowed the writ and ordered the University to supply the requisite documents to the foreign student.

12. In another case, *V. Ravi Chandran v. Union of India*[25], the Supreme Court of India entertained a writ petition filed by an American citizen for the custody of his minor child (also an American citizen), who was unauthorizedly brought to India by his divorced wife. The Court dismissed the objection raised regarding the maintainability of 'habeas corpus' petition under Article 32 of the Indian Constitution, on the ground that it was required under the facts of the case. The Court ruled in favour of the husband.

### B. Code of Civil Procedure

1. Section 9 of the Civil Procedure Code (CPC), 1908 confers jurisdiction over the civil courts to adjudicate upon all suits of civil nature, except such suits the cognizance of which is

---

[23] ERBIS Engineering Company Ltd. v. State of West Bengal, (2011) 2 C ALLT 450 (HC).
[24] AIR 1993 P&H 162.
[25] (2010) 1 SCC 174.

either expressly or implied barred.[26] In other words, whenever the object and facts of the proceedings are of civil nature, a civil court would have jurisdiction to entertain the suit, unless the cognizance of the said suit is barred by a specific statute governing that particular jurisdiction.

2. Section 79 of CPC provides that in a civil suit filed by or against the Government, the authority to be named as plaintiff or defendant shall be either "Union of India" (in the case of a suit by or against the Central Government) or "the State" (in the case of a suit by or against a State Government).[27] This provision is similar to Article 300 of the Indian Constitution which provides that the Government of India may sue or be sued by the name of the Union of India and the Government of a State may sue or be sued by the name of the State.[28]

3. Section 83 of CPC provides the right to an alien (foreign national) to sue anyone in India.[29] By virtue of the provision, alien friends may sue in any Court otherwise competent to try

---

[26] Section of CPC provides: "Courts to try all civil suits unless barred.—The Courts shall (subject to the provisions herein contained) have jurisdiction to try all suits of a civil nature excepting suits of which their cognizance is either expressly or impliedly barred. [Explanation I].—A suit in which the right to property or to an office is contested is a suit of a civil nature, notwithstanding that such right may depend entirely on the decision of questions as to religious rites or ceremonies. [Explanation I].—For the purposes of this section, it is immaterial whether or not any fees are attached to the office referred to in Explanation I or whether or not such office is attached to a particular place.]"

[27] The text of Section 79 of CPC reads: "In a suit by or against the Government, the authority to be named as plaintiff or defendant, as the case may be, shall be— (a) in the case of a suit by or against the Central Government, [the Union of India], and (b) in the case of a suit by or against a State Government, the State.]"

[28] Article 300(1) of the Constitution provides: "The Government of India may sue or be sued by the name of the Union of India and the Government of a State may sue or be sued by the name of the State..."

[29] Section 83 of CPC provides: "When aliens may sue.—Alien enemies residing in India with the permission of the Central Government, and alien friends, may sue in any Court otherwise competent to try the suit, as if they were citizens of India, but alien enemies residing in India without such permission, or residing in a foreign country, shall not sue in any such Court. Explanation. —Every person residing in a foreign country, the Government of which is at war with India and carrying on business in that country without a licence in that

the suit, as if they were citizens of India. Alien friends are foreigners whose government is not at war with India. Alien enemies residing in India with the permission of the Central Government may also sue in any court of competent jurisdiction. This position of law has been applied in several case laws.[30] Foreign nationals have brought civil suits before a civil court in India for matters related to property[31] and for the return of the money that they had paid in respect of a contract that has become void.[32]

4.  By a combined reading of Sections 9, 79, and 83, a foreign national, whose government is not at war with India, can sue the Indian government in a civil suit, as if he/she/they were an Indian citizen.

C.  **Other Rights under criminal law, consumer protection law, accidents claims**

1.  Under Section 482 of Criminal Procedure Code (CrPC), anyone can approach a High Court for quashing an FIR (First Information Report) on the ground that the person was falsely accused or arrested.[33] In *Konan Kodio Ganstone v. State of Maharashtra*[34], the Bombay High Court quashed the FIRs filed by the police against a total of 29 foreign nationals who

---

behalf granted by the Central Government, shall, for the purpose of this section, be deemed to be an alien enemy residing in a foreign country."

[30] Ibrahim v. Gulam Mohammad, AIR 1995 Raj 117; Nizamuddin v. Huseni, AIR 1960 MP 212; Abdul Hussain v. Amir Uddin, 1998 (4) GLT 121; Feroza Begam v. Dewan Daulat Rai Kapoor, AIR 1975 Delhi 1; AK Mukherjee v. Pradip Ranjan Sarbadhikary, (1987) 2 CHN 365.

[31] Abdul Hussain v. Amir Uddin, 1998 (4) GLT 121; Feroza Begam v. Dewan Daulat Rai Kapoor, AIR 1975 Delhi 1; AK Mukherjee v. Pradip Ranjan Sarbadhikary, (1987) 2 CHN 365.

[32] Messers Mannaseh Film Co. Ltd. v. Gemini Pictures Circuit, AIR 1944 Mad 239.

[33] Section 482 of CrPC provides: "Nothing in this Code shall be deemed to limit or affect the inherent powers of the High Court to make such orders as may be necessary to give effect to any order under this Code, or to prevent abuse of the process of any Court or otherwise to secure the ends of justice."

[34] 2020 (3) Bom CR (Cri) 185

were booked under various provisions of Indian Penal Code, Epidemic Diseases Act, etc. for allegedly violating their Tourist Visa conditions by attending a religious congregation in contravention of COVID19 restrictions. The Court held that there was no *prima facie* case being made against the foreign nationals.

2.  A foreign national may also approach a consumer court (either the National Consumer Disputes Resolution Commission or the National Consumer Disputes Resolution Commission) under the consumer protection law.[35] In the Consumer Protection Act, 2019, the definition of "consumer" (Section 2(7)) is broad enough to cover even a foreign national, and "consumer rights" (Section 2(9)) include "the right to be protected against the marketing of goods, products or services which are hazardous to life and property" and "the right to seek redressal against… unscrupulous exploitation of consumers".

3.  The dependents of a foreign national, who died in a motor vehicle accident in India, can bring a suit for compensation under Motor Vehicles Act, 1988. In the case of *United India Insurance Co. Ltd. v. Patricia Jean Mahajan*[36], the Motor Accident Claims Tribunal and later the Supreme Court (in appeal) dealt with a claim for compensation filed by dependents of an American national, who lost his life in a car accident in India.

4.  Ordinarily, where a breach of contract is complained of, the party complaining of such breach may sue for specific performance of the contract, if contract is capable of being specifically performed. Otherwise, the party may sue for damages under Section 73 of the Indian Contract Act, 1872.

---

[35] C.D. Fatel v. Canara Bank, 1997 (2) C.P.C. 706
[36] AIR 2002 SC 2607

In the light of the above discussion, I submit that the requirement under Reciprocity Act, 28 U.S.C. § 2502 is fulfilled. I hope the content of this letter is helpful to the honourable court on deciding the *locus standi* of Mr. Teja Ravi.

I shall be available for any further assistance to the honourable court.

Yours sincerely,

(Anurag Bhaskar)

Email: abhaskar@llm19.law.harvard.edu
Address: Block C-211(SF),
Jindal Global City, Sector 35,
Sonipat (India)- 131001

# EXHIBIT B



सत्यमेव जयते

# THE CONSTITUTION OF INDIA

*[As on 9th December, 2020]*

**2020**

**GOVERNMENT OF INDIA**

**MINISTRY OF LAW AND JUSTICE**

**LEGISLATIVE DEPARTMENT**

(*2*) All other resources of the exclusive economic zone of India shall also vest in the Union and be held for the purposes of the Union.

(*3*) The limits of the territorial waters, the continental shelf, the exclusive economic zone, and other maritime zones, of India shall be such as may be specified, from time to time, by or under any law made by Parliament.]

[1][**298. Power to carry on trade, etc.**— The executive power of the Union and of each State shall extend to the carrying on of any trade or business and to the acquisition, holding and disposal of property and the making of contracts for any purpose:

Provided that—

(*a*) the said executive power of the Union shall, in so far as such trade or business or such purpose is not one with respect to which Parliament may make laws, be subject in each State to legislation by the State; and

(*b*) the said executive power of each State shall, in so far as such trade or business or such purpose is not one with respect to which the State Legislature may make laws, be subject to legislation by Parliament.]

**299. Contracts.**—(*1*) All contracts made in the exercise of the executive power of the Union or of a State shall be expressed to be made by the President, or by the Governor[2]*** of the State, as the case may be, and all such contracts and all assurances of property made in the exercise of that power shall be executed on behalf of the President or the Governor[1]*** by such persons and in such manner as he may direct or authorise.

(*2*) Neither the President nor the Governor[3]*** shall be personally liable in respect of any contract or assurance made or executed for the purposes of this Constitution, or for the purposes of any enactment relating to the Government of India heretofore in force, nor shall any person making or executing any such contract or assurance on behalf of any of them be personally liable in respect thereof.

**300. Suits and proceedings.**—(*1*) The Government of India may sue or be sued by the name of the Union of India and the Government of a State may sue or be sued by the name of the State and may, subject to any provisions which may be made by Act of Parliament or of the Legislature of such State enacted by virtue of powers conferred by this Constitution, sue or be sued in relation to their respective affairs in the like cases as the Dominion of India and the corresponding Provinces or the corresponding Indian States might have sued or been sued if this Constitution had not been enacted.

(*2*) If at the commencement of this Constitution—

(*a*) any legal proceedings are pending to which the Dominion of India is a party, the Union of India shall be deemed to be substituted for the Dominion in those proceedings; and

(*b*) any legal proceedings are pending to which a Province or an Indian State is a party, the corresponding State shall be deemed to be substituted for the Province or the Indian State in those proceedings.

[4][CHAPTER IV.—RIGHT TO PROPERTY

**300A. Persons not to be deprived of property save by authority of law.**—No person shall be deprived of his property save by authority of law.]

---

1. Subs. by the Constitution (Seventh Amendment) Act, 1956, s. 20 (w.e.f. 1-11-1956).
2. The words "or the Rajpramukh" omitted by the Constitution (Seventh Amendment) Act, 1956, s. 29 and Sch., (w.e.f. 1-11-1956).
3. The words "nor the Rajpramukh" omitted by *ibid.*
4. Ins. by the Constitution (Forty-fourth Amendment) Act, 1978, s. 34 (w.e.f. 20-6-1979).

# EXHIBIT C



सत्यमेव जयते

# THE CONSTITUTION OF INDIA

*[As on 9th December, 2020]*

## 2020

## GOVERNMENT OF INDIA

## MINISTRY OF LAW AND JUSTICE

## LEGISLATIVE DEPARTMENT

(*4*) Nothing in sub-clause (*c*) of the said clause shall affect the operation of any existing law in so far as it imposes, or prevent the State from making any law imposing, in the interests of the sovereignty and integrity of India or public order or morality, reasonable restrictions on the exercise of the right conferred by the said sub-clause.

(*5*) Nothing in [1][sub-clauses (*d*) and (*e*)] of the said clause shall affect the operation of any existing law in so far as it imposes, or prevent the State from making any law imposing, reasonable restrictions on the exercise of any of the rights conferred by the said sub-clauses either in the interests of the general public or for the protection of the interests of any Scheduled Tribe.

(*6*) Nothing in sub-clause (*g*) of the said clause shall affect the operation of any existing law in so far as it imposes, or prevent the State from making any law imposing, in the interests of the general public, reasonable restrictions on the exercise of the right conferred by the said sub-clause, and, in particular, [2][nothing in the said sub-clause shall affect the operation of any existing law in so far as it relates to, or prevent the State from making any law relating to,—

(*i*) the professional or technical qualifications necessary for practising any profession or carrying on any occupation, trade or business, or

(*ii*) the carrying on by the State, or by a corporation owned or controlled by the State, of any trade, business, industry or service, whether to the exclusion, complete or partial, of citizens or otherwise].

**20. Protection in respect of conviction for offences.**—(*1*) No person shall be convicted of any offence except for violation of a law in force at the time of the commission of the Act charged as an offence, nor be subjected to a penalty greater than that which might have been inflicted under the law in force at the time of the commission of the offence.

(*2*) No person shall be prosecuted and punished for the same offence more than once.

(*3*) No person accused of any offence shall be compelled to be a witness against himself.

**21. Protection of life and personal liberty.**—No person shall be deprived of his life or personal liberty except according to procedure established by law.

[3][**21A. Right to education.**—The State shall provide free and compulsory education to all children of the age of six to fourteen years in such manner as the State may,  by law,  determine.]

**22. Protection against arrest and detention in certain cases.**—(*1*) No person who is arrested shall be detained in custody without being informed, as soon as may be, of the grounds for such arrest nor shall he be denied the right to consult, and to be defended by, a legal practitioner of his choice.

(*2*) Every person who is arrested and detained in custody shall be produced before the nearest magistrate within a period of twenty-four hours of such arrest excluding the time necessary for the journey from the place of arrest to the court of the magistrate and no such person shall be detained in custody beyond the said period without the authority of a magistrate.

(*3*) Nothing in clauses (*1*) and (*2*) shall apply—

(*a*) to any person who for the time being is an enemy alien; or

(*b*) to any person who is arrested or detained under any law providing for preventive detention.

[*](*4*) No law providing for preventive detention shall authorise the detention of a person for a longer period than three months unless—

---

1. Subs. by the Constitution (Forty-fourth Amendment) Act, 1978, s. 2 for "sub-clauses *(d)*, *(e)* and *(f)*" (w.e.f. 20-6-1979).
2. Subs. by the Constitution (First Amendment) Act, 1951, s. 3, for certain words (w.e.f. 18-6-1951).
3. Ins. by the Constitution (Eighty-sixth Amendment) Act, 2002, s. 2  (w.e.f. 1-4-2010).
[*] On the commencement of s. 3 of the Constitution (Forty-fourth Amendment) Act, 1978, clause *(4)*of  art. 22 shall stand amended as directed in s. 3 of that Act.  For the text of that Act, *see*  Appendix II. (date of enforcement yet to be notified).

# EXHIBIT D



# THE CONSTITUTION OF INDIA

*[As on 9th December, 2020]*

*[As on 9th December, 2020]*

## 2020

## GOVERNMENT OF INDIA

## MINISTRY OF LAW AND JUSTICE

## LEGISLATIVE DEPARTMENT

(*i*) any *jagir*, *inam* or *muafi* or other similar grant and in the States of [1][Tamil Nadu] and Kerala, any *janmam* right;

(*ii*) any land held under ryotwari settlement;

(*iii*) any land held or let for purposes of agriculture or for purposes ancillary thereto, including waste land, forest land, land for pasture or sites of buildings and other structures occupied by cultivators of land, agricultural labourers and village artisans;]

(*b*) the expression "rights", in relation to an estate, shall include any rights vesting in a proprietor, sub-proprietor, under-proprietor, tenure-holder, [2][*raiyat, under-raiyat*] or other intermediary and any rights or privileges in respect of land revenue.]

[3][**31B. Validation of certain Acts and Regulations.**—Without prejudice to the generality of the provisions contained in article 31A, none of the Acts and Regulations specified in the Ninth Schedule nor any of the provisions thereof shall be deemed to be void, or ever to have become void, on the ground that such Act, Regulation or provision is inconsistent with, or takes away or abridges any of the rights conferred by, any provisions of this Part, and notwithstanding any judgment, decree or order of any court or Tribunal to the contrary, each of the said Acts and Regulations shall, subject to the power of any competent Legislature to repeal or amend it, continue in force.]

[4][**31C. Saving of laws giving effect to certain directive principles**.—Notwithstanding anything contained in article 13, no law giving effect to the policy of the State towards securing [5][all or any of the principles laid down in Part IV] shall be deemed to be void on the ground that it is inconsistent with, or takes away or abridges any of the rights conferred by [6][article 14 or article 19]; [7][*and no law containing a declaration that it is for giving effect to such policy shall be called in question in any court on the ground that it does not give effect to such policy]:*

Provided that where such law is made by the Legislature of a State, the provisions of this article shall not apply thereto unless such law, having been reserved for the consideration of the President, has received his assent.]

[8]**31D**. [*Saving of laws in respect of anti-national activities.*].–*Omitted by the Constitution (Forty-third Amendment) Act, 1977, s. 2 (w.e.f. 13-4-1978).*

*Right  to Constitutional Remedies*

**32. Remedies for enforcement of rights conferred by this Part**.—(*1*) The right to move the Supreme Court by appropriate proceedings for the enforcement of the rights conferred by this Part is guaranteed.

(*2*) The Supreme Court shall have power to issue directions or orders or writs, including writs in the nature of *habeas corpus, mandamus,* prohibition, *quo warranto* and *certiorari,* whichever may be appropriate, for the enforcement of any of the rights conferred by this Part.

(*3*) Without prejudice to the powers conferred on the Supreme Court by clauses (*1*) and (*2*), Parliament

1. Subs. by the Madras State (Alteration of Name) Act, 1968 (53 of 1968), s. 4, for "Madras" (w.e.f. 14-1-1969).
2. Ins. by the Constitution (Fourth Amendment) Act, 1955, s. 3 (with retrospective effect).
3. Ins. by the Constitution (First Amendment) Act, 1951, s. 5 (w.e.f. 18-6-1951).
4. Ins. by the Constitution (Twenty-fifth Amendment) Act, 1971, s. 3. (w.e.f. 20-4-1972).
5. Subs. by the Constitution  (Forty-second  Amendment) Act, 1976, s. 4, for "the principles specified in clause *(b)* or clause *(c)* of article 39" (w.e.f. 3-1-1977). Section 4 has been declared invalid by  the Supreme Court in *Minerva Mills Ltd. and others V*s. *Union of India and others*  (1980) s.  2*,* AIR 1980 SC 1789.
6. Subs. by the Constitution (Forty-fourth Amendment) Act, 1978, s. 8 for "article 14, article 19 or article 31" (w.e.f. 20-6-1979).
7. In *Kesavananda Bharati V*s. *the State of Kerala* (1973). AIR 1973 SC 1461, the Supreme Court had held the provisions in italics to be invalid.
8. Ins. by the Constitution (Forty-second Amendment) Act, 1976, s. 5 (w.e.f. 3-1-1977).

may by law empower any other court to exercise within the local limits of its jurisdiction all or any of the powers exercisable by the Supreme Court under clause (*2*).

(*4*) The right guaranteed by this article shall not be suspended except as otherwise provided for by this Constitution.

[1][**32A.***Constitutional validity of State laws not to be considered in proceedings under article* 32.].– *Omitted by the Constitution (Forty-third Amendment) Act, 1977, s. 3 (w.e.f. 13-4-1978).*

[2][**33. Power of Parliament to modify the rights conferred by this Part in their application to Forces, etc**.—Parliament may, by law, determine to what extent any of the rights conferred by this Part shall, in their application to,—

(*a*) the members of the Armed Forces; or

(*b*) the members of the Forces charged with the maintenance of public order; or

(*c*) persons employed in any bureau or other organisation established by the State for purposes of intelligence or counter intelligence; or

(*d*) person employed in, or in connection with, the telecommunication systems set up for the purposes of any Force, bureau or organisation referred to in clauses *(a)* to *(c)*,

be restricted or abrogated so as to ensure the proper discharge of their duties and the maintenance of discipline among them.]

**34. Restriction on rights conferred by this Part while martial law is in force in any area**.—Notwithstanding anything in the foregoing provisions of this Part, Parliament may by law indemnify any person in the service of the Union or of a State or any other person in respect of any act done by him in connection with the maintenance or restoration of order in any area within the territory of India where martial law was in force or validate any sentence passed, punishment inflicted, forfeiture ordered or other act done under martial law in such area.

**35. Legislation to give effect to the provisions of this Part.**—Notwithstanding anything in this Constitution,—

(*a*) Parliament shall have, and the Legislature of a State shall not have, power to make laws—

(*i*) with respect to any of the matters which under clause (*3*) of article 16, clause (*3*) of article 32, article 33 and article 34 may be provided for by law made by Parliament; and

(*ii*) for prescribing punishment for those acts which are declared to be offences under this Part,

and Parliament shall, as soon as may be after the commencement of this Constitution, make laws for prescribing punishment for the acts referred to in sub-clause (*ii*);

(*b*) any law in force immediately before the commencement of this Constitution in the territory of India with respect to any of the matters referred to in sub-clause (*i*) of clause (*a*) or providing for punishment for any act referred to in sub-clause (*ii*) of that clause shall, subject to the terms thereof and to any adaptations and modifications that may be made therein under article 372, continue in force until altered or repealed or amended by Parliament.

*Explanation.*—In this article, the expression "law in force" has the same meaning as in article 372.

---

1.Ins. by the Constitution (Forty-second Amendment) Act, 1976, s. 6 (w.e.f. 1-2-1977).
2.Subs. by the Constitution (Fiftieth Amendment) Act, 1984, s. 2 (w.e.f. 11-9-1984).

# EXHIBIT E



# THE CONSTITUTION OF INDIA

*[As on 9th December, 2020]*

## 2020

## GOVERNMENT OF INDIA

## MINISTRY OF LAW AND JUSTICE

## LEGISLATIVE DEPARTMENT

this Chapter,[1][the National Judicial Appointments Commission on a reference made to it by the Chief Justice of a High Court for any State, may with the previous consent of the President], request any person who has held the office of a Judge of that Court or of any other High Court to sit and act as a Judge of the High Court for that State, and every such person so requested shall, while so sitting and acting, be entitled to such allowances as the President may by order determine and have all the jurisdiction, powers and privileges of, but shall not otherwise be deemed to be, a Judge of that High Court:

Provided that nothing in this article shall be deemed to require any such person as aforesaid to sit and act as a Judge of that High Court unless he consents so to do.]

**225. Jurisdiction of existing High Courts**.—Subject to the provisions of this Constitution and to the provisions of any law of the appropriate Legislature made by virtue of powers conferred on that Legislature by this Constitution, the jurisdiction of, and the law administered in, any existing High Court, and the respective powers of the Judges thereof in relation to the administration of justice in the Court, including any power to make rules of Court and to regulate the sittings of the Court and of members thereof sitting alone or in Division Courts, shall be the same as immediately before the commencement of this Constitution:

[2][Provided that any restriction to which the exercise of original jurisdiction by any of the High Courts with respect to any matter concerning the revenue or concerning any act ordered or done in the collection thereof was subject immediately before the commencement of this Constitution shall no longer apply to the exercise of such jurisdiction.]

[3][**226. Power of High Courts to issue certain writs.**—(*1*) Notwithstanding anything in article 32[4]***, every High Court shall have power, throughout the territories in relation to which it exercises jurisdiction, to issue to any person or authority, including in appropriate cases, any Government, within those territories directions, orders or [5][writs, including writs in the nature of *habeas corpus, mandamus,* prohibition, *quo warranto* and *certiorari,* or any of them, for the enforcement of any of the rights conferred by Part III and for any other purpose.]

(*2*) The power conferred by clause (*1*) to issue directions, orders or writs to any Government, authority or person may also be exercised by any High Court exercising jurisdiction in relation to the territories within which the cause of action, wholly or in part, arises for the exercise of such power, notwithstanding that the seat of such Government or authority or the residence of such person is not within those territories.

[6][(*3*) Where any party against whom an interim order, whether by way of injunction or stay or in any other manner, is made on, or in any proceedings relating to, a petition under clause (*1*), without—

(*a*) furnishing to such party copies of such petition and all documents in support of the plea for such interim order; and

(*b*) giving such party an opportunity of being heard,

makes an application to the High Court for the vacation of such order and furnishes a copy of such application to the party in whose favour such order has been made or the counsel of such party, the High Court shall

---

1. Subs. by the Constitution (Ninety-ninth Amendment) Act, 2014, s. 9, for "the Chief Justice of a High Court for any State may at anytime, with the previous consent of the President"  (w.e.f. 13-4-2015). This amendment has been struck down by the Supreme Court *vide* its order dated the 16th October, 2015 in the *Supreme Court Advocates-on-Record Association and Another Vs. Union of India* reported in AIR 2016 SC 117.
2. Ins. by the Constitution (Forty-fourth Amendment) Act, 1978, s. 29 (w.e.f. 20-6.1979). Original Proviso was omitted by the Constitution (Forty-second Amendment) Act, 1976, s. 37 (w.e.f. 1-2-1977).
3. Subs. by the Constitution (Forty-second Amendment) Act, 1976, s. 38 (w.e.f. 1-2-1977).
4. The words, figures and letters "but subject to the provisions of article 131A and article 226A" omitted by the Constitution (Forty-third Amendment) Act, 1977, s. 7 (w.e.f. 13-4-1978).
5. Subs. by the Constitution (Forty-fourth Amendment) Act, 1978, s. 30 for the portion beginning with the words "writs in the nature of habeas corpus, mandamus, prohibition, quo warranto and certiorari, or any of them" and ending with the words "such illegality has resulted in substantial failure of justice" (w.e.f. 1-8-1979).
6. Subs. by *ibid.*, s. 30, for clauses *(3), (4), (5)* and *(6)*.

dispose of the application within a period of two weeks from the date on which it is received or from the date on which the copy of such application is so furnished, whichever is later, or where the High Court is closed on the last day of that period, before the expiry of the next day afterwards on which the High Court is open; and if the application is not so disposed of, the interim order shall, on the expiry of that period, or, as the case may be, the expiry of the said next day, stand vacated.]

[1][(4)] The power conferred on a High Court by this article shall not be in derogation of the power conferred on the Supreme Court by clause (2) of article 32.]

[2][**226A**. *Constitutional validity of Central laws not to be considered in proceedings under article* 226.]

**227. Power of superintendence over all courts by the High Court**.—[3][(1) Every High Court shall have superintendence over all courts and tribunals throughout the territories in relation to which it exercises jurisdiction.]

(2) Without prejudice to the generality of the foregoing provision, the High Court may—

(a) call for returns from such courts;

(b) make and issue general rules and prescribe forms for regulating the practice and proceedings of such courts; and

(c) prescribe forms in which books, entries and accounts shall be kept by the officers of any such courts.

(3) The High Court may also settle tables of fees to be allowed to the sheriff and all clerks and officers of such courts and to attorneys, advocates and pleaders practising therein:

Provided that any rules made, forms prescribed or tables settled under clause (2) or clause (3) shall not be inconsistent with the provision of any law for the time being in force, and shall require the previous approval of the Governor.

(4) Nothing in this article shall be deemed to confer on a High Court powers of superintendence over any court or tribunal constituted by or under any law relating to the Armed Forces.

[4](5)*          *          *          *          *

**228. Transfer of certain cases to High Court.**—If the High Court is satisfied that a case pending in a court subordinate to it involves a substantial question of law as to the interpretation of this Constitution the determination of which is necessary for the disposal of the case, [5][it shall withdraw the case and [6]*** may—]

(a) either dispose of the case itself, or

(b) determine the said question of law and return the case to the court from which the case has been so withdrawn together with a copy of its judgment on such question, and the said court shall on receipt thereof proceed to dispose of the case in conformity with such judgment.

---

1. Cl. (7) renumbered as cl. (4) by the Constitution (Forty-fourth Amendment) Act, 1978, s. 30 (w.e.f. 1-8-1979).
2. Ins. by the Constitution (Forty-second Amendment) Act, 1976, s. 39 (w.e.f. 1-2-1977).
3. Cl. (1) has been successively subs. by the Constitution (Forty-second Amendment) Act, 1976, s. 40 (w.e.f. 1-2-1977) and the Constitution (Forty-fourth Amendment) Act, 1978, s. 31 to read as above (w.e.f. 20-6-1979).
4. Cl. (5) was ins. by the Constitution (Forty-second Amendment) Act, 1976, s. 40 (w.e.f. 1-2-1977) and omitted by the Constitution (Forty-fourth Amendment) Act, 1978, s. 31 (w.e.f. 20-6-1979).
5 . Subs. by the Constitution (Forty-second Amendment) Act, 1976, s. 41, for "it shall withdraw the case and may—" (w.e.f. 1-2-1977).
6. The words, figures and letter "subject to the provisions of article 131A,"omittedby the Constitution (Forty-third Amendment) Act, 1977, s. 9 (w.e.f.13-4-1978).

# EXHIBIT F

# THE CODE OF CIVIL PROCEDURE, 1908

## ACT NO. 5 OF 1908[1]

[21*st March*, 1908.]

An Act to consolidate and amend the laws relating to the procedure of the Courts of Civil

Judicature.

WHEREAS it is expedient to consolidate and amend the laws relating to the procedure of the Courts of Civil Judicature : It is hereby enacted as follows : —

PRELIMINARY

**1. Short title, commencement and extent.—**(*1*) This Act may be cited as the Code of Civil Procedure, 1908.

(*2*) It shall come into force on the first day of January, 1909.

---

1. This Act has been amended in its application to Assam by Assam Acts 2 of 1941 and 3 of 1953; to Tamil Nadu by Madras Act 34 of 1950, Madras A.O. 1950, and Tamil Nadu Act 15 of 1970; to Punjab by Punjab Act 7 of 1934; to Uttar Pradesh by U.P. Acts 4 of 1925, 35 of 1948, 24 of 1954, 17 of 1970, 57 of 1976 and 31 of 1978; to Karnataka by Mysore Act 14 of 1955; to Kerala by Kerala Act 13 of 1957; to Rajasthan by Rajasthan Act 19 of 1958; to Maharashtra by Maharashtra Act 22 of 1960 and 25 of 1970; It has been extended to Berar by the Berar Laws Act, 1941 (4 of 1941) and, by notification under ss. 5 and 5A of the Schedule Districts Act, 1874 (14 of 1874), also to the following Scheduled Districts :—

(*1*) The district of Jalpaiguri, Cachar (excluding the North Cachar Hills Goalpara (including the Eastern Duars), Kamrup, Darrang, Nowgong (excluding the Mikir Hill Tracts) Sibsagar (excluding the Mikir Hill Tracts) and Lakhimpur (excluding the Dibrugarh Frontier Tracts) : Gazette of India, 1909, Pt. 1. p. 5 and *ibid*, 1914, Pt I, p. 1690.

(*2*) The District of Darjeeling and the District of Hazaribagh, Ranchi, Palamau and Manbhum in Chota Nagpur : Calcutta Gazette, 1909, Pt. I, p. 25 and Gazette of India, 1909, Pt. I, p. 33.

(*3*) The Province of Kumaon and Garhwal and the Tarai Parganas (with modifications) : U.P. Gazette, 1909, Pt. I, p. 3 and Gazette of India, 1909, Pt. I, p. 31.

(*4*) The Pargana of Jaunsar-Bawar in Dehradun and the Scheduled portion of the Mirzapur District : U.P. Gazette, 1909, Pt. I, p. 4 and Gazette of India, 1909, Pt. I, p. 32.

(*5*) Coorg : Gazette of India, 1909, Pt. I, p. 32.

(*6*) Scheduled Districts in the Punjab : Gazette of India, 1909, Pt. I, p. 33.

(*7*) Sections 36 to 43 to all the Scheduled Districts in Madras, Gazette of India, 1909, Pt. I. p. 152.

(*8*) Scheduled Districts in the C.P., except so much as is already in force and so much as authorizes the attachment and sale of immovable property in execution of a decree, not being a decree directing the sale of such property : Gazette of India, 1909, Pt. I, p. 239.

(*9*) Ajmer-Merwara except ss. 1 and 155 to 158: Gazette of India, 1909, Pt. II, p. 480.

(*10*) Pargana Dhalbhum, the Municipality of Chaibassa in the Kolhan and the Porahat Estate in the District of Singhbhum : Calcutta, Gazette of India, 1909, Pt. I, p. 453 and Gazette of India, 1909. Pt. I, p. 443.

Under s. 3(3)(a) of the Sonthal Parganas Settlement Regulation (3 of 1872), ss. 38 to 42 and 156 and rules 4 to 9 in Order XXI in the First Schedule have been declared to be in force in the Sonthal Parganas and the rest of the Code for the trial of suits referred to in s. 10 of the Sonthal Parganas Justice Regulation, 1893 (3 of 1893) : *see* Calcutta, Gazette, 1909, Pt. I, p. 45.

It has been declared to be in force in Panth Piploda by the Panth Piploda Laws Regulation. 1929 (1 of 1929), s. 2; in the Khondmals District by the Khondmals Laws Regulation, 1936 (4 of 1936), s. 3 and Sch. and in the Angul District by the Angul Laws Regulation, 1936 (5 of 1936), s. 3 and Sch.

It has been extended to the District of Koraput and Ganjam Agency by Orissa Regulation, (5 of 1951) s.2.

It has been extended to the State of Manipur (w.e.f. 1-1-1957) by Act 30 of 1950, s. 3 to the whole of the Union Territory of Lakshadweep (w.e.f. 1-10-1967) by Regulation 8 of 1965, s. 3 and Sch. : to Goa, Daman and Diu (w.e.f. 15-6-1966) by Act 30 of 1965, s. 3; to Dadra and Nagar Haveli (w.e.f. 1-7-1965) by Reg. 6 of 1963, s. 2 and Sch. 1 and to the State of Sikkim (w.e.f. 1-9-1984), *vide* Notification No. S.O. 599 (E), dated 13-8-1984, Gazette of India Extraordinary., Part. II, s. 3.

(*2*) Execution shall not be issued on any such decree unless it remains unsatisfied for the period of three months computed from the date of [1][such decree].

[2][(*3*) The provisions of sub-sections (*1*) and (*2*) shall apply in relation to an order or award as they apply in relation to a decree, if the order or award—

(*a*) is passed or made against [3][the Union of India] or a State or a public officer in respect of any such act as aforesaid, whether by a Court or by any other authority; and

(*b*) is capable of being executed under the provisions of this Code or of any other law for the time being in force as if it were a decree.]

[4][SUITS BY ALIENS AND BY OR AGAINST FOREIGN RULERS, AMBASSADORS AND ENVOYS]

**83. When aliens may sue.**—Alien enemies residing in India with the permission of the Central Government, and alien friends, may sue in any Court otherwise competent to try the suit, as if they were citizens of India, but alien enemies residing in India without such permission, or residing in a foreign country, shall not sue in any such Court.

*Explanation.* —Every person residing in a foreign country, the Government of which is at war with India and carrying on business in that country without a licence in that behalf granted by the Central Government, shall, for the purpose of this section, be deemed to be an alien enemy residing in a foreign country.

**84. When foreign States may sue.**—A foreign State may sue in any competent Court :

Provided that the object of the suit is to enforce a private right vested in the Ruler of such State or in any officer of such State in his public capacity.

**85. Persons specially appointed by Government to prosecute or defend on behalf of foreign Rulers.**—(*1*) The Central Government may, at the request of the Ruler of a foreign State or at the request of any person competent in the opinion of the Central Government to act on behalf of such Ruler, by order, appoint any persons to prosecute or defend any suit on behalf of such Ruler, and any persons so appointed shall be deemed to be the recognized agents by whom appearances, acts and applications under this Code may be made or done on behalf of such Ruler.

(*2*) An appointment under this section may be made for the purpose of a specified suit or of several specified suits, or for the purpose of all such suits as it may from time to time be necessary to prosecute or defend on behalf of such Ruler.

(*3*) A person appointed under this section may authorise or appoint any other persons to make appearances and applications and do acts in any such suit or suits as if he were himself a party thereto.

**86. Suits against foreign Rulers, Ambassadors and Envoys.**—(*1*) No. [5]*** foreign State may be sued in any Court otherwise competent to try the suit except with the consent of the Central Government certified in writing by a Secretary to that Government :

Provided that a person may, as a tenant of immovable property, sue without such consent as aforesaid [6][a foreign State] from whom he holds or claims to hold the property.

(*2*) Such consent may be given with respect to a specified suit or to several specified suits or with respect to all suits of any specified class or classes, and may specify, in the case of any suit or class of suits, the Court in which [7][the foreign State] may be sued, but it shall not be given, unless it appears to the Central Government that [7][the foreign State]—

(*a*) has instituted a suit in the Court against the person desiring to sue [8][it], or

---

1. Subs. by Act 104 of 1976, s. 28, for "such report" (w.e.f. 1-2-1977).
2. Ins. by Act 32 of 1949, s. 2.
3. Subs. by the A.O. 1950, for "the Dominion of India".
4. Subs. by Act 2 of 1951, s. 12, for the former heading and ss. 83 to 87.
5. The words "Ruler of a" omitted by  Act 104 of 1976, s. 29 (w.e.f. 1-2-1977).
6. Subs. by s. 29, *ibid*., for "a Ruler" (w.e.f. 1-2-1977).
7. Subs. by s. 29, *ibid*., for "the Ruler (w.e.f. 1-2-1977).
8. Subs. by s. 29, *ibid*., for "him" (w.e.f. 1-2-1977).

# EXHIBIT G

Anwar vs The State Of J. & K on 7 July, 1970

Supreme Court of India
Anwar vs The State Of J. & K on 7 July, 1970
Equivalent citations: 1971 AIR 337, 1971 SCR (1) 637
Author: I Dua
Bench: Dua, I.D.

```
                PETITIONER:
    ANWAR

            Vs.

    RESPONDENT:
    THE STATE OF J. & K.

    DATE OF JUDGMENT:
    07/07/1970

    BENCH:
    DUA, I.D.
    BENCH:
    DUA, I.D.

    CITATION:
     1971 AIR  337              1971 SCR  (1) 637
     1970 SCC  (2) 411


    ACT:
    Constitution  of  India  Articles  19,  20  &  22--Habeas
    corpus--Claim  by  foreigners--If  maintainable--Foreigner's
    Act,  (31 of 1946) S. 3(2)--Order of deportation if  can  be
    passed by the State Government.



    HEADNOTE:
    The  petitioner a Pakistani national, who had entered  India
    illegally was detained for the purpose of expelling him from
    India.   Instead  of making any representation against  the
    detention  order,  he challenged his detention by  filing  a
    writ  of habeas corpus in this Court.  This  Court  directed
    rule  nisi.   The state revoked the order of  detention  and
    ordered  the deportation of the petitioner from India  under
    section 3(2) of the Foreigners Act read with the Ministry of
    Home Affairs Notification issued under S.O. 590 dated  April
    9, 1958.  Dismissing the petition, this Court.--
    HELD : (i) The petitioner was a foreigner as defined in  the
    Foreigners  Act and not being a citizen, he was clearly  not
    entitled  to any fundamental right guaranteed by Article  19
    of  the Constitution.  His entry into this country was  also
    without any right, he had thus no right to remain within the
    territories  of  India. The order of  the  deportation  was
    consistent  with the order of detention which was also  made
```

with the object of expelling him from India. The order of his release, if made by this Court, would, not only result in his presence in a part of India in contravention of the statutory provisions but would in addition render it somewhat difficult for the authorities to enforce compliance with the order of his expulsion. In these circumstances, the restraint on his personal liberty for the purpose of taking him to the border in order to expel him from India in accordance with the statutory provisions could by no means be considered to be an illegal custody justifying an order of release by this Court. [639 B-C, 644 H]

(ii) Habeas corpus, though a writ of right, is not a writ of course. Its scope has grown to achieve its purpose, of protecting individuals 'against erosion of the right to be free from wrongful restraint on their rightful liberty. But, when, as in the present, case, the, petitioner has no right to move about freely in this country without a proper legal sanction, the restraint exercised on him for expelling him 'from India could not be construed on the facts and circumstances of this case to amount to his custody being illegal so as to require this Court to direct his immediate release. The constitutional protection against illegal deprivation of personal liberty construed in a practical way cannot entitle non-citizens like the petitioner to remain in India contrary to the provisions of the law governing foreigners. [645 D]

(iii) The notification dated April 19, 1958 was a complete answer to the petitioner's contention that it was the Central Government alone which could make a lawful order of deportation under s. 3(2)(c) of the Foreigners Act. Under the said rectifications the State was entrusted with the functions of the Central Government under s. 3(2) of the Foreigners Act. [641 G]
638
State of Punjab v. Ajaib Singli, [1953] S.C.R. 254; State of U.P. V. Abdul Samad, A.I.R. 1968 S.C, 1506 followed.


JUDGMENT:

ORIGINAL JURISDICTION : Writ Petition No, 131 of 1970. Petition under Art. 32 of the Constitution 'of India for a writ in the nature of habeas corpus.

H. K. Puri, for the petitioner.

S. P. Nayar for R. N. Sachthey, for the respondent. The Judgment of the Court was delivered by Dua, J. The petitioner, Anwar alias Raldu son of Basawa Batwal, resident of Nathu Pora, District Sialkot, (West Pakistan), forwarded to this Court his application dated March 11, 1970 from Central Jail, Jammu where he was being detained, praying for a 'Writ in the nature of the habeas corpus for his production in this Court to enable him to challenge his detention. In the application it was asserted

inter alia that the petitioner had been brought from Pakistan to the State of Jammu & Kashmir by his uncle Shri Dosa, son of Jumma who was working for Indian Intelligence. The petitioner had crossed the cease-fire line and come to India for the purpose of taking to Pakistan the necessities of life. His uncle who was inimical towards him got him arrested after he had crossed the cease-fire line on the basis of the allegation that the petitioner was a smuggler and had opium on his person. The petitioner was thereafter convicted and sentenced. His sentence expired in January, 1970. After his release he was again arrested. His detention after his rearrest was challenged in this application.

In the return it was sworn by Shri A. K. Hamdani, Under Secretary, Home Department, Jammu & Kashmir State that the petitioner had been detained on January 30, 1970 pursuant to an order dated January 27, 1970. The petitioner was duly informed of the grounds of his detention and also of his right to make a representation. He, however, made no representation. His case was referred to the Advisory Board, and the opinion of the Board was being awaited. The petitioner, according to the return, had been detained earlier and on the expiry of two years of detention he was re-arrested with the object of making arrangements for his expulsion from the State of Jammu & Kashmir. On June 9, 1970 this case was heard by the Vacation Judge (Ray, J.) and time was granted to the petitioner up to June 23, 1970 for filing a rejoinder to the return. On June 15, 1970 the State filed an application stating that the order of the petitioner's detention had since been revoked and that the petitioner had been ordered on June 9, 1970 to leave India within ten days. This application came up for hearing on June 16, 1970 when the State took time for producing the orders of revocation of the detention order and of the petitioner's deportation. The case was accordingly adjourned to June 18, 1970 when by means of a short order the writ petition was dismissed and the petitioner was permitted to be sent out of India. I now proceed to give reasons for the order.

The petitioner is not a citizen of India. He is, therefore,, a foreigner as defined in the Foreigners Act. Not being a citizen, he is clearly not entitled to any fundamental right guaranteed by Art. 19 of the Constitution. He has thus no right to remain within the territories of India. His entry into this country was also without any right and indeed he himself does not claim to have entered into India in accordance with the provisions of the Foreigners Act and the Orders made thereunder. The only rights which he can claim in the present proceedings are those contained in Arts. 20 to 22. The order dated January 27, 1970 reads as under :

> "Whereas Anwar @ Raldu s/o Basawa Batwal r/o Nathupora District Sialkot presently in the State is a foreigner within the meaning of the Foreigners Act, 1946, and;
>
> Whereas the Government is satisfied that with a view to making arrangements for his expulsion from the State, it is necessary to do so;
>
> Now, therefore, in exercise of the powers conferred by section 3 (1) (b) read with section 5 of the Jammu & Kashmir Preventive Detention Act, 1964, the Government hereby direct that the said Anwar @ Raldu be detained in the Central Jail, Jammu subject to such conditions as to maintenance, discipline and punishment for breaches of discipline as have been specified in the Jammu & Kashmir Detenus (General)

Order, 1968."

This order was made in exercise of the powers conferred by s. 3 (I) (b) read with s. 5 of the Jammu & Kashmir Preventive Detention Act, 1964. The Government felt satisfied that the petitioner who was a foreigner within the meaning of the Foreigners Act (Act 31 of 1946) should be expelled from the State of Jammu & Kashmir and it was with a view to making arrangements for his expulsion that it was considered necessary to detain him., I-, appears that in the opinion of the Authorities making the order it was necessary to give to the petitioner an opportunity of making a representation to the Government against the order of detention. In order to give this opportunity, on February 4, 1970 the grounds of detention were disclosed to the petitioner and he was further informed that if he so desired he could make a representation to the Government. It may be recalled that according to the return he was actually, detained on January 30, 1970 though the order of detention had been made on the 27th of that month. The petitioner, without making any representation, apparently sent the present application to this Court through the jail authorities at Jammu. On April 9, 1970 this Court directed a rule nisi to issue in his case along with some other cases. Apparently, the State authorities did not consider it proper to take any further steps for implementing the orders of the petitioner's expulsion because this Court had been seized of the habeas corpus proceedings. According to the application dated June 15, 1970 the order of detention was revoked on June 9, 1970 with the result that the habeas corpus petition assailing that order must be considered to have become infructuous. The question naturally arose it this Court should order the petitioner's release forthwith on account of there vocation of the impugned order of detention or it should dismiss the writ petition as infructuous and send the petitioner back to Jammu to be released from the detention under the order dated January 27, 1970 and leave it to the Government to deal with the petitioner-in accordance with law. The peti- tioner not being a citizen of India obviously had no right to remain in Delhi and according to the order of deportation he was bound to leave India by June 19, 1970. The order of deportation may at this stage be reproduced :

"In exercise of the powers conferred by clause

(c) of sub-section (2) of section 3 of the Foreigners Act, 1946 (Act No. XXXI of 1946), read with Ministry of Home Affairs Notification issued under s.o. 590 dated 19th of April, 1958, the Government of Jammu and Kashmir hereby direct that the persons named below who are foreigners shall not remain in India and shall leave India within ten days from the date of this order :-

1.Anwar @ Raldu s/o Basawa Batwal r/o Nathpora District Sialkot.

.. ... ... ....

This order has to be read with the Ministry of Home Affairs Notification issued under S.O. 590 dated April 19, 1958. That notification is in the following terms "In exercise of the powers conferred by cl. (1) of Art. 258 of the Constitution and all other powers enabling him in this behalf and in supersession of all previous notifications on the subject in so far as they relate to the Act, rules and orders hereinafter mentioned, the President with the consent of the State Government -concerned

hereby entrusts to the Government of each of the State of A.P., Assam, Bihar, Bombay, J & K, Kerala, M.P., Madras, Mysore, Orissa, Punjab, Rajasthan, U.P. and West Bengal the functions of the Central Government, (1) under s. 5 of the Indian Passports Act, 1920 (34 of 1920), (2) under rules 2 and 4 of the Indian Passports Rules, 1950, (3) under r. 3 of the Registration of Foreigners Rules, 1939, (4) in making orders of the nature specified in cls. (c), (cc), (d), (e) and (f) of sub-s. (2) of s. 3 of the Foreigners Act, 1946 (31 of 1946) and (5) under the Foreigners Order, 1948 subject to the following conditions, namely,

(a) that in the exercise of that function, the said State Government shall comply with such general or special directions as the Central Government may from time to time issue, and

(b) that notwithstanding this entrustment the Central Government may itself exercise any of the said functions should it deem fit to do so in any case.

I have reproduced this notification because Shri H. K. Puri, the learned counsel appearing amicus curiae in support of the petitioners application for habeas corpus, had raised the point that it was the Central Government alone which could make a lawful order of deportation under s. 3 (2) (c) of the Foreigners Act. This notification is a complete answer to this objection because the President has under Art. 258 lawfully entrusted inter alia to the Government of Jammu & Kashmir the function of the Central Government under s. 2 (3) (c), (d), (e) and (f) of the Foreigners Act. Reverting to the fundamental right claimable by the peti- tioner who is not a citizen of India it is clear that Art. 20 of the Constitution is not attracted to this case. Article 21 merely lays down that no person shall be deprived of his life or personal Sup. C.I./70-12 liberty except according to procedure established by law. Article 22 deals with detention of persons in certain cases. In the case in hand in January, 1970 an order of detention was made under s. 3 (I) (b) of the J & K Preventive Detention Act which clearly empowers the Government to detain a foreigner within the meaning of the Foreigners Act with a view to inter alia making arrangements for his expulsion from the State. The petitioner not being a citizen of India is, as already stated, a foreigner and therefore liable to be so detained. The Government, it appears, considered it incumbent to comply with the provisions of ss. 8 to I 1 of the J & K Preventive Detention Act even when the petitioner was being detained for the purpose of expelling him from India. The period fixed for the Advisory Board to submit its report had not yet expired when the petitioner, without making any representation, applied to this Court on March 11, 1970 and initiated the present proceedings. After the present application for a writ of habeas corpus was entertained by this Court,the orders in respect of his custody were subject to the control and permission of this Court and the State authorities were naturally reluctant in taking any step towards implementation of the order of expulsion,without this Court's permission. As soon as the order of detention was revoked the State Government made an order under s. 3 (2)(c) of the Foreigners Act read with the Ministry of Home Affairs Notification issued under S.O. 590 dated April 19, 1958 directing the petitioner not to remain in India and to leave India within ten days from June 9, 1970, the date of the order. Soon thereafter the State Government filed an application in this Court stating all the relevant facts. The petitioner was informed of this ,order and Shri Puri the learned Counsel appearing; as amicus curaie actually addressed this Court on its legality after consulting the petitioner.This order appears to be consistent with the order of detentiondated January 27, 1970 which was also made with the object of expelling the petitioner from India. Since

the order dated June 9, 1970 had to be complied with by June 19, one day earlier, as already noticed, on June 18 this Court permitted the State authorities to take suitable steps for deporting the petitioner from India. The question arises if in these circumstances it can be said that after the revocation of the detention order the petitioner was deprived of his personal liberty illegally or without procedure established by law so as to require this Court to order his immediate release. In State of Punjab v. Ajaib Singh(') this Court held that physical restraint put upon an abducted woman (abducted during the partition of the undivided Punjab in 1947) in the process of recovering and taking her into custody without (1) [1953] S.C.R. 254.

any allegation or accusation of any actual or suspected or apprehended commission by her of any offence of a criminal or quasicriminal nature or of any act prejudicial to the State or the public interest and handing her over to the custody of the officer-incharge of the nearest camp under S. 4 of the Abducted Persons (Recovery and Restoration) Act, 55 of 1949 could not be regarded as arrest and detention within the meaning of Art. 22(1) and (2). In the State of U.P. v. Abdul Samad(1) two persons (Mr. & Mrs. Abdul Samad) were in Pakistan in March, 1955. In September, 1955 they obtained a Pakistani passport and came to India after securing a visa for temporary stay till December 16, 1955. They secured repeated extension of the period of stay. In 1957 they unsuccessfully applied for their registration as Indian citizens. Against refusal to register them as Indian citizens their application under Art. 226 of the Constitution also failed in 1959. The State Government then directed them to leave India. They secured several extensions of time for complying with this order. Finally on July 7, 1960 they were required to leave India within 24 hours. On their failure to do so they were taken into custody on July 21, 1960 and sent by train to Amritsar for being deported to Pakistan. They were produced before a Magistrate at Amritsar who ordered that they be kept in the Civil Lines Thana till further orders, Meanwhile an application was filed before the Lucknow Bench of the Allahabad High Court under s. 491, I.P.C. on July 25, 1960. On being informed that the two persons concerned having been sent to Amritsar were no longer within its territorial jurisdiction, the High Court recorded an order that it had no jurisdiction in the matter and that the proceedings be consigned to records. In the meantime a spurious telegram and a spurious telephone message purporting to emanate from Saxena, Under Secretary, Home Department, U.P. were received by the police at Amritsar stating that the High Court had issued orders for Mr. & Mrs. Abdul Samad to be brought back to Lucknow to attend the case on July 25, 1960. Pursuant to this message Mr. & Mrs. Abdul Samad were taken to Lucknow and produced before the Deputy Registrar of the High Court, but after the court had disposed of the habeas corpus petition. They were produced before the Deputy Registrar who directed their production in the High Court on July 26, at 10.15 a.m. An application was thereupon filed on behalf of Mr. & Mrs. Abdul Samad on July 25, 1960 to revive their earlier habeas corpus petition. A fresh habeas corpus petition was also filed on July 26, 1960 praying for their release. On Jully 27, 1960 the High Court passed an interim order of their release on bail on the fresh habeas corpus petition. That application was ultimately allowed and Mr. & Mrs. Abdul Samad were released on the ground that after their arrival in Lucknow at I p.m. on July 25, 1960 they had not been produced before a (1) A.I.R. 1962 S.C. 1506.

Magistrate within 24 hours and this was in breach of the mandatory provisions contained in Art. 22(2) of the Constitution. On appeal by the State, the Supreme Court set aside the order of the High Court and held that there was no violation of Art. 22(2). In this connection it was emphasised that

Mr. & Mrs. Abdul Samad had actually been produced before the High Court on July 26, 1960 within 24 hours of their arrival at Lucknow on July 25, 1960 and that they were again produced before the High Court on July 27, 1960. On both occasions they had full opportunity of representing their case. The view expressed in this decision would rule out the argument of non-compliance with Art. 22(2) on the facts and circumstances of the present case.

As observed earlier the petitioner had no right to enter and remain within the territories of India and indeed he was bound, .under the order dated June 9, 1970, to leave India by June 19, 1970. According to cl. (3) of the Foreigners Order, 1948 no foreigner can enter into India :-

> (a) otherwise than at such port or other place of entry on the border of India as a Registration Officer having jurisdiction at that port or place may appoint in this behalf; either for foreigners generally or for any specified class or description of foreigners; or

> (b) without the leave of the civil authority having, jurisdiction at such port or place."

Under cl. (5) of this Order no foreigner can leave India

(a) otherwise than at such port or other recognised place of departure on the borders of India as the Registration Officer having jurisdiction at that port or place may appoint in this behalf either for foreigners generally or for any specified class or description of foreigners; or

(b) without the leave of the civil authority having jurisdiction at such port or place." It would thus be seen that the petitioner who had illegally and clandestinely entered into India could not stay in any part of its territory. Indeed, he had, to leave India by June 19, 1970 and this had to be done in accordance with the statutory regulations. The order of his release by this Court would, therefore, not only have resulted in his presence in a part of India in contravention of the statutory provisions but would in addition have rendered it somewhat difficult for the authorities to enforce compliance with the order of his expulsion. In these circumstances the res-

traint on his personal liberty for the purpose of taking him to the border in order to expel him from India in accordance with the statutory provisions could by no means be considered to be an illegal custody justifying an order of release by this Court. While dealing with cases like the present one cannot ignore the historical fact of Pakistan's extremely hostile attitude towards the State of Jammu & Kashmir and also the fact that from the borders of the State of Jammu & Kashmir adjoining those of West Pakistan infiltrators have constantly been surreptitiously entering that part of the Indian territory for unfriendly activities which endanger maintenance of public order and security of the State. The petitioner had on his own showing crossed the cease-fire line secretly with the object of taking out of India the necessities of life. Regulations governing the entry into and departure from India as also the presence in this country of Pakistani infiltrators from across the cease-fire line on the Jammu & Kashmir border demand strict enforcement and the claim to personal liberty made by unlawful infiltrators from Pakistan cannot be placed above the security of the country and maintenance of law and order. Habeas corpus, though a writ of right, is not a writ of course. Its

scope has grown to achieve its purpose of protecting individuals against erosion of the right to be free from wrongful restraint on their rightfull liberty. But when, as in the present case, the petitioner has no right to move about freely in this country without a proper legal sanction, the restraint exercised on him for expelling him from India by June 19, 1970 cannot be construed on the facts and circumstances of this case to amount to his custody being illegal so as to require this Court to direct his immediate release. The constitutional protection against illegal, deprivation of personal liberty construed in a practical way cannot entitle non-citizens like the petitioner to remain in India contrary to the provisions of the law governing foreigners. It is accordingly difficult to hold that the petitioner is being illegally deprived of his right to personal liberty to stay and move about in India without restraint. The petition accordingly fails and is dismissed.

```
    Y.P.                    Petition dismissed.
```

# EXHIBIT H

Supreme Court of India

The Chairman, Railway Board & Ors vs Mrs. Chandrima Das & Ors on 28 January, 2000

Author: S Ahmad

Bench: R.P.Sethi, S.Saghir Ahmad

```
            PETITIONER:
    THE CHAIRMAN, RAILWAY BOARD & ORS.

            Vs.

    RESPONDENT:
    MRS.  CHANDRIMA DAS & ORS.

    DATE OF JUDGMENT:        28/01/2000

    BENCH:
    R.P.Sethi, S.Saghir Ahmad




    JUDGMENT:
```

S.SAGHIR AHMAD, J.

Leave granted.

Mrs. Chandrima Das, a practising advocate of the Calcutta High Court, filed a petition under Article 226 of the Constitution against the Chairman, Railway Board; General Manager, Eastern Railway; Divisional Railway Manager, Howrah Division; Chief Commercial Manager, Eastern Railway; State of West Bengal through the Chief Secretary; Home Secretary, Government of West Bengal; Superintendent of Police (Railways), Howrah; Superintendent of Police, Howrah; Director General of Police, West Bengal and many other Officers including the Deputy High Commissioner, Republic of Bangladesh; claiming compensation for the victim, Smt. Hanuffa Khatoon, a Bangladeshi national who was gang-raped by many including employees of the Railways in a room at Yatri Niwas at Howrah Station of the Eastern Railway regarding which G.R.P.S. Case No. 19/98 was registered on 27th February, 1998. Mrs. Chandrima Das also claimed several other reliefs including a direction to the respondents to eradicate anti-social and criminal activities at Howrah Railway Station.

The facts as noticed by the High Court in the impugned judgment are as follows:-

"Respondents Railways and the Union of India have admitted that amongst the main accused you are employees of the railways and if the prosecution version is proved in accordance with law, they are perpetrators of the heinous crime of gang rape repeatedly committed upon the hapless victim Hanufa Khatun. It is not in dispute that Hanufa came from Bangladesh. She at the relevant time was the elected representative. She at the relevant time was the elected representative of the Union Board. She arrived at Howrah Railway Station on 26th February, 1998 at about 14.00 hours to avail Jodhpur Express at 23.00 Hours for paying a visit to Ajmer Sharif. With that intent in mind, she

The Chairman, Railway Board & Ors vs Mrs. Chandrima Das & Ors on 28 January, 2000

arrived at Calcutta on 24th February, 1998 and stayed at a hotel at 10, Sudder Street, Police Station Taltola and came to Howrah Station on the date and time aforementioned. She had, however, a wait listed ticket and so she approached a Train Ticket Examiner at the Station for confirmation of berth against her ticket. The Train Ticket Examiner asked her to wait in the Ladies Waiting room. She accordingly came to the ladies waiting room and rested there.

At about 17.00 hours on 26th February, 1998 two unknown persons (later identified as one Ashoke Singh, a tout who posed himself as a very influential person of the Railway and Siya Ram Singh a railway ticket broker having good acquaintance with some of the Railway Staff of Howrah Station) approached her, took her ticket and returned the same after confirming reservation in Coach No.S-3 (Berth No.17) of Jodhpur Express. At about 20.00 hours Siya Ram Singh came again to her with a boy named Kashi and told her to accompany the boy to a restaurant if she wanted to have food for the night. Accordingly at about 21.00 hours she went to a nearby eating house with Kashi and had her meal there. Soon after she had taken her meal, she vomitted and came back to the Ladies Waiting room. At about 21.00 hours Ashoke Singh along with Rafi Ahmed a Parcel Supervisor at Howrah Station came to the Ladies Niwas before boarding the train. She appeared to have some doubt initially but on being certified by the lady attendants engaged on duty at the Ladies Waiting Room about their credentials she accompanied them to Yatri Niwas. Sitaram Singh, a khalasi of electric Department of Howrah Station joined them on way to Yatri Niwas. She was taken to room No.102 on the first floor of Yatri Niwas. The room was booked in the name of Ashoke Singh against Railway Card pass No. 3638 since 25th February, 1998. In room No.102 two other persons viz. one Lalan Singh, Parcel Clerk of Howrah Railway Station and Awdesh Singh, Parcel Clearing Agent were waiting. Hanufa Khatun suspected someting amiss when Ashoke Singh forced her into the room. Awdesh Singh bolted the room from outside and stood on guard outside the room. The remaining four persons viz. Ashoke, Lalan, Rafi and Sitaram took liquor inside the room and also forcibly compelled her to consume liquor. All the four persons who were present inside the room brutally violated, Hanufa Khatun, it is said, was in a state of shock and daze. When she could recover she managed to escape from the room of Yatri Niwas and came back to the platform where again she met Siya Ram Singh and found him talking to Ashoke Singh. Seeing her plight Siya Ram Singh pretended to be her saviour and also abused and slapped Ashoke Singh. Since it was well past midnight and Jodhpur Express had already departed, Siya Ram requested Hanufa Khatoon to accompany him to his residence to rest for the night with his wife and children. He assured her to help entrain Poorva Express on the following morning. Thereafter Siyaram accompanied by Ram Samiram Sharma, a friend of Siyaram took her to the rented flat of Ram Samiram Sharma at 66, Pathuriaghata Street, Police Station Jorabagan, Calcutta. There Siyaram raped Hanufa and when she protested and resisted violently Siyaram and Ram Samiran Sharma gagged her mouth and nostrils intending to kill her as a result Hanufa bled profusely. On being informed by the landlord of the building following the hue and cry raised by Hanufa Khatun, she was rescued by Jorabagan Police."

It was on the basis of the above facts that the High Court had awarded a sum of Rs.10 lacs as compensation for Smt. Hanuffa Khatoon as the High Court was of the opinion that the rape was committed at the building (Rail Yatri Niwas) belonging to the Railways and was perpetrated by the Railway employees.

In the present appeal, we are not concerned with many directions issued by the High Court. The only question argued before us was that the Railways would not be liable to pay compensation to Smt. Hanuffa Khatoon who was a foreigner and was not an Indian national. It is also contended that commission of the offence by the person concerned would not make the Railway or the Union of India liable to pay compensation to the victim of the offence. It is contended that since it was the individual act of those persons, they alone would be prosecuted and on being found guilty would be punished and may also be liable to pay fine or compensation, but having regard to the facts of this case, the Railways, or, for that matter, the Union of India would not even be vicariously liable. It is also contended that for claiming damages for the offence perpetrated on Smt. Hanuffa Khatoon, the remedy lay in the domain of Private Law and not under Public Law and, therefore, no compensation could have been legally awarded by the High Court in a proceeding under Article 226 of the Constitution and, that too, at the instance of a practising advocate who, in no way, was concerned or connected with the victim.

We may first dispose of the contention raised on behalf of the appellants that proceedings under Article 226 of the Constitution could not have been legally initiated for claiming damages from the Railways for the offence of rape committed on Smt. Hanuffa Khatoon and that Smt. Hanuffa Khatoon herself should have approached the Court in the realm of Private Law so that all the questions of fact could have been considered on the basis of the evidence adduced by the parties to record a finding whether all the ingredients of the commission of "tort" against the person of Smt. Hanuffa Khatoon were made out, so as to be entitled to the relief of damages. We may also consider the question of locus standi as it is contended on behalf of the appellants that Mrs. Chandrima Das, who is a practicing Advocate of the High Court of Calcutta, could not have legally instituted these proceedings.

The distinction between "Public Law" and "Private Law" was considered by a Three-Judge Bench of this Court in Common Cause, A Regd. Society vs. Union of India & Ors. (1999) 6 SCC 667 = AIR 1999 SC 2979 = (1999) 5 JT 237, in which it was, inter alia, observed as under :

"Under Article 226 of the Constitution, the High Court has been given the power and jurisdiction to issue appropriate Writs in the nature of Mandamus, Certiorari, Prohibition, Quo-Warranto and Habeas Corpus for the enforcement of Fundamental Rights or for any other purpose. Thus, the High Court has jurisdiction not only to grant relief for the enforcement of Fundamental Rights but also for "any other purpose" which would include the enforcement of public duties by public bodies. So also, the Supreme Court under Article 32 has the jurisdiction to issue prerogative Writs for the enforcement of Fundamental Rights guaranteed to a citizen under the Constitution.

Essentially, under public law, it is the dispute between the citizen or a group of citizens on the one hand and the State or other public bodies on the other, which is resolved. This is done to maintain the rule of law and to prevent the State or the public bodies from acting in an arbitrary manner or in violation of that rule. The exercise of constitutional powers by the High Court and the Supreme Court under Article 226 or 32 has been categorised as power of "judicial review". Every executive or administrative action of the State or other statutory or public bodies is open to judicial scrutiny and the High Court or the Supreme Court can, in exercise of the power of judicial review under the

Constitution, quash the executive action or decision which is contrary to law or is violative of Fundamental Rights guaranteed by the Constitution. With the expanding horizon of Article 14 read with other Articles dealing with Fundamental Rights, every executive action of the Govt. or other public bodies, including Instrumentalities of the Govt., or those which can be legally treated as "Authority" within the meaning of Article 12, if arbitrary, unreasonable or contrary to law, is now amenable to the writ jurisdiction of this Court under Article 32 or the High Courts under Article 226 and can be validly scrutinised on the touchstone of the Constitutional mandates."

The earlier decision, namely, Life Insurance Corporation of India vs. Escorts Limited & Ors. 1985 Supp. (3) SCR 909 = (1986) 1 SCC 264 = AIR 1986 SC 1370, in which it was observed as under:

"Broadly speaking, the Court will examine actions of State if they pertain to the pubic law domain and refrain from examining them if they pertain to the private law field. The difficulty will lie in demarcating the frontier between the public law domain and the private law field. It is impossible to draw the line with precision and we do not want to attempt it. The question must be decided in each case with reference to the particular action, the activity in which the State or the instrumentality of the State is engaged when performing the action, the public law or private law character of the action and a host of other relevant circumstances."

was relied upon.

Various aspects of the Public Law field were considered. It was found that though initially a petition under Article 226 of the Constitution relating to contractual matters was held not to lie, the law underwent a change by subsequent decisions and it was noticed that even though the petition may relate essentially to a contractual matter, it would still be amenable to the writ jurisdiction of the High Court under Article 226. The Public Law remedies have also been extended to the realm of tort. This Court, in its various decisions, has entertained petitions under Article 32 of the Constitution on a number of occasions and has awarded compensation to the petitioners who had suffered personal injuries at the hands of the officers of the Govt. The causing of injuries, which amounted to tortious act, was compensated by this Court in many of its decisions beginning from Rudul Sah vs. State of Bihar 1983(3) SCR 508 = (1983) 4 SCC 141 = AIR 1983 SC 1086. [See also : Bhim Singh vs. State of Jammu & Kashmir (1985) 4 SCC 577 = AIR 1986 SC 494; People's Union for Democratic Rights vs. State of Bihar, 1987 (1) SCR 631 = (1987) 1 SCC 265 = AIR 1987 SC 355; People's Union for Democratic Rights Thru. Its Secy. vs. Police Commissioner, Delhi Police Headquarters, (1989) 4 SCC 730 = 1989 (1) SCALE 599; SAHELI, A Woman's Resources Centre vs. Commissioner of Police, Delhi (1990) 1 SCC 422 = 1989 (Supp.) SCR 488 = AIR 1990 SC 513; Arvinder Singh Bagga vs. State of U.P. (1994) 6 SCC 565 = AIR 1995 SC 117; P. Rathinam vs. Union of India (1989) Supp. 2 SCC 716; In Re: Death of Sawinder Singh Grower (1995) Supp. (4) SCC 450 = JT (1992) 6 SC 271 = 1992 (3) SCALE 34; Inder Singh vs. State of Punjab (1995) 3 SCC 702 = AIR 1995 SC 1949; D.K. Basu vs. State of West Bengal (1997) 1 SCC 416 = AIR 1997 SC 610].

In cases relating to custodial deaths and those relating to medical negligence, this Court awarded compensation under Public Law domain in Nilabati Behera vs. State of Orissa (1993) 2 SCC 746 = 1993 (2) SCR 581 = AIR 1993 SC 1960; State of M.P. vs. Shyam Sunder Trivedi (1995) 4 SCC 262 =

The Chairman, Railway Board & Ors vs Mrs. Chandrima Das & Ors on 28 January, 2000

1995 (3) SCALE 343; People's Union for Civil Liberties vs. Union of India (1997) 3 SCC 433 = AIR 1997 SC 1203 and Kaushalya vs. State of Punjab (1996) 7 SCALE (SP) 13; Supreme Court Legal Aid Committee vs. State of Bihar (1991) 3 SCC 482; Dr. Jacob George vs. State of Kerala (1994) 3 SCC 430 = 1994 (2) SCALE 563; Paschim Bangal Khet Mazdoor Samity vs. State of West Bengal & Ors. (1996) 4 SCC 37 = AIR 1996 SC 2426; and Mrs. Manju Bhatia vs. N.D.M.C. (1997) 6 SCC 370 = AIR 1998 SC 223 = (1997) 4 SCALE 350.

Having regard to what has been stated above, the contention that Smt. Hanuffa Khatoon should have approached the civil court for damages and the matter should not have been considered in a petition under Article 226 of the Constitution, cannot be accepted. Where public functionaries are involved and the matter relates to the violation of Fundamental Rights or the enforcement of public duties, the remedy would still be available under the Public Law notwithstanding that a suit could be filed for damages under Private Law.

In the instant case, it is not a mere matter of violation of an ordinary right of a person but the violation of Fundamental Rights which is involved. Smt. Hanuffa Khatoon was a victim of rape. This Court in Bodhisatwa vs. Ms. Subdhra Chakroborty (1996) 1 SCC 490 has held "rape" as an offence which is violative of the Fundamental Right of a person guaranteed under Article 21 of the Constitution. The Court observed as under :

"Rape is a crime not only against the person of a woman, it is a crime against the entire society. It destroys the entire psychology of a woman and pushes her into deep emotional crisis. Rape is therefore the most hated crime. It is a crime against basic human rights and is violative of the victims most cherished right, namely, right to life which includes right to live with human dignity contained in Article 21."

Rejecting, therefore, the contention of the learned counsel for the appellants that the petition under Public Law was not maintainable, we now proceed to his next contention relating to the locus standi of respondent, Mrs. Chandrima Das, in filing the petition.

The main contention of the learned counsel for the appellants is that Mrs. Chandrima Das was only a practising advocate of the Calcutta High Court and was, in no way, connected or related to the victim, Smt. Hanuffa Khatoon and, therefore, she could not have filed a petition under Article 226 for damages or compensation being awarded to Smt. Hanuffa Khatoon on account of the rape committed on her. This contention is based on a misconception. Learned counsel for the appellants is under the impression that the petition filed before the Calcutta High Court was only a petition for damages or compensation for Smt. Hanuffa Khatoon. As a matter of fact, the reliefs which were claimed in the petition included the relief for compensation. But many other reliefs as, for example, relief for eradicating anti-social and criminal activities of various kinds at Howrah Railway Station were also claimed. The true nature of the petition, therefore, was that of a petition filed in public interest.

The existence of a legal right, no doubt, is the foundation for a petition under Article 226 and a bare interest, may be of a minimum nature, may give locus standi to a person to file a Writ Petition, but

the concept of "Locus Standi" has undergone a sea change, as we shall presently notice. In Dr. Satyanarayana Sinha vs. S. Lal & Co. Pvt. Ltd., AIR 1973 SC 2720 = (1973) 2 SCC 696, it was held that the foundation for exercising jurisdiction under Article 32 or Article 226 is ordinarily the personal or individual right of the petitioner himself. In writs like Habeas Corpus and Quo Warranto, the rule has been relaxed and modified.

In S.P. Gupta & Ors. vs. Union of India & Ors., AIR 1982 SC 149 = (1981) Supp. SCC 87, the law relating to locus standi was explained so as to give a wider meaning to the phrase. This Court laid down that "practising lawyers have undoubtedly a vital interest in the independence of the judiciary; they would certainly be interested in challenging the validity or constitutionality of an action taken by the State or any public authority which has the effect of impairing the independence of the judiciary." It was further observed that "lawyer's profession was an essential and integral part of the judicial system; they could figuratively be described as priests in the temple of justice. They have, therefore, a special interest in preserving the integrity and independence of the judicial system; they are equal partners with the Judges in the administration of justice. The lawyers, either in their individual capacity or as representing some Lawyers' Associations have the locus standi to challenge the circular letter addressed by the Union Law Minister to the Governors and Chief Ministers directing that one third of the Judges of the High Court should, as far as possible, be from outside the State."

In the context of Public Interest Litigation, however, the Court in its various Judgments has given widest amplitude and meaning to the concept of locus standi. In People's Union for Democratic Rights and Ors. vs. Union of India & Ors., AIR 1982 SC 1473 = (1982) 3 SCC 235, it was laid down that Public Interest Litigation could be initiated not only by filing formal petitions in the High Court but even by sending letters and telegrams so as to provide easy access to Court. (See also: Bandhua Mukti Morcha vs. Union of India & Ors., AIR 1984 SC 802 = 1984 (2) SCR 67 = (1984) 3 SCC 161 and State of Himachal Pradesh vs. Student's Parent Medical College, Shimla & Ors., AIR 1985 SC 910 = (1985) 3 SCC 169 on the right to approach the Court in the realm of Public Interest Litigation). In Bangalore Medical Trust vs. B.S. Muddappa and Ors., AIR 1991 SC 1902 = 1991 (3) SCR 102 = (1991) 4 SCC 54, the Court held that the restricted meaning of aggrieved person and narrow outlook of specific injury has yielded in favour of a broad and wide construction in the wake of Public Interest Litigation. The Court further observed that public-spirited citizens having faith in the rule of law are rendering great social and legal service by espousing causes of public nature. They cannot be ignored or overlooked on technical or conservative yardstick of the rule of locus standi or absence of personal loss or injury. There has, thus, been a spectacular expansion of the concept of locus standi. The concept is much wider and it takes in its stride anyone who is not a mere "busy-body".

Having regard to the nature of the petition filed by respondent Mrs. Chandrima Das and the relief claimed therein it cannot be doubted that this petition was filed in public interest which could legally be filed by the respondent and the argument that she could not file that petition as there was nothing personal to her involved in that petition must be rejected.

It was next contended by the learned counsel appearing on behalf of the appellants, that Smt. Hanuffa Khatoon was a foreign national and, therefore, no relief under Public Law could be granted

to her as there was no violation of the Fundamental Rights available under the Constitution. It was contended that the Fundamental Rights in Part III of the Constitution are available only to citizens of this country and since Smt. Hanuffa Khatoon was a Bangladeshi national, she cannot complain of the violation of Fundamental Rights and on that basis she cannot be granted any relief. This argument must also fail for two reasons; first, on the ground of Domestic Jurisprudence based on Constitutional provisions and secondly, on the ground of Human Rights Jurisprudence based on the Universal Declaration of Human Rights, 1948, which has the international recognition as the "Moral Code of Conduct" having been adopted by the General Assembly of the United Nations. We will come to the question of Domestic Jurisprudence a little later as we intend to first consider the principles and objects behind Universal Declaration of Human Rights, 1948, as adopted and proclaimed by the United Nations General Assembly Resolution of 10th December, 1948. The preamble, inter alia, sets out as under:

"Whereas recognition of the INHERENT DIGNITY and of the equal and inalienable rights of all members of the human family is the foundation of freedom, justice and peace in the world.

Whereas disregard and contempt for human rights have resulted in barbarous acts which have outraged the conscience of mankind, and the advent of a world in which human beings shall enjoy freedom of speech and belief and freedom from fear and want has been proclaimed as the highest aspiration of the common people.

Whereas it is essential to promote the development of friendly relations between nations.

Whereas the people of the United Nations have in the Charter affirmed their faith in fundamental human rights, IN THE DIGNITY AND WORTH OF THE HUMAN PERSON AND IN THE EQUAL RIGHTS OF MEN AND WOMEN and have determined to promote social progress and better standards of life in larger freedom. Whereas Member States have pledged themselves to achieve, in cooperation with the United Nations, the promotion of universal respect for and observance of human rights and fundamental freedoms.

Whereas a common understanding of these rights and freedoms is of the greatest importance for the full realization of this pledge."

Thereafter, the Declaration sets out, inter alia, in various Articles, the following:

"Article 1 -- All human beings are born free and equal in dignity and rights. They are endowed with reason and conscience and should act towards one another in a spirit of brotherhood.

Article 2 -- Every one is entitled to all the rights and freedoms set forth in this Declaration, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, NATIONAL OR SOCIAL ORIGIN, PROPERTY, BIRTH OR OTHER STATUS.

Furthermore, NO DISTINCTION SHALL BE MADE ON THE BASIS OF THE POLITICAL, JURISDICTIONAL OR INTERNATIONAL STATUS OF THE COUNTRY OR TERRITORY to which a

person belongs, whether it be independent, trust, non-self governing or under any other limitation of sovereignty.

Article 3 -- Everyone has the right to life, liberty and security of person.

Article 5 -- No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment.

Article 7 -- All are equal before the law and are entitled without any discrimination to equal protection of the law. All are entitled to equal protection against any discrimination in violation of this Declaration and against any incitement to such discrimination.

Article 9 -- No one shall be subjected to arbitrary arrest, detention or exile."

Apart from the above, the General Assembly, also while adopting the Declaration on the Elimination of Violence against Women, by its Resolution dated 20th December, 1993, observed in Article 1 that, "violence against women" means any act of gender-based violence that results in, or is likely to result in, physical, sexual or psychological harm or suffering to women, including threats of such acts, coercion or arbitrary deprivation of liberty, whether occurring in public or in private life." In Article 2, it was specified that, "violence against women shall be understood to encompass, but not be limited to:

(a) Physical, sexual and psychological violence occurring in the family including battering, sexual abuse of female children in the household, dowry-related violence, marital rape, female genital mutilation and other traditional practices harmful to women, non-spousal violence and violence related to exploitation;

(b) Physical, sexual and psychological violence occurring within the general community, including rape, sexual abuse, sexual harassment and intimidation at work, in educational institutions and elsewhere, trafficking in women and forced prostitution;

(c) Physical, sexual and psychological violence perpetrated or condoned by the State, wherever it occurs."

In Article 3, it was specified that "women are entitlted to the equal enjoyment and protection of all human rights, which would include, inter alia,:

(a) the right to life, (b) the right to equality, and

(c) the right to liberty and security of person.

The International Covenants and Declarations as adopted by the United Nations have to be respected by all signatory States and the meaning given to the above words in those Declarations and Covenants have to be such as would help in effective implementation of those Rights. The

applicability of the Universal Declaration of Human Rights and principles thereof may have to be read, if need be, into the domestic jurisprudence. Lord Diplock in Salomon v. Commissioners of Customs and Excise [1996] 3 All ER 871 said that there is a, prima facie, presumption that Parliament does not intend to act in breach of international law, including specfic treaty obligations. So also, Lord Bridge in Brind v. Secretary of State for the Home Department [1991] 1 All ER 720, observed that it was well settled that, in construing any provision in domestic legislation which was ambiguous in the sense that it was capable of a meaning which either conforms to or conflicts with the International Convention, the courts would presume that Parliament intended to legislate in conformity with the Convention and not in conflict with it.

The domestic application of international human rights and norms was considered by the Judicial Colloquia (Judges and Lawyers) at Bangalore in 1988. It was later affirmed by the Colloquia that it was the vital duty of an independent judiciary to interpret and apply national constitutions in the light of those principles. Further Colloquia were convened in 1994 at Zimbabwe, in 1996 at Hong Kong and in 1997 at Guyana and in all those Colloquia, the quetion of domestic application of international and regional human rights specially in relation to women, was considered. The Zimbabwe Declaration 1994, inter alia, stated :

"Judges and lawyers have duty to familiarise themselves with the growing international jurisprudence of human rights and particularly with the expanding material on the protection and promotion of the human rights of women."

But this situation may not really arise in our country.

Our Constitution guarantees all the basic and fundamental human rights set out in the Universal Declaration of Human Rights, 1948, to its citizens and other persons. The chapter dealing with the Fundamental Rights is contained in Part III of the Constitution. The purpose of this Part is to safeguard the basic human rights from the vicissitudes of political controversy and to place them beyond the reach of the political parties who, by virtue of their majority, may come to form the Govt. at the Centre or in the State.

The Fundamental Rights are available to all the "citizens" af the country but a few of them are also available to "persons". While Article 14, which guarantees equality before law or the equal protection of laws within the territory of India, is applicable to "person" which would also include the "citizen" of the country and "non- citizen" both, Article 15 speaks only of "citizen" and it is specifically provided therein that there shall be no discrimination against any "citizen" on the ground only of religion, race, caste, sex, place of birth or any of them nor shall any citizen be subjected to any disability, liability, restriction or condition with regard to access to shops, public restaurants, hotels and places of public entertainment, or the use of wells, tanks, bathing ghats, roads and places of public resort on the aforesaid grounds. Fundamental Right guaranteed under Article 15 is, therefore, restricted to "citizens". So also, Article 16 which guarantees equality of opportunity in matters of public employment is applicable only to "citizens". The Fundamental Rights contained in Article 19, which contains the right to "Basic Freedoms", namely, freedom of speech and expression; freedom to assemble peaceably and without arms; freedom to form associations or unions; freedom to move

freely throughout the territory of India; freedom to reside and settle in any part of the territory of India and freedom to practise any profession, or to carry on any occupation, trade or business, are available only to "citizens" of the country. The word "citizen" in Article 19 has not been used in a sense different from that in which it has been used in Part II of the Constitution dealing with "citizenship". [See: State Trading Corporation of India Ltd. vs. The Commercial Tax Officer and Others, AIR 1963 SC 1811 = 1964 (4) SCR 99]. It has also been held in this case that the words "all citizens" have been deliberately used to keep out all "non-citizens" which would include "aliens". It was laid down in Hans Muller of Nurenburg vs. Superintendent Presidency Jail Calcutta, AIR 1955 SC 367 (374) = 1955 (1) SCR 1284, that this Article applies only to "citizens". In another decision in Anwar vs. State of J & K, AIR 1971 SC 337 = 1971 (1) SCR 637 = (1971) 3 SCC 104, it was held that non-citizen could not claim Fundamental Rights under Article

19. In Naziranbai vs. State, AIR 1957 M.B. 1 and Lakshmi Prasad & Anr. vs. Shiv Pal & Others, AIR 1974 Allahabad 313, it was held that Article 19 does not apply to a "foreigner". The Calcutta High Court in Sk. Md. Soleman vs. State of West Bengal and Another, AIR 1965 Calcutta 312, held that Article 19 does not apply to a Commonwealth citizen.

In Anwar vs. State of J & K, AIR 1971 SC 337 = 1971 (1) SCR 637 = (1971) 3 SCC 104 (already referred to above), it was held that the rights under Articles 20, 21 and 22 are available not only to "citizens" but also to "persons" which would include "non-citizens".

Article 20 guarantees right to protection in respect of conviction for offences. Article 21 guarantees right to life and personal liberty while Article 22 guarantees right to protection against arbitrary arrest and detention. These are wholly in consonance with Article 3, Article 7 and Article 9 of the Universal Declaration of Human Rights, 1948.

The word "LIFE" has also been used prominently in the Universal Declaration of Human Rights, 1948. [See: Article 3 quoted above]. The Fundamental Rights under the Constitution are almost in consonance with the Rights contained in the Universal Declaration of Human Rights as also the Declaration and the Covenants of Civil and Political Rights and the Covenants of Economic, Social and Cultural Rights, to which India is a party having ratified them, as set out by this Court in Kubic Darusz vs. Union of India & Ors. (1990) 1 SCC 568 = AIR 1990 SC 605. That being so, since "LIFE" is also recognised as a basic human right in the Universal Declaration of Human Rights, 1948, it has to have the same meaning and interpretation as has been placed on that word by this Court in its various decisions relating to Article 21 of the Constitution. The meaning of the word "life" cannot be narrowed down. According to the tenor of the language used in Article 21, it will be available not only to every citizen of this country, but also to a "person" who may not be a citizen of the country.

Let us now consider the meaning of the word "LIFE" interpreted by this Court from time to time. In Kharak Singh vs. State of U.P., AIR 1963 SC 1295 = 1964 (1) SCR 332, it was held that the term "life" indicates something more than mere animal existence. [See also : State of Maharashtra vs. Chandrabhan Tale, AIR 1983 SC 803 = 1983 (3) SCR 337 = (1983) 3 SCC 387]. The inhibitions contained in Article 21 against its deprivation extends even to those faculties by which life is enjoyed. In Bandhua Mukti Morcha vs. U.O.I., AIR 1984 SC 802 = 1984 (2) SCR 67 = (1984) 3 SCC

The Chairman, Railway Board & Ors vs Mrs. Chandrima Das & Ors on 28 January, 2000

161, it was held that the right to life under Article 21 means the right to live with dignity, free from exploitation. [See also: Maneka Gandhi vs. U.O.I., AIR 1978 SC 597 = 1978 (2) SCR 621 = (1978) 1 SCC 248 and Board of Trustees of the Port of Bombay vs. Dilip Kumar Raghavendranath Nadkarni, AIR 1983 SC 109 = 1983 (1) SCR 828 = (1983) 1 SCC 124].

On this principle, even those who are not citizens of this country and come here merely as tourists or in any other capacity will be entitled to the protection of their lives in accordance with the Constitutional provisions. They also have a right to "Life" in this country. Thus, they also have the right to live, so long as they are here, with human dignity. Just as the State is under an obligation to protect the life of every citizen in this country, so also the State is under an obligation to protect the life of the persons who are not citizens.

The Rights guaranteed under Part III of the Constitution are not absolute in terms. They are subject to reasonable restrictions and, therefore, in case of non- citizen also, those Rights will be available subject to such restrictions as may be imposed in the interest of the security of the State or other important considerations. Interest of the Nation and security of the State is supreme. Since 1948 when the Universal Declaration was adopted till this day, there have been many changes - political, social and economic while terrorism has disturbed the global scenario. Primacy of the interest of Nation and the security of State will have to be read into the Universal Declaration as also in every Article dealing with Fundamental Rights, including Article 21 of the Indian Constitution.

It has already been pointed out above that this Court in Bodhisatwa's case (supra) has already held that "rape" amounts to violation of the Fundamental Right guaranteed to a woman under Article 21 of the Constitution.

Now, Smt. Hanuffa Khatoon, who was not the citizen of this country but came here as a citizen of Bangladesh was, nevertheless, entitled to all the constitutional rights available to a citizen so far as "Right to Life" was concerned. She was entitled to be treated with dignity and was also entitled to the protection of her person as guaranteed under Article 21 of the Constitution. As a national of another country, she could not be subjected to a treatment which was below dignity nor could she be subjected to physical violence at the hands of Govt. employees who outraged her modesty. The Right available to her under Article 21 was thus violated. Consequently, the State was under the Constitutional liability to pay compensation to her. The judgment passed by the Calcutta High Court, therefore, allowing compensation to her for having been gang-raped, cannot be said to suffer from any infirmity.

Learned counsel for the appellants then contended that the Central Govt. cannot be held vicariously liable for the offence of rape committed by the employees of the Railways. It was contended that the liability under the Law of Torts would arise only when the act complained of was performed in the course of official duty and since rape cannot be said to be an official act, the Central Govt. would not be liable even under the Law of Torts. The argument is wholly bad and is contrary to the law settled by this Court on the question of vicarious liability in its various decisions.

In State of Rajasthan vs. Mst. Vidhyawati AIR 1962 SC 933, it was held that the Govt. will be vicariously liable for the tortious act of its employees. This was a case where a claim for damages was made by the heirs of a person who died in an accident caused by the negligence of the driver of a Govt. vehicle. Reference may also be made to the decisions of this Court in State of Gujarat vs. Memon Mahomed Haji Hasan AIR 1967 SC 1885 and Smt. Basava Kom Dyamogouda Patil vs. State of Mysore AIR 1977 SC 1749. These principles were reiterated in N. Nagendra Rao & Co. vs. State of A.P. AIR 1994 SC 2663 = (1994) 6 SCC 205 and again in State of Maharashtra vs. Kanchanmala Vijaysing Shirke, 1995 ACJ 1021 (SC) = (1995) 5 SCC 659 = JT 1995 (6) SC 155. Reliance placed by the counsel for the appellants on the decision of this Court in Kasturi Lal Ralia Ram Jain vs. State of U.P. AIR 1965 SC 1039 = 1965 (1) SCR 375 cannot help him as this decision has not been followed by this Court in the subsequent decisions, including the decisions in State of Gujarat vs. Memon Mahomed Haji Hasan and Smt. Basava Kom Dyamogouda Patil vs. State of Mysore (supra). The decision in Kasturi Lal's case was also severely criticised by Mr. Seervai in his prestigious book

- Constitutional Law of India. A Three- Judge Bench of this Court in Common Cause, A Regd. Society vs. Union of India (1999) 6 SCC 667 also did not follow the decision in Kasturi Lal's case (supra) and observed that the efficacy of this decision as a binding precedent has been eroded.

The theory of Sovereign power which was propounded in Kasturi Lal's case has yielded to new theories and is no longer available in a welfare State. It may be pointed out that functions of the Govt. in a welfare State are manifold, all of which cannot be said to be the activities relating to exercise of Sovereign powers. The functions of the State not only relate to the defence of the country or the administration of justice, but they extend to many other spheres as, for example, education, commercial, social, economic, political and even marital. These activities cannot be said to be related to Sovereign power.

Running of Railways is a commercial activity. Establishing Yatri Niwas at various Railway Stations to provide lodging and boarding facilities to passengers on payment of charges is a part of the commercial activity of the Union of India and this activity cannot be equated with the exercise of Sovereign power. The employees of the Union of India who are deputed to run the Railways and to manage the establishment, including the Railway Stations and Yatri Niwas, are essential components of the Govt. machinery which carries on the commercial activity. If any of such employees commits an act of tort, the Union Govt., of which they are the employees, can, subject to other legal requirements being satisfied, be held vicariously liable in damages to the person wronged by those employees. Kasturi Lal's decision, therefore, cannot be pressed in aid. Moreover, we are dealing with this case under Public Law domain and not in a suit instituted under Private Law domain against persons who, utilising their official position, got a room in the Yatri Niwas booked in their own name where the act complained of was committed.

No other point was raised before us. The appeal having no merit is dismissed with the observation that the amount of compensation shall be made over to the High Commissioner for Bangladesh in India for payment to the victim, Smt. Hanuffa Khatoon. The payment to the High Commissioner shall be made within three months. There will be no order as to costs.

# EXHIBIT I

Francis Coralie Mullin vs The Administrator, Union ... on 13 January, 1981

Supreme Court of India

Francis Coralie Mullin vs The Administrator, Union ... on 13 January, 1981

Equivalent citations: 1981 AIR 746, 1981 SCR (2) 516

Author: P Bhagwati

Bench: Bhagwati, P.N.

```
            PETITIONER:
    FRANCIS CORALIE MULLIN

            Vs.

    RESPONDENT:
    THE ADMINISTRATOR, UNION TERRITORY OF DELHI & ORS.

    DATE OF JUDGMENT13/01/1981

    BENCH:
    BHAGWATI, P.N.
    BENCH:
    BHAGWATI, P.N.
    FAZALALI, SYED MURTAZA

    CITATION:
     1981 AIR  746            1981 SCR  (2) 516
     1981 SCC  (1) 608        1981 SCALE  (1)79
     CITATOR INFO :
     RF         1981 SC2041  (9)
     D          1982 SC 710  (92,93)
     D          1982 SC1029  (14)
     MV         1982 SC1325  (16,36,75)
     R          1982 SC1473  (11)
     E&D        1985 SC1618  (9)
     R          1986 SC 180  (39,42)
     RF         1986 SC 847  (12)
     RF         1987 SC 990  (16)
     R          1991 SC 101  (239)
     RF         1991 SC1902  (24)
     RF         1992 SC1858  (10)


    ACT:
         Right of  the detenu  under Conservation  of Foreign
    Exchange &  Prevention of  Smuggling Activities Act, to have
    interview with  a lawyer  and the  members  of his  family-
    Section 3(b)(i)  & (ii)  read with  rule 559A and 550 of the
    Punjab Manual  of the  Superintendence  and  Management  of
    Jails-Whether  violates  Articles  14  and  21  of  the
    Constitution  and  hence  invalid-Distinction  between
    preventive detention with punitive detention-Constitution of
    India 1950 Article 21, scope of.
```

HEADNOTE:

    Allowing the writ petition, the Court
^

    HELD : (1) While  considering the question of validity
of conditions  of detention  courts must necessarily bear in
mind the  vital distinction between preventive detention and
punitive  detention.  Punitive  detention  is  intended  to
inflict punishment on a person, who is found by the judicial
process to  have  committed  an  offence,  while  preventive
detention is  not by  way of  punishment at  all, but  it is
intended to  pre-empt a  person from  indulging  in  conduct
injurious to the society. [523 A-B]

    (2) The  power  of  preventive  detention  has  been
recognised as  a necessary  evil and  is tolerated in a free
society in  the larger interest of security of the State and
maintenance of public order. It is a drastic power to detain
a person  without trial  and in  many countries  it  is  not
allowed  to  be  exercised  except  in  times  of  war  or
aggression.  The  Indian  Constitution  does  recognise  the
existence of  this power,  but it  is hedged-in by  various
safeguards set  out in  Articles 21  and 22.  Article 22  in
clauses  (4)  to  (7)  deals  specifically  with  safeguards
against preventive  detention and  enjoins that  any law  of
preventive  detention  or  action  by  way  of  preventive
detention taken  under such  law must  be in conformity with
the restrictions  laid down  by those  clauses  on  pain  of
invalidation, Article  21 also lays down restrictions on the
power of preventive detention. [523 B-D]

    Article 21  as  interpreted  in  Maneka  Gandhi's  case
requires that  no one  shall be  deprived  of  his  life  or
personal liberty except by procedure established  by law and
this procedure  must be  reasonable, fair  and just  and not
arbitrary, whimsical  or fanciful  and it is for the Court to
decide in  the  exercise  of  its  constitutional  power  or
judicial review  whether the deprivation of life or personal
liberty in  a given  case is  by procedure, which is
reasonable, fair  and just  or it  is otherwise.  The law of
preventive detention must, therefore, pass the test not only
of Article  22 but  also of  Article 21.  But, despite these
safeguards laid  down by  the  Constitution  and  creatively
evolved by  the Courts. the power of preventive detention is
a frightful  and awesome  power with  drastic  consequences
affecting personal liberty, which is the most cherished
517
and prized possession of man in a civilised society. It is a
power to be exercised with the greatest care and caution and
the courts  have to  be ever vigilant to see that this power
is  not  abused  or  misused,  inasmuch  as  the  preventive
detention is qualitatively different from punitive detention
and their  purposes  are  different.  In  case  of  punitive
detention, the  person has  fullest  opportunity  to  defend
himself,  while  in  case  of  preventive  detention,  the
opportunity that  he has  for contesting  the action  of the

Executive is very limited. Therefore, the "restrictions placed on a person preventively detained must, consistently with the effectiveness of detention, be minimal". [524A-G]

Maneka Gandhi v. Union of India, [1979] 1 SCC 248; M.O. Hoscot v. State of Maharashtra, [1979] 1 SCR 192; Hussainara Khatoon v. State of Bihar, [1980] 1 SCC 81; Sunil Batra (I) v. Delhi Administration, [1979] 1 SCR 392; Sunil Batra (II) v. Delhi Administration, [1980] 2 SCR 557, referred to.

Sampat Prakash v. State of Jammu and Kashmir, [1969] 3 SCR 574, followed.

3. The prisoner or detenu has all the fundamental rights and other legal rights available to a free person, save those which are incapable of enjoyment by reason of incarceration. A prisoner or detenu is not stripped of his fundamental or other legal rights, save those which are inconsistent with his incarceration, and if any of these rights are violated, the Court will immediately spring into action and run to his rescue. [525 B-C, 526 G-H, 527 A]

Sunil Batra (I) v. Delhi Administration, [1979] 1 SCR 392; Sunil Batra (II) v. Delhi Administration, [1980] 2 SCR 557, State of Maharashtra v. Prabhakar Sanzgire [1966] 1 SCR 702; D. B. Patnaik v. State of Andhra Pradesh , [1975] 2 SCR 24, followed.

Eve Pall's Case, 417 US 817: 41 Lawyers Edition 2nd 495; Charles Wolffs Case, 41 Lawyers Edition 2nd 935, quoted with approval.

(4) While arriving at the proper meaning and content of the right to life, the attempt of the court should always be to expand the reach and ambit of the fundamental right rather than to attenuate its meaning and content. A constitutional provision must be construed, not in a narrow and constricted sense, but in a wide and liberal manner so as to anticipate and take account of changing conditions and purposes so that the constitutional provision does not get atrophied or fossilized but remains flexible enough to meet the newly emerging problems and challenges. This principle applies with greater force in relation to a fundamental right enacted by the Constitution. The fundamental right to life which is the most precious human right and which forms the ark of all other rights must therefore be interpreted in a broad and expansive spirit so as to invest it with significance and vitality which may endure for years to come and enhance the dignity of the individual and the worth of the human person. [527 C-D, 528 A-C]

Weems v. U.S. 54 Lawyers Edition 801, quoted with approval.

(5) The right to life enshrined in Article 21 cannot be restricted to mere animal existence. It means something much more than just physical survival.

518

Every limb or faculty through which life is enjoyed is thus protected by Article 21 and a fortiorari, this would include the faculties of thinking and feeling. Now deprivation which

is inhibited  by Article  may be  total or partially neither
any limb  or faculty  can be totally destroyed nor can it be
partially damaged.  Moreover it is every kind of deprivation
that is  hit by  Article 21,  whether  such deprivation  be
permanent or  temporary and, furthermore, deprivation is not
an act  which  is  complete  once  and  for all:  it  is  a
continuing act  and so  long as  it lasts,  it  must be  in
accordance with  procedure established by law. Therefore any
act which  damages or  injures or interferes with the use of
any limb  or faculty  of a person either permanently or even
temporarily, would  be within  the inhibition of Article 21.
[528 D, G-H, 529 A]

Kharak Singh  v. State  of Uttar  Pradesh, [1964] 1 SCR
232, followed.

Munn v. Illinois [1877] 94 US 133, referred to.

Sunil Batra  v. Delhi Administration, [1980] 2 SCR 557,
applied.

(6) The  right to  life includes the right to live with
human dignity  and all  that goes along with it, namely, the
bare  necessaries  of  life  such  as  adequate  nutrition,
clothing and shelter and facilities for reading, writing and
expressing oneself in diverse forms, freely moving about and
mixing  and  commingling  with  fellow  human  beings.  The
magnitude and  content of the components of this right would
depend upon  the extent  of the  economic development of the
country, but it must, in any view of the matter, include the
right to the basic necessities of life and also the right to
carry on  such functions  and activities  as constitute  the
bare minimum  expression of  the human self. Every act which
offends against  or impairs  human dignity  would constitute
deprivation pro  tanto of  this right  to live  and it would
have to  be in  accordance with  reasonable, fair  and  just
procedure established  by law which stands the test of other
fundamental rights. Therefore, any form of torture or cruel,
inhuman or  degrading treatment  would be offensive to human
dignity and constitute an inroad into this right to live and
it would,  on this  view, be prohibited by Article 21 unless
it is in accordance with procedure prescribed by law, but no
law which  authorises and  no procedure  which leads to such
torture or  cruelty, inhuman or degrading treatment can ever
stand the  test of  reasonableness and non-arbitrariness: it
would  plainly  be  unconstitutional  and  void  as  being
violative of Article 14 and 21. [529 B-F]

(7) There  is implicit  in  Article 21  the  right  to
protection against  torture or  cruel, inhuman  or degrading
treatment which  is enunciated in Article 5 of the Universal
Declaration of  Human Rights  and guaranteed by Article 7 of
the international  Covenant on  Civil and  Political Rights.
This right  to live  which is  comprehended within the broad
connotation of  the right to life can concededly be abridged
according to  procedure established  by law  and  therefore,
when a  person is  lawfully imprisoned, this right to live is
bound to  suffer attenuation  to the  extent to  which it is

incapable of enjoyment by reason of incarceration. The prisoner or detenu obviously cannot move about freely by going outside the prison walls nor can be socialise at his free will with persons outside the jail. But, as part of the right to live with human dignity and therefore, as a necessary component of the right to life, he would be entitled to have interviews with the members of his family and friends and no prison regulation or procedure laid down by prison regulation regulating the right to have interviews with the members of the family and

519

friends can be upheld as constitutionally valid under Article 14 and 21, unless it is reasonable, fair and just.

Considered from the point of view also of the right to personal liberty enshrined in Article 21, the right to have interviews with members of the family and friends is clearly part of personal liberty guaranteed under that Article. The expression "personal liberty" occurring in Article 21 is of the widest amplitude and it covers a variety of rights which go to constitute the personal liberty of a man and it also includes rights which "have been raised to the status of distinct Fundamental Rights and given additional protection under Article 19". Therefore, personal liberty would include the right to socialise with members of the family and friends subject, of course, to any valid prison regulations and under Articles 14 and 21, such prison regulations must be reasonable and non-arbitrary. If any prison regulation or procedure laid down by it regulating the right to have interviews with members of the family and friends is arbitrary or unreasonable, it would be liable to be struck down as invalid as being violative of Articles 14 and 21. [530 B-E]

Maneka Gandhi v. Union of India, [1979] 1 SCC 248, applied.

(8) Sub-clause (ii) of clause 3(b) of the Conditions of Detention Order is violative of Articles 14 and 21 in so far as it permits only one interview in a month to a detenu. When an under-trial prisoner is granted the facility of interviews with relatives and friends twice in a week under Rule 559A and a convicted prisoner is permitted to have interviews with his relatives and friends, once in a week under Rule 550, sub-clause (ii) of clause 3(b) of the Conditions of Detention Order, which restricts the interview only to one in a month in case of a detenu, is unreasonable and arbitrary, particularly when a detenu stands on a highest pedestal than an under-trial prisoner or a convict. A detenu must be permitted to have at least two interviews in a week with relatives and friends and it should be possible for relative or friend to have interview with the detenu at any reasonable hour on obtaining permission from the Superintendent of the Jail and it should not be necessary to seek the permission of the District Magistrate, Delhi, as the latter procedure would be cumbrous and

unnecessary from the point of view of security and hence
unreasonable. Even independently of Rules 550 and 559A, of
the Punjab Manual for the Superintendence and Management of
Jails, the present norm of two interviews in a week for
prisoners furnishes a reasonable and non-arbitrary
criterion. [530 F-H, 531 A-B]

    Sampath Prakash v. State of Jammu and Kashmir, [1969] 3
SCR 574, applied.

    (9) Sub-clause (i) of clause 3(b) of the Conditions of
Detention Order regulating the right of a detenu to have
interview with a legal adviser of his choice is violative of
Article 14 and 21 and therefore unconstitutional and void,
It would be quite reasonable if a detenu were to be entitled
to have interview with his legal adviser at any reasonable
hour during the day after taking appointment from the
Superintendent of the Jail, which appointment should be
given by the Superintendent without any avoidable delay. The
interview need not necessarily take place in the presence of
a nominated officer of Customs/ Central Excise/Enforcement
but if the presence of such officer can be conveniently
secured at the time of the interview without involving any
postponement of the interview, than such officer and if his
presence cannot be so secured,
520
then any other Jail official may, if thought necessary,
watch the interview but in a month to a detenu. When an
under-trial prisoner is granted the facility [532C-F]

    (10) The right of a detenu to consult a legal adviser
of his choice for any purpose not necessarily limited to
defence in a criminal proceeding but also for securing
release from preventive detention or filling a writ petition
or prosecuting any claim or proceeding, civil or criminal is
obviously included in the right to live with human dignity
and is also part of personal liberty and the detenu cannot
be deprived of this right nor can this right of the detenu
be interfered with except in accordance with reasonable,
fair and just procedure established by a valid law. [531C-E]


    JUDGMENT:

ORIGINAL JURISDICTION: Writ Petition No. 3042 of 1980. (Under Article 32 of the Constitution.)
N. M. Ghatate (Dr.) and S. V. Deshpande for the Petitioner.

Hardayal Hardy and M. N. Shroff for the Respondents Nos. 1-2.

The Judgment of the Court was delivered by BHAGWATI, J. This petition under Article 32 of the
Constitution raises a question in regard of the right of a detenu under the Conservation of Foreign
Exchange & Prevention of Smuggling Activities Act (hereinafter referred to as COFEPOSA Act) to
have interview with a lawyer and the members of his family. The facts giving rise to the petition are

few and undisputed and may be briefly stated as follows:

The petitioner, who is a British national, was arrested and detained in the Central Jail, Tihar under an Order dated 23rd November 1979 issued under section 3 of the COFEPOSA Act. She preferred a petition in this Court for a writ of habeas corpus challenging her detention, but by a judgment delivered by this Court on 27th February 1980, her petition was rejected with the result that she continued to remain under detention in the Tihar Central Jail. Whilst under detention, the petitioner experienced considerable difficulty in having interview with her lawyer and the members of her family. Her daughter aged about five years and her sister, who was looking after the daughter, were permitted to have interview with her only once in a month and she was not allowed to meet her daughter more often, though a child of very tender age. It seems that some criminal proceeding was pending against the petitioner for attempting to smuggle hashish out of the country and for the purpose of her defence in such criminal proceeding, it was necessary for her to consult her lawyer, but even her lawyer found it difficult to obtain an interview with her because in order to arrange an interview, he was required to obtain prior appointment from the District Magistrate, Delhi and the interview could take place only in the presence of a Customs Officer nominated by the Collector of Customs. This procedure for obtaining interview caused considerable hardship and inconvenience and there were occasions when, even after obtaining prior appointment from the District Magistrate, Delhi, her lawyer could not have an interview with her since no Customs Officer nominated by the Collector of Customs remained present at the appointed time. The petitioner was thus effectively denied the facility of interview with her lawyer and even her young daughter 5 years old could not meet her except once in a month. This restriction on interviews was imposed by the Prison Authorities by virtue of clause 3(b) sub-clauses (i) and

(ii) of the Conditions of Detention laid down by the Delhi Administration under an Order dated 23rd August 1975 issued in exercise of the powers conferred under section 5 of the COFEPOSA Act. These two sub-clauses of clause 3(b) provided inter alia as under:

"3. The conditions of detention in respect of classification and interviews shall be as under:-

(a) ..........

(b) Interviews: Subject to the direction issued by the Administrator from time to time, permission for the grant of interviews with a detenu shall be granted by the District Magistrate, Delhi as under:-

(i) Interview with legal adviser:

Interview with legal adviser in connection with defence of a detenu in a criminal case or in regard to writ petitions and the like, may be allowed by prior appointment, in the presence of an officer of Customs/Central Excise/ Enforcement to be nominated by the local Collector of Customs/Central Excise or Deputy Director of Enforcement who sponsors the case for detention.

(ii) Interview with family members:

A monthly interview may be permitted for members of the family consisting of wife,
children or parents of the detenu .........."

The petitioner, therefore, preferred a petition in this Court under Article 32 challenging the
constitutional validity of sub-clauses (i) and (ii) of clause 3(b) of the Conditions of Detention Order
and praying that the Administrator of the Union Territory of Delhi and the Superintendent of Tihar
Central Jail be directed to permit her to have interview with her lawyer and the members of her
family without complying with the restrictions laid down in those sub-clauses.

The principal ground on which the constitutional validity of sub-clauses (i) and (ii) of clause 3(b) of
the Conditions of Detention Order was challenged was that these provisions were violative of
Articles 14 and 21 of the Constitution inasmuch as they were arbitrary and unreasonable. It was
contended on behalf of the petitioner that allowing interview with the members of the family only
once in a month was discriminatory and unreasonable, particularly when under-trial prisoners were
granted the facility of interview with relatives and friends twice in a week under Rule 559A and
convicted prisoners were permitted to have interview with their relatives and friends once in a week
under Rule 550 of the Rules set out in the Manual for the Superintendence and Management of Jails
in the Punjab. The petitioner also urged that a detenu was entitled under Article 22 of the
Constitution to consult and be defended by a legal practitioner of his choice and she was, therefore
entitled to the facility of interview with a lawyer whom he wanted to consult or appear for him in a
legal proceeding and the requirement of prior appointment for interview and of the presence of a
Customs or Excise Officer at the interview was arbitrary and unreasonable and therefore violative of
Articles 14 and 21. The respondents resisted the contentions of the petitioner and submitted that
sub- clauses (i) and (ii) of clause 3(b) were not violative of Articles 14 and 21, since the restrictions
imposed by them were reasonable, fair and just, but stated that they would have no objection if
instead of a monthly interview, the petitioner was granted the facility of interview with her daughter
and sister twice in a week as in the case of under- trial prisoners and so far as interview with the
lawyer is concerned, they would not insist on the presence of a customs or excise officer at the
interview. Though these two concessions were made on behalf of the respondents at the hearing of
the petition before us, the question still remains whether sub-clause (i) and (ii) of cl. 3(b) are valid
and it is necessary that we should examine this question in the context of our constitutional values,
since there are a large number of detenus under the COFEPOSA Act and the conditions of their
detention in regard to interviews must be finally settled by this Court.

Now it is necessary to bear in mind the distinction between 'preventive detention' and punitive
detention', when we are considering the question of validity of conditions of detention. There is a
vital distinction between these two kinds of detention. 'Punitive detention' is intended to inflict
punishment on a person, who is found by the judicial process to have committed an offence, while
'preventive detention' is not by way of punishment at all, but it is intended to pre-empt a person
from indulging in conduct injurious to the society. The power of preventive detention has been
recognised as a necessary evil and is tolerated in a free society in the larger interest of security of the
State and maintenance of public order. It is a drastic power to detain a person without trial and

there are many countries where it is not allowed to be exercised except in times of war or aggression. Our Constitution does recognise the existence of this power, but it is hedged-in by various safeguards set out in Articles 21 and 22. Art. 22 in clauses (4) to (7), deals specifically with safeguards against preventive detention and any law of preventive detention or action by way of preventive detention taken under such law must be in conformity with the restrictions laid down by those clauses on pain of invalidation. But apart from Art. 22, there is also Art. 21 which lays down restrictions on the power of preventive detention. Until the decision of this Court in Maneka Gandhi. v. Union of India, a very narrow and constricted meaning was given to the guarantee embodied in Art. 21 and that article was understood to embody only that aspect of the rule of law, which requires that no one shall be deprived of his life or personal liberty without the authority of law. It was construed only as a guarantee against executive action unsupported by law. So long as there was some law, which prescribed a procedure authorising deprivation of life or personal liberty, it was supposed to meet the requirement of Art. 21. But in Maneka Gandhi's case (supra), this Court for the first time opened-up a new dimension of Art. 21 and laid down that Art. 21 is not only a guarantee against executive action unsupported by law, but is also a restriction on law making. It is not enough to secure compliance with the prescription of Article 21 that there should be a law prescribing some semblance of a procedure for depriving a person of his life or personal liberty, but the procedure prescribed by the law must be reasonable, fair and just and if it is not so, the law would be void as violating the guarantee of Art. 21. This Court expanded the scope and ambit of the right to life and personal liberty enshrined in Art. 21 and sowed the seed for future development of the law enlarging this most fundamental of Fundamental Rights. This decision in Maneka Gandhi's case became the starting point-the-spring-board-for a most spectacular evolution the law culminating in the decisions in M. O. Hoscot v.

State of Maharashtra,, Hussainara Khatoon's case, the first Sunil Batra's case and the second Sunil Batra's case. The position now is that Art. 21 as interpreted in Maneka Gandhi's case (supra) requires that no one shall be deprived of his life or personal liberty except by procedure established by law and this procedure must be reasonable, fair and just and not arbitrary, whimsical or fanciful and it is for the Court to decide in the exercise of its constitutional power of judicial review whether the deprivation of life or personal liberty in a given case is by procedure, which is reasonable, fair and just or it is otherwise. The law of preventive detention has therefore now to pass the test not only of Art. 22, but also of Art. 21 and if the constitutional validity of any such law is challenged, the Court would have to decide whether the procedure laid down by such law for depriving a person of his personal liberty is reasonable, fair and just. But despite these safeguards laid down by the Constitution and creatively evolved by the Courts, the power of preventive detention is a frightful and awesome power with drastic consequences affecting personal liberty, which is the most cherished and prized possession of man in a civilised society. It is a power to be exercised with the greatest care and caution and the courts have to be ever vigilant to see that this power is not abused or misused. It must always be remembered that preventive detention is qualitatively different from punitive detention and their purposes are different. In case of punitive detention, the person concerned is detained by way of punishment after he is found guilty of wrong doing as a result of trial where he has the fullest opportunity to defend himself, while in case of preventive detention, he is detained merely on suspicion with a view to preventing him from doing harm in future and the opportunity that he has for contesting the action of the Executive is very limited. Having regard to

this distinctive character of preventive detention, which aims not at punishing an individual for a wrong done by him, but at curtailing his liberty with a view to pre-empting his injurious activities in future, it has been laid down by this Court in Sampat Prakash v. State of Jammu and Kashmir "that the restrictions placed on a person preventively detained must, consistently with the effectiveness of detention, be minimal."

The question which then arises is whether a person preventively detained in a prison has any rights which he can enforce in a Court of law. Once his freedom is curtailed by incarceration in a jail, does he have any fundamental rights at all or does he leave them behind, when he enters the prison gate ? The answer to this question is no longer res integra. It has been held by this Court in the two Sunil Batra cases that "fundamental rights do not flee the person as he enters the prison although they may suffer shrinkage necessitated by incarceration." The prisoner or detenu has all the fundamental rights and other legal rights available to a free person, save those which are incapable of enjoyment by reason of incarceration. Even before the two Sunil Batra cases, this position was impliedly accepted in State of Maharashtra v. Prabhakar Sanzgiri and it was spelt-out clearly and in no uncertain terms by Chandrachud, J. as he then was, in D. B. Patnaik v. State of Andhra Pradesh :

> "Convicts are not, by mere reason of the conviction, denuded of all the fundamental rights which they otherwise possess. A compulsion under the authority of law, following upon a conviction, to live in a prison-house entails to by its own force the deprivation of fundamental freedoms like the right to move freely throughout the territory of India or the right to "practise" a profession. A man of profession would thus stand stripped of his right to hold consultations while serving out his sentence. But the Constitution guarantees other freedoms like the right to acquire, hold and dispose of property for the exercise of which incarceration can be no impediment. Likewise, even a convict is entitled to the precious right guaranteed by Art. 21 of the Constitution that he shall not be deprived of his life or personal liberty except according to procedure established by law."

This statement of the law was affirmed by a Bench of five Judges of this Court in the first Sunil Batra case (supra) and by Krishna Iyer, J. speaking on behalf of the Court in the second Sunil Batra case (supra). Krishna Iyer, J. in the latter case proceeded to add in his characteristic style; "The jurisdictional reach and range of this Court's writ to hold prison caprice and cruelty in constitutional leash is incontestable" and concluded by observing; "Thus it is now clear law that a prisoner wears the armour of basic freedom even behind bars and that on breach thereof by lawless officials the law will respond to his distress signals through 'writ' aid. The Indian human has a constant companion-the Court armed with the Constitution."

It is interesting to note that the Supreme Court of the United States has also taken the same view in regard to rights of prisoners. Mr. Justice Douglas struck a humanistic note when he said in Eve Pall's case :

> "Prisoners are still persons entitled to all constitutional rights unless their liberty has been constitutionally curtailed by procedures that satisfy all the requirements of due

process."

So also in Charles Wolff's case, Mr. Justice White made the same point in emphatic terms.

> "But, though his rights may be diminished by environment, a prisoner is not wholly stripped off constitutional protections, when he is imprisoned for crime. There is no iron curtain drawn between the Constitution and the prisons of this country."

Mr. Justice Douglas reiterated his thesis when he asserted:

> "Every prisoner's liberty i.e. of courses, circumscribed by the very fact of his confinement, but his interest in the limited liberty left to him is then only the more substantial. Conviction of a crime does not render one a non-person whose rights are subject to the whim of the prison administration, and therefore, the imposition of any serious punishment within the system requires procedural safeguards."

Mr. Justice Marshall also expressed himself clearly and explicitly in the same terms:

> "I have previously stated my view that a prisoner does not shed his basic constitutional rights at the prison gate, and I fully support the court's holding that the interest of inmates in freedom from imposition of serious discipline is a 'liberty' entitled to due process protection."

What is stated by these learned Judges in regard to the rights of a prisoner under the Constitution of the United States applies equally in regard to the rights of a prisoner or detenu under our constitutional system. It must, therefore, now be taken to be well-settled that a prisoner or detenu is not stripped of his fundamental or other legal rights, save those which are inconsistent with his incarceration, and if any of these rights are violated, the Court which is to use the words of Krishna Iyer, J., "not a distant abstraction omnipotent in the books but an activist institution which is the cynosure of public hope," will immediately spring into action and run to his rescue.

We must therefore proceed to consider whether any of the Fundamental Rights of the detenu are violated by sub- clauses (i) and (ii) of clause 3(b) so as to result in their invalidation wholly or in part. We will first take up for consideration the Fundamental Right of the detenu under Article 21 because that is a Fundamental Right which has, after the decision in Maneka Gandhi's case (supra), a highly activist magnitude and it embodies a constitutional value of supreme importance in a democratic society. It provides that no one shall be deprived of his life or personal liberty except according to procedure established by law and such procedure shall be reasonable fair, and just. Now what is the true scope and ambit of the right to life guaranteed under this Article ? While arriving at the proper meaning and content of the right to life, we must remember that it is a constitutional provision which we are expounding and moreover it is a provision enacting a Fundamental right and the attempt of the court should always be to expand the reach and ambit of the Fundamental right rather than to attenuate its meaning and content. The luminous guideline in the interpretation of a constitutional provision is provided by the Supreme Court of United States in

Weems v. U. S. 54 Lawyers Edition 801.

> "Legislation, both statutory and constitutional is enacted, it is true, from an experience of evils, but- its general language should not, therefore, be necessarily confined to the form that evil had, therefore taken. Time works changes, brings into existence new conditions and purposes. Therefore, a principle, to be vital, must be capable of wider application than mischief which gave it birth. This is peculiarly true of constitutions. They are not ephemeral enactments designed to meet passing occasions. They are, to use the words of Chief Justice Marshall, "designed to approach immorality as nearly as human institutions can approach it" The future is their care, and provisions for events of good and bad tendencies of which no prophecy can be made. In the application of a constitution, therefore, our contemplation cannot be only of what has been, but of what may be. Under any other rule a constitution would indeed be as easy of application as it would be deficient in efficacy and power. Its general principles would have little value, and be converted by precedent into important and lifeless formulas. Rights declared in the words might be lost in reality. And this has been recognised. The meaning and vitality of the Constitution have developed against narrow and restrictive construction."

This principle of interpretation which requires that a Constitutional provision must be construed, not in a narrow and constricted sense but in a wide and liberal manner so as to anticipate and take account of changing conditions and purposes so that the Constitutional provision does not get atrophied or fossilized but remains flexible enough to meet the newly emerging problems and challenges, applies with greater force in relation to a fundamental right enacted by the Constitution. The fundamental right to life which is the most precious human right and which forms the ark of all other rights must therefore be interpreted in a broad and expansive spirit so as to invest it with significance and vitality which may endure for years to come and enhance the dignity of the individual and the worth of the human person.

Now obviously, the right to life enshrined in Article 21 can not be restricted to mere animal existence. It means something much more than just physical survival. In Kharak Singh v. State of Uttar Pradesh Subba Rao J. quoted with approval the following passage from the judgment of Field J. in Munn v. Illinois to emphasize the quality of life covered by Article 21:

> "By the term "life" as here used something more is meant than mere animal existence. The inhibition against its deprivation extends to all those limbs and faculties by which life is enjoyed. The provision equally prohibits the mutilation of the body or amputation of an arm or leg or the putting out of an eye or the destruction of any other organ of the body through which the soul communicates with the outer world."

and this passage was again accepted as laying down the correct law by the Constitution Bench of this Court in the first Sunil Batra case (supra). Every limb or faculty through which life is enjoyed is thus protected by Article 21 and a fortiorari, this would include the faculties of thinking and feeling. Now

deprivation which is inhibited by Article 21 may be total or partial, neither any limb or faculty can be totally destroyed nor can it be partially damaged. Moreover it is every kind of deprivation that is hit by Article 21, whether such deprivation be permanent or temporary and, furthermore, depriva-

tion is not an act which is complete once and for all: it is a continuing act and so long as it lasts, it must be in accordance with procedure established by law. It is therefore clear that any act which damages or injures or interferes with the use of, any limb or faculty of a person, either permanently or even temporarily, would be within the inhibition of Article 21.

But the question which arises is whether the right to life is limited only to protection of limb or faculty or does it go further and embrace something more. We think that the right to life includes the right to live with human dignity and all that goes along with it, namely, the bare necessaries of life such as adequate nutrition, clothing and shelter and facilities for reading, writing and expressing one-self in diverse forms, freely moving about and mixing and commingling with fellow human beings. Of course, the magnitude and content of the components of this right would depend upon the extent of the economic development of the country, but it must, in any view of the matter, include the right to the basic necessities of life and also the right to carry on such functions and activities as constitute the bare minimum expression of the human-self. Every act which offends against or impairs human dignity would constitute deprivation protanto of this right to live and it would have to be in accordance with reasonable, fair and just procedure established by law which stands the test of other fundamental rights. Now obviously, any form of torture or cruel, inhuman or degrading treatment would be offensive to human dignity and constitute an inroad into this right to live and it would, on this view, be prohibited by Article 21 unless it is in accordance with procedure prescribed by law, but no law which authorises and no procedure which leads to such torture or cruel, inhuman or degrading treatment can ever stand the test of reasonableness and non-arbitrariness: it would plainly be unconstitutional and void as being violative of Articles 14 and 21. It would thus be seen that there is implicit in Article 21 the right to protection against torture or cruel, inhuman or degrading treatment which is enunciated in Article 5 of the Universal Declaration of Human Rights and guaranteed by Article 7 of the International Covenant on Civil and Political Rights. This right to live which is comprehended within the broad connotation of the right to life can concededly be abridged according to procedure established by law and therefore when a person is lawfully imprisoned, this right to live is bound to suffer attenuation to the extent to which it is incapable of enjoyment by reason of incarceration. The prisoner or detenu obviously cannot move about freely by going outside the prison walls nor can he socialise at his free will with persons outside the jail. But, as part of the right to live with human dignity and therefore as a necessary component of the right to life, he would be entitled to have interviews with the members of his family and friends and no prison regulation or procedure laid down by prison regulation regulating the right to have interviews with the members of the family and friends can be upheld as constitutionally valid under Articles 14 and 21, unless it is reasonable, fair and just.

The same consequence would follow even if this problem is considered from the point of view of the right to personal liberty enshrined in Article 21, for the right to have interviews with members of the family and friends is clearly part of personal liberty guaranteed under that Article. The expression 'personal liberty' occurring in Article 21 has been given a broad and liberal interpretation in Maneka

Gandhi's case (supra) and it has been held in that case that the expression 'personal liberty used in that Article is of the widest amplitude and it covers a variety of rights which go to constitute the personal liberty of a man and it also includes rights which "have been raised to the status of distinct Fundamental Rights and given additional protection under Article 19". There can therefore be no doubt that 'personal liberty would include the right to socialise with members of the family and friends subject, of course, to any valid prison regulations and under Articles 14 and 21, such prison regulations must be reasonable and non-arbitrary. If any prison regulation or procedure laid down by it regulating the right to have interviews with members of the family and friends is arbitrary or unreasonable, it would be liable to be struck down as invalid as being violative of Articles 14 and 21.

Now obviously when an under-trial prisoner is granted the facility of interviews with relatives and friends twice in a week under Rule 559A and a convicted prisoner is permitted to have interviews with his relatives and friends once in a week under Rule 550, it is difficult to understand how sub-clause (ii) of Clause 3(b) of the Conditions of Detention Order, which restricts the interview only to one in a month in case of a detenu, can possibly be regarded as reasonable and non-arbitrary, particularly when a detenu stands on a higher pedestal than an under-trial prisoner or a convict and, as held by this Court in Sampath Prakash's case (supra) restrictions placed on a detenu must "consistent with the effectiveness of detention, be minimal." We would therefore unhesitatingly hold sub-clause

(ii) of clause 3(b) to be violative of Articles 14 and 21 in so far as it permits only one interview in a month to a detenu. We are of the view that a detenu must be permitted to have atleast two interviews in a week with relatives and friends and it should be possible for a relative or friend to have interview with the detenu at any reasonable hour on obtaining permission from the Superintendent of the Jail and it should not be necessary to seek the permission of the District Magistrate, Delhi, as the latter procedure would be cumbrous and unnecessary from the point of view of security and hence unreasonable. We would go so far as to say that even independently of Rules 550 and 559A, we would regard the present norm of two interviews in a week for prisoners as furnishing a criterion of what we would consider reasonable and non-arbitrary.

The same reasoning must also result in invalidation of sub-clause (i) of clause 3(b) of the Conditions of Detention Order which prescribes that a detenu can have interview with a legal adviser only after obtaining prior permission of the District Magistrate, Delhi and the interview has to take place in the presence of an officer of Customs/Central Excise/Enforcement to be nominated by the local Collector of Customs/Central Excise or Deputy Director of Enforcement who has sponsored the case for detention. The right of a detenu to consult a legal adviser of his choice for any purpose not necessarily limited to defence in a criminal proceeding but also for securing release from preventive detention of filing a writ petition or prosecuting any claim or proceeding, civil or criminal, is obviously included in the right to live with human dignity and is also part of personal liberty and the detenu cannot be deprived of this right nor can this right of the detenu be interfered with except in accordance with reasonable, fair and just procedure established by a valid law. A prison regulation may, therefore, regulate the right of a detenu to have interview with a legal adviser in a manner which is reasonable, fair and just but it cannot prescribe an arbitrary or unreasonable procedure for regulating such an interview and if it does so, it would be violative of Articles 14 and 21. Now in the

present case the legal adviser can have interview with a detenu only by prior appointment after obtaining permission of the District Magistrate, Delhi. This would obviously cause great hardship and inconvenience because the legal adviser would have to apply to the District Magistrate, Delhi well in advance and then also the time fixed by the District Magistrate, Delhi may not be suitable to the legal adviser who would ordinarily be a busy practitioner and, in that event, from a practical point of view the right to consult a legal adviser would be rendered illusory. Moreover, the interview must take place in the presence of an officer of Customs/Central Excise/Enforcement to be nominated by the local Collector of Customs/Central Excise or Deputy Director of Enforcement who has sponsored the detention and this too would seem to be an unreasonable procedural requirement because in order to secure the presence of such officer at the interview, the District Magistrate, Delhi would have to fix the time for the interview in consultation with the Collector of Customs/Central Excise or the Deputy Director of Enforcement and it may become difficult to synchronise the time which suits the legal adviser with the time convenient to the concerned officer and furthermore if the nominated officer does not, for any reason, attend at the appointed time, as seems to have happened on quite a few occasions in the case of the petitioner, the interview cannot be held at all and the legal adviser would have to go back without meeting the detenu and the entire procedure for applying for an appointment to the District Magistrate, Delhi would have to be gone through once again. We may point out that no satisfactory explanation has been given on behalf of the respondents disclosing the rationale of this requirement.

We are therefore of view that sub-clause (i) of clause 3(b) regulating the right of a detenu to have interview with a legal adviser of his choice is violative of Arts. 14 and 21 and must be held to be unconstitutional and void. We think that it would be quite reasonable if a detenu were to be entitled to have interview with his legal adviser at any reasonable hour during the day after taking appointment from the Superintendent of the Jail, which appointment should be given by the Superintendent without any avoidable delay. We may add that the interview need not necessarily take place in the presence of a nominated officer of Customs/Central Excise/Enforcement but if the presence of such officer can be conveniently secured at the time of the interview without involving any postponement of the interview, then such officer and if his presence cannot be so secured, then any other Jail official may, if thought necessary, watch the interview but not as to be within hearing distance of the detenu and the legal adviser.

We accordingly allow the writ petition and grant relief to the extent indicated above.

    V.D.K.                                    Petition allowed.

# EXHIBIT J

Supreme Court of India

V.Ravi Chandran vs Union Of India & Ors on 17 November, 2009

Author: R Lodha

Bench: Tarun Chatterjee, R.M. Lodha, B.S. Chauhan

```
                                                       Reportable

            IN THE SUPREME COURT OF INDIA
            CRIMINAL ORIGINAL JURISDICTION

         WRIT PETITION (CRL.) NO.112/2007


   Dr. V. Ravi Chandran                            ..Petitioner

                          Versus

   Union of India & Ors.                           ..Respondents



                        JUDGMENT
```

R.M. LODHA, J.

Adithya is a boy of seven, born on July 1, 2002, in the United States of America. He is a foreign national. The petition before us is by the father - Dr. V . Ravi Chandran--praying for a writ of habeas corpus for the production of his minor son Adithya and for handing over the custody and his passport to him.

2. On August 28, 2009, this Court passed an order requesting Director, Central Bureau of Investigation (CBI) to trace minor Adithya and produce him before this Court. The necessity of such order arose as despite efforts made by the police officers and officials of different states, Adithya and his mother - respondent no. 6--Vijayasree Voora--could not be traced and their whereabouts could not be found for more than two years since the notice was issued by this Court. In pursuance of the order dated August 28, 2009, CBI issued look out notices on all India basis through heads of police of States, Union Territories and Metropolitan Cities and also alert notices through Deputy Director, Bureau of Immigration (Immigration), Ministry of Home Affairs, New Delhi and flashed photographs of the child Adithya and his mother Vijayasree Voora. Ultimately with its earnest efforts, CBI traced Adithya and his mother Vijayashree Voora in Chennai on October 24, 2009 and brought them to Delhi and produced the child along with his mother at the residential office of one of us (Tarun Chatterjee, J.) on October 25, 2009. On that day, the CBI authorities were directed to keep the child under their custody and produce him before the Court on October 27, 2009. Respondent no. 6 was also directed to be produced on that date. On October 27, 2009, the matter was adjourned for November 4, 2009 since respondent no.6 wanted to engage a lawyer and file a counter affidavit. On November 4, 2009, matter was adjourned to November 10, 2009 and then to November 12, 2009. The petitioner was permitted to meet the child for one hour on November 10, 2009 and November 12, 2009. In the meanwhile, respondent no. 6 has filed counter affidavit in

opposition to the habeas corpus petition and petitioner has filed rejoinder affidavit to the counter affidavit filed by respondent no.6.

3. We heard Ms. Pinky Anand, learned senior counsel for the petitioner and Mr. T.L.V. Iyer, learned senior counsel for respondent no. 6. Now since minor Adithya has been produced, the only question that remains to be considered is with regard to the prayer made by the petitioner for handing over the custody of minor Adithya to him with his passport.

4. But before we do that, it is necessary to notice few material facts. Dr. V. Ravi Chandran - petitioner - is an American citizen. He and respondent no. 6 got married on December 14, 2000 at Tirupathi, Andhra Pradesh according to Hindu rites. On July 1, 2002, Adithya was born in United States of America. In the month of July 2003, respondent no. 6 approached the New York State Supreme Court for divorce and dissolution of marriage. A consent order governing the issues of custody and guardianship of minor Adithya was passed by the New York State Supreme Court on April 18, 2005. The Court granted joint custody of the child to the petitioner and respondent no. 6 and it was stipulated in the order to keep the other party informed about the whereabouts of the child. On July 28, 2005, a Separation Agreement was entered between the petitioner and respondent no.6 for distribution of marital property, spouse maintenance and child support. As regards custody of the minor son Adithya and parenting time, the petitioner and respondent no. 6 consented to the order dated April 18, 2005. On September 8, 2005, the marriage between the petitioner and respondent no.6 was dissolved by the New York State Supreme Court. Child custody order dated April 18, 2005 was incorporated in that order.

5. Upon the petition for modification of custody filed by the petitioner and the petition for enforcement filed by him and upon the petition for enforcement filed by respondent no.6 before the Family Court of the State of New York, on June 18, 2007, upon the consent of both parties, inter - alia, the following order came to be passed:

"ORDERED, the parties shall share joint legal and physical custody of the minor child; and it is further ORDERED, that commencing during August 2007, Adithya shall reside in Allen, Texas; and it is further ORDERED, that the parties acknowledge that it is the intention of the parties to reside within the same community. As such, it is the mother's current intention to relocate to Texas, within a forty (40) mile radius of the father's residence. If the mother does relocate to a forty (40) mile radius of the father's residence (which shall be within a twenty (20) mile radius from the child's school),, the parties shall equally share physical custody of Adithya. The parties shall alternate physical custody on a weekly basis, with the exchange being on Friday, at the end of the School day, or at the time when school would ordinarily let out in the event that there is no school on Friday; ................ ...................................................................... ......................................................................

ORDERED, that in the event that the mother does not relocate within forty (40) miles from the father's residence located in Allen, Texas (and within twenty (20) miles of Adithya's school), the mother shall have custodial time with the minor child, as follows:

A. On Alternating weekends from Friday, at the end of the school day until Monday, prior to the beginning of school, commencing during the first week of September, 2007. Such periods of custodial time shall take place within forty (40) miles from the father's residence located in Allen, Texas. In the event that there is no school on the Friday of the mother's weekend, she shall have custodial time with the child beginning at 7.00 a.m. on Friday morning, and, in the event that there is no school on Monday of the mother's custodial weekend, she shall have custodial time until 5.00 p.m. on Monday, and B. For ten (10) consecutive days during Spring vacation from school; and C. For the entirety of the Christmas recess from School, except for Christmas Eve and Christmas day, which shall be with the father. In the event that the school recess is prior to Christmas Eve, the mother shall have the right to have custodial time during those recessed days to long as she produces the child at the father's residence for Christmas Eve and Christmas day ; and D. During the following holidays:

i) Mother's birthday, which is on April 25;

ii) Mother's Day;

iii) Hindu Festival of Diwali and Deepavali;

iv) Adithya's birthday (July 1) in alternating years;

v) Thanks giving in alternating years (so that the mother has custodial time during even -

numbered years and the father has custodial time during odd - numbered years);

vi) New Year's Day in alternating years (so that the mother has custodial time during even -

numbered years and the father has custodial time during odd -numbered years) ;............ .................

...........................................................

ORDERED, that the parties shall share the summer recess from school so that the mother has custodial time for a total of up to fifty (50) days on a schedule so that each party has custodial time for 4 consecutive weeks, with the mother's custodial time commencing on the Monday following the final day of school..........

ORDERED, for the summer of 2007, the mother shall have custodial time from June 18 until June 20; the father shall have custodial time from June 20 until June 24; the mother shall have custodial time from June 25 until July 1; the father shall have custodial time from July 1 until July 6; and the mother shall then have custodial time from July 6 until August 3 and she shall be solely responsible for transporting the child to the father's residence in Allen, Texas on August 3. The father shall have custodial time until the commencement of school. Thereafter the father shall continue to have custodial time until such time as the mother either a) returns from India and/or begins her alternating weekly schedule as set froth herein, or b) moves within 40 miles of the father's residence

in Allen, Texas and commences her custodial time during alternating weeks;....................................
........................................................... ............................................................

ORDERED, that each party agrees that they shall provide the other parent with a phone number and address where the child will be located at all time, and that the other parent shall have reasonable and regular telephone communication with the minor child; and it is further ORDERED, that each party agrees to provide the other party with the child's passport during each custodial exchange of the minor child, and that each party shall sign and deliver to the other, whatever written authorization may be necessary for travel with the child within the Continental United States or abroad;"...........................................

6. On June 28, 2007 respondent no.6 brought minor Adithya to India informing the petitioner that she would be residing with her parents in Chennai. On August 08, 2007, the petitioner filed the petition for modification (Custody) and Violation Petition (Custody) before the Family Court of the State of New York on which a show cause notice came to be issued to respondent no.6. On that very day, the petitioner was granted temporary sole legal and physical custody of Adithya and respondent no. 6 was directed to immediately turn over the minor child and his passport to the petitioner and further her custodial time with the minor child was suspended and it was ordered that the issue of custody of Adithya shall be heard in the jurisdiction of the United States Courts, specifically, the Albany County Family Court.

7. It transpires that the Family Court of the State of New York has issued child abuse non-bailable warrants against respondent no.6.

8. In the backdrop of the aforenoticed facts, we have to consider--now since the child has been produced--what should be the appropriate order in the facts and circumstances keeping in mind the interest of the child and the orders of the courts of the country of which the child is a national.

9. In re B--'s Settlement,1 Chancery Division was concerned with an application for custody by the father of an infant who had been made a ward of court. The father was a Belgian national and the mother a British national who took Belgian nationality on marriage to him. The infant was born in Belgium. The mother was granted a divorce by a judgment of the Court in Belgium, but the judgment was reversed and the father became entitled to custody by the common {1940} Ch. 54 law of Belgium. The mother, who had gone to live in England, visited Belgium and was by arrangement given the custody of the infant for some days. She took him to England and did not return him. The infant had been living with mother in England for nearly two years. The father began divorce proceedings in Belgium, and the Court appointed him guardian. Pending the proceedings, the Court gave him the custody and ordered the mother to return the infant within twenty-four hours of service of the order on her. She did not return the infant. The Correctional Court in Brussels fined her for disobedience and sentenced her to imprisonment should the fine be not paid. The Correctional Court also confirmed the custody order. In the backdrop of these facts, the summons taken out by the father that custody of the infant be given to him came up before Morton, J. who after hearing the parties and in view of the provisions of the Guardianship of Infants Act, 1925 observed thus:

"...At the moment my feeling is very strong that, even assuming in the father's favour that there is nothing in his character or habits which would render him unfitted to have the custody of the child, the welfare of the child requires, in all the circumstances as they exist, that he should remain in England for the time being.............................

In the present case the position is that nearly two years ago, when the child was already in England, an interlocutory order was made by the Divorce Court in Belgium giving the custody of the child to the father I do not know how far, if at all, the matter was considered on the footing of what was best for the child at that time, or whether it was regarded as a matter of course that the father, being the guardian by the common law of Belgium and the applicant in the divorce proceedings and the only parent in Belgium, should be given the custody. I cannot regard that order as rendering it in any way improper or contrary to the comity of nations if I now consider, when the boy has been in this country for nearly two years, what is in the best interests of the boy. I do not think it would be right for the Court, exercising its jurisdiction over a ward who is in this country, although he is a Belgian national, blindly to follow the order made in Belgium on October 5, 1937. I think the present case differs from Nugent v. Vetzera {FN10}, the case that was before Page Wood V.-C., and it is to be observed that even in that case, and in the special circumstances of that case, the Vice-Chancellor guarded himself against anything like abdication of the control of this Court over its wards. It does not appear what the Vice-Chancellor's view would have been if there had been evidence, for example, that it would be most detrimental to the health and well-being of the children if they were removed from England and sent to Austria.................................................. ........I ought to give due weight to any views formed by the Courts of the country whereof the infant is a national. But I desire to say quite plainly that in my view this Court is bound in every case, without exception, to treat the welfare of its ward as being the first and paramount consideration, whatever orders may have been made by the Courts of any other country.".................. .................. .............

10. In Mark T. Mc.Kee vs. Eyelyn McKee2, the Privy Council was concerned with an appeal from the Supreme Court of Canada. That was a case where the parents of the infant were American {1951} A.C. 352 citizens. They were married in America and to whom a son was born in California in July 1940. They separated in December 1940 and on September 4, 1941, executed an agreement which provided, inter- alia, that neither of them should remove the child out of the United States without the written permission of the other. By a judgment of December 17, 1942, in divorce proceedings before the Superior Court of the State of California, the custody of the child was awarded to the father. On August 1, 1945, following applications by the father and the mother, the previous order as to custody was modified to provide full custody of the child to the mother with right of reasonable visitation to the father. Thereafter, and without the consent or knowledge of the mother, the father went from the United States of America with the child into the Province of Ontario. The mother thereupon instituted habeas corpus proceedings in the Supreme Court of Ontario seeking to have the child delivered to her. Wells, J., before whom the matter came held that infant's best interests would be served in the custody of his father. The Court of Appeal for Ontario dismissed the appeal preferred by the mother. However, the Supreme Court of Canada by majority judgment allowed the appeal of the mother and set aside the order of custody of child to the father. On appeal from the Supreme Court of Canada at the instance of the father, the Privy Council held as follows:

"..........For, after reaffirming "the well established general rule that in all questions relating to the custody of an infant the paramount consideration is the welfare of the infant", he observed that no case had been referred to which established the proposition that, where the facts were such as he found them to exist in the case, the salient features of which have been stated, a parent by the simple expedient of taking the child with him across the border into Ontario for the sole purpose of avoiding obedience to the judgment of the court, whose jurisdiction he himself invoked, becomes "entitled as of right to have the whole question retried in our courts and to have them reach a anew and independent judgment as to what is best for the infant". and it is, in effect, because he held that the father had no such right that the judge allowed the appeal of the mother, and that the Supreme Court made the order already referred to.

But with great respect to the judge, this was not the question which had to be determined. It is possible that a case might arise in which it appeared to a court, before which the question of custody of an infant came, that it was in the best interests of that infant that it should not look beyond the circumstances in which its jurisdiction was invoked and for that reason give effect to the foreign judgment without further inquiry. But it is the negation of the proposition, from which every judgment in this case has proceeded, namely, that the infant's welfare is the paramount consideration, to say that where the trial judge has in his discretion thought fit not to take the drastic course above indicated, but to examine all the circumstances and form an independent judgment, his decision ought for that reason to be overruled. Once it is conceded that the court of Ontario had jurisdiction to entertain the question of custody and that it need not blindly follow an order made by a foreign court, the consequence cannot be escaped that it must form an independent judgment on the question, though in doing so it will give proper weight to the foreign judgment. What is the proper weight will depend on the circumstances of each case. It may be that, if the matter comes before the court of Ontario within a very short time of the foreign judgment and there is no new circumstance to be considered, the weight may be so great that such an order as the Supreme Court made in this case could be justified. But if so, it would be not because the court of Ontario, having assumed jurisdiction, then abdicated it, but because in the exercise of its jurisdiction it determined what was for the benefit of the infant.

It cannot be ignored that such consequences might follow as are suggested by Cartwright, J. The disappointed parent might meet stratagem by stratagem and, taking the child into the Province of Manitoba, invoke the protection of its courts, whose duty it would then be to determine the question of custody. That is a consideration which, with others, must be weighed by the trial judge. It is not, perhaps, a consideration which in the present case should have weighed heavily.

It has been said that the weight or persuasive effect of a foreign judgment must depend on the circumstances of each case. In the present case there was ample reason for the trial judge, in the first place, forming the opinion that he should not take the drastic course of following it without independent inquiry and, in the second place, coming to a different conclusion as to what was for the infant's benefit."...................................

11. The aforesaid two cases came up for consideration in Harben vs. Harben3, wherein Sachs J. observed as follows:

> "It has always been the practice of this court to ensure that a parent should not gain advantage by the use of fraud or force in relation to the kidnapping of children from the care of the other spouse, save perhaps where there is some quite overwhelming reason in the children's interest why the status quo should not be restored by the court before deciding further issues. In the present case I am concerned with three young children, two of whom are girls and the youngest is aged only three. It is a particularly wicked thing to snatch such children from the care of a mother, and, in saying that, I have in mind not merely the mother's position but the harm that can be done {1957} 1. W.L.R. 261 to the children. No affidavit of the husband tendering either his regrets or any vestige of excuse for his action has been proffered. Further, as I have already mentioned, when first I asked Mr. Syms what was the nature of the case which he might wish to make, if so minded, for depriving these children of a mother's care, he only spoke of her association with a certain man and never suggested that she had in any way whatsoever failed to look after the children properly."

12. In Kernot vs. Kernot4 , the facts were thus: In May 1961, the plaintiff mother, an Italian lady, married an English man in Italy where both were residents. A boy was born there on March 29, 1962. On October 19, 1963, they obtained in Italian Court a separation order by consent providing therein that custody of the child would remain with father, with rights of access to the mother . On October 29, 1963, the father brought the infant to England with intention to make England his home. The mother commenced wardship proceedings in which she brought a motion for an order that the father return the infant to her in Italy. She also prayed for restraint order against him from taking the infant out of her care. Buckley, J. in these facts held thus:

> "So that even where a foreign court has made an order on the merits - which is not the present case, because the only order which has been made was a consent order without any investigation of the merits by the Italian court - that domestic court before whom the matter comes (the Ontario {1965} Ch.217 court in the case to which I have just referred, or this court in the case before me) is bound to consider what is in the best interests of the infant; and although the order of the foreign court will be attended to as one of the circumstances to be taken into account it is not conclusive one way or the other. How much stronger must the duty of this court be to entertain the case where the foreign court has not made any order based on any investigation of the case on its merits."

13. In re H. (Infants)5, the Court of Appeal was concerned with two American boys whose divorced parents were both citizens of United States of America. On December 11, 1964, the Supreme Court of New York State made a consent order directing that the two boys whose custody had been given to the mother should be maintained in her apartment in New York and not be removed from a 50 miles' radius of Peekskill without the prior written consent of the father. However, the mother in

March 1965 brought these boys to England and bought a house for herself and children in June 1965. On June 15, 1965, the New York Court ordered the children to be returned to New York. The mother started wardship proceedings in the English court. The father took out motion asking the mother that the two children should be delivered into his care, that he should be at liberty to convey them to New York and that the wardship of the children should be discharged. The Trial Judge held (1966) 1 W.L.R. 381 = (1966) 1 All.E.R. 886 that the justice of the case required the children to be returned without delay to the jurisdiction of the New York court, so that the question of where and with whom they should live might be decided as soon as possible by that court. The mother appealed to the Court of Appeal. Willmer L.J. and Harman L.J. by their separate judgments affirmed the view of the Trial Judge and held that the proper order was to send these two boys back to their State of New York, where they belong (and where the Supreme Court is already seized of their case), and more especially so having regard to the fact that they have been kept in flagrant contempt of New York Court's order. Willmer L.J. agreed with the remark of Cross J. where he said:

> "The sudden and unauthorized removal of children from one country to another is far too frequent nowadays, and as it seems to me it is the duty of all courts in all countries to do all they can to ensure that the wrongdoer does not gain an advantage by his wrongdoing."

Willmer L.J. went on to hold:

> "The judge took the view (and I think it was the right view) that in a case such as the present it was not necessary to go into all the disputed questions between the parents, but that he ought to send these boys back to their own country to be dealt with by the court of their own country, provided that he was satisfied (as he was satisfied, having seen the father himself, and having had the benefit of the view expressed on behalf of the Official Solicitor) that they would come to no harm if the father took them back to the United States; and that this was so, even though it might subsequently turn out, after all the merits of the case had been thoroughly thrashed out in the court in New York, that it would perhaps be better after all for the boys to reside in England and see little or nothing of their father."

Harman L.J. in his separate judgment held thus:

> ".......But if he chose to take the course which the judge here took in the interests of the children , as he thought, of sending them back to the United States with no more inquiry into the matter than to ensure, so far as he could, that there was no danger to their moral or physical health in taking that course, I am of opinion that he was amply justified, and that that was the right way in which to approach the issue.
>
> These children had been the subject of an order (it is true made by consent) made in the courts of their own country in December, 1964. It was only three months later that the mother flouted that order, deceived her own advisers and deceived the court , and brought the children here with the object of taking them right out of their father's

life and depriving him altogether of their society. The interval is so short that it seems to me that the court inevitably was bound to view the matter through those spectacles; that is to say, that the order having been made so shortly before, and there being no difference in the circumstances in the three months which had elapsed , there was no justification for the course which the mother had taken, and that she was not entitled to seek to bolster her own wrong by seeking the assistance of this court in perpetuating that position, and seeking to change the situation to the father's disadvantage."

14. In re. L (minors)6, the Court of Appeal was concerned with the custody of the foreign children who were removed from foreign jurisdiction by one parent. That was a case where a German national domiciled and resident in Germany married an English woman. Their matrimonial home (1974) 1 All ER 913 was Germany and the two children were born out of the wedlock and brought up in Germany. The lady became unhappy in her married life and in August, 1972, she brought her children to England with an intention of permanently establishing herself and the children in England. She obtained residential employment in the school in England and the children were accommodated at the school. The children not having returned to Germany, the father came to England to find them. On October 25, 1972, the mother issued an originating summons making them wards of court. The trial judge found that the children should be brought up by their mother and treating the case as a `kidnapping' class of case, approached the matter by observing that in such a case where the children were foreign children, who had moved in a foreign home, their life should continue in what were their natural surroundings, unless it appeared to the court that it would be harmful to the children if they were returned. He concluded that in view of the arrangements which their father could make for them, the children would not be harmed by being returned. He, accordingly, ordered that they be returned to Germany and that they remain in their father's custody until further order. The mother appealed, contending that in every case the welfare of the child was the first and paramount consideration and that the welfare of the children would be best served by staying with their mother in England. Buckley, LJ in his detailed consideration of the matter, wherein he referred to the aforenoticed decisions and few other decisions as well, held as follows :

"…….Where the court has embarked on a full-scale investigation of that facts, the applicable principles, in my view, do not differ from those which apply to any other wardship case. The action of one party in kidnapping the child is doubtless one of the circumstances to be taken into account, any may be a circumstance of great weight; the weight to be attributed to it must depend on the circumstances of the particular case. The court may conclude that notwithstanding the conduct of the `kidnapper' the child should remain in his or her care (McKee v. McKee, Re E (an infant) and Re. T.A. (infants), where the order was merely interim); or it may conclude that the child should be returned to his or her native country or the jurisdiction from which he or she has been removed. Where a court makes a summary order for the return of a child to a foreign country without investigating the merits, the same principles, in my judgment apply, but the decision must be justified on somewhat different grounds.

V.Ravi Chandran vs Union Of India & Ors on 17 November, 2009

...............................................................................

...........The judge may well be persuaded that it would be better for the child that those merits should be investigated in a court in his native country than that he should spend in this country the period which must necessarily elapse before all the evidence can be assembled for adjudication here. Anyone who has had experience of the exercise of this delicate jurisdiction knows what complications can result from a child developing roots in new soil, and what conflicts this can occasion in the child's own life. Such roots can grow rapidly. An order that the child should be returned forthwith to the country from which he has been removed in the expectation that any dispute about his custody will be satisfactorily resolved in the courts of that country may well be regarded as being in the best interests of the child......"

15. In re. L. (minors)6, the Court of Appeal has made a distinction between cases, where the court considers the facts and fully investigates the merits of a dispute, in a wardship matter in which the welfare of the child concerned is not the only consideration but is the first and paramount consideration, and cases where the court do not embark on a full-scale investigation of the facts and make a summary order for the return of a child to a foreign country without investigating the merits. In this regard, Buckley, L.J. noticed what was indicated by the Privy Council in McKee v. McKee2 that there may be cases in which it is proper for a court in one jurisdiction to make an order directing that a child be returned to a foreign jurisdiction without investigating the merits of the dispute relating to the care of the child on the ground that such an order is in the best interest of the child.

16. This Court in Smt. Surinder Kaur Sandhu v. Harbax Singh Sandhu and Another7 was concerned with the custody of a child-- British citizen by birth--to the parents of Indian citizens, who after (1984) 3 SCC 698 their marriage settled in England. The child was removed by the husband from the house when the wife was in the factory where she was working and brought him to India. The wife obtained an order under Section 41(English) Supreme Court Act, 1981 whereby the husband was directed to handover the custody of the boy to her. The said order was later on confirmed by the High Court in England. The wife then came to India and filed a writ petition under Article 226 in the High Court praying for production and custody of the child. The High Court dismissed her writ petition against which the wife appealed before this Court. Y.V. Chandrachud, C.J. (as he then was) speaking for the Court held thus :

"The modern theory of Conflict of Laws recognises and, in any event, prefers the jurisdiction of the State which has the most intimate contact with the issues arising in the case. Jurisdiction is not attracted by the operation or creation of fortuitous circumstances such as the circumstance as to where the child, whose custody is in issue, is brought or for the time being lodged. To allow the assumption of jurisdiction by another State in such circumstances will only result in encouraging forum-shopping.

Ordinarily, jurisdiction must follow upon functional lines. That is to say, for example, that in matters relating to matrimony and custody, the law of that place must govern which has the closest

concern with the well-being of the spouses and the welfare of the offsprings of marriage. The spouses in this case had made England their home where this boy was born to them. The father cannot deprive the English Court of its jurisdiction to decide upon his custody by removing him to India, not in the normal movement of the matrimonial home but, by an act which was gravely detrimental to the peace of that home. The fact that the matrimonial home of the spouses was in England, establishes sufficient contacts or ties with that State in order to make it reasonable and just for the courts of that State to assume jurisdiction to enforce obligations which were incurred therein by the spouses. (See International Shoe Company v. State of Washington which was not a matrimonial case but which is regarded as the fountainhead of the subsequent developments of jurisdictional issues like the one involved in the instant case.) It is our duty and function to protect the wife against the burden of litigating in an inconvenient forum which she and her husband had left voluntarily in order to make their living in England, where they gave birth to this unfortunate boy."

17. In Mrs. Elizabeth Dinshaw v. Arvand M. Dinshaw and Another8, this Court held that it was the duty of courts in all countries to see that a parent doing wrong by removing children out of the country does not gain any advantage by his or her wrongdoing. In para 9 of the report, this Court considered the decision of the Court of Appeal in re H.5 and approved the same in the following words:

> "9. In Re H. (infants) [(1966) 1 All ER 886] the Court of Appeal in England had occasion to consider a somewhat similar question. That case concerned the abduction to England of two minor boys who were American citizens. The father was a natural-born American citizen and the mother, though of Scottish origin, had been resident for 20 years in the United States of America. They were divorced in 1953 by a decree in Mexico, which embodied provisions entrusting the custody of the two boys to the mother with liberal access to the father. By an amendment made in that order in December 1964, a provision was incorporated that the boys should reside at all times in the State of New York and should at all times be under the control and jurisdiction of the State of New York. In March 1965, the mother removed the boys to England, without having obtained the approval of the New York court, and without having consulted the father; she purchased a house in England with the intention of remaining there permanently and of cutting off all contacts with the father. She ignored an order made in June 1965, by the Supreme Court of New York State to return the boys there. On a motion on notice given by the father in the Chancery Division of the Court in England, the trial Judge Cross, J.

directed that since the children were American children and the (1987) 1 SCC 42 American court was the proper court to decide the issue of custody, and as it was the duty of courts in all countries to see that a parent doing wrong by removing children out of their country did not gain any advantage by his or her wrongdoing, the court without going into the merits of the question as to where and with whom the children should live, would order that the children should go back to America. In the appeal filed against the said judgment in the Court of Appeal, Willmer, L.J. while dismissing the appeal extracted with approval the following passage from the judgment of Cross, J. [(1965) 3 All ER

at p. 912. (Ed. : Source of the second quoted para could not be traced.)]:

> "The sudden and unauthorised removal of children from one country to another is far too frequent nowadays, and as it seems to me, it is the duty of all courts in all countries to do all they can to ensure that the wrongdoer does not gain an advantage by his wrongdoing.
>
> The courts in all countries ought, as I see it, to be careful not to do anything to encourage this tendency. This substitution of self-help for due process of law in this field can only harm the interests of wards generally, and a Judge should, as I see it, pay regard to the orders of the proper foreign court unless he is satisfied beyond reasonable doubt that to do so would inflict serious harm on the child."

10. With respect we are in complete agreement with the aforesaid enunciation of the principles of law to be applied by the courts in situations such as this."

18. In the case of Dhanwanti Joshi v. Madhav Unde9, this Court was again concerned with the matter relating to removal of a child from one country to another contrary to custody order of the court from where the child was removed. This court considered English decisions, inter alia, McKee v. McKee2 and H. (infants), re.5 and also noticed the decision of this Court in Mrs. Elizabeth Dinshaw8 and observed as follows :

(1998) 1 SCC 112 "28. The leading case in this behalf is the one rendered by the Privy Council in 1951, in McKee v. McKee [(1951) AC 352]. In that case, the parties, who were American citizens, were married in USA in 1933 and lived there till December 1946. But they had separated in December 1940. On 17-12-1941, a decree of divorce was passed in USA and custody of the child was given to the father and later varied in favour of the mother. At that stage, the father took away the child to Canada. In habeas corpus proceedings by the mother, though initially the decisions of lower courts went against her, the Supreme Court of Canada gave her custody but the said Court held that the father could not have the question of custody retried in Canada once the question was adjudicated in favour of the mother in the USA earlier. On appeal to the Privy Council, Lord Simonds held that in proceedings relating to custody before the Canadian Court, the welfare and happiness of the infant was of paramount consideration and the order of a foreign court in USA as to his custody can be given due weight in the circumstances of the case, but such an order of a foreign court was only one of the facts which must be taken into consideration. It was further held that it was the duty of the Canadian Court to form an independent judgment on the merits of the matter in regard to the welfare of the child. The order of the foreign court in US would yield to the welfare of the child. "Comity of courts demanded not its enforcement, but its grave consideration". This case arising from Canada which lays down the law for Canada and U.K. has been consistently followed in latter cases. This view was reiterated by the House of Lords in J v. C (1970 AC 668). This is the law also in USA (see 24 American Jurisprudence, para 1001) and Australia. (See Khamis v. Khamis [(1978) 4 Fam LR 410 (Full Court) (Aus)].

29. However, there is an apparent contradiction between the above view and the one expressed in H. (infants), Re[(1966) 1 All ER 886] and in E. (an infant), Re [(1967) 1 All ER 881] to the effect that the court in the country to which the child is removed will send back the child to the country from which the child has been removed. This apparent conflict was explained and resolved by the Court of Appeal in 1974 in L. (minors) (wardship : jurisdiction), Re [(1974) 1 All ER 913, CA] and in R. (minors) (wardship : jurisdiction), Re [(1981) 2 FLR 416 (CA)]. It was held by the Court of Appeal in L., Re [(1974) 1 All ER 913, CA] that the view in McKee v. McKee [1951 A.C. 352 : (1951) All ER 942] is still the correct view and that the limited question which arose in the latter decisions was whether the court in the country to which the child was removed could conduct (a) a summary inquiry or (b) an elaborate inquiry on the question of custody. In the case of (a) a summary inquiry, the court would return custody to the country from which the child was removed unless such return could be shown to be harmful to the child. In the case of (b) an elaborate inquiry, the court could go into the merits as to where the permanent welfare lay and ignore the order of the foreign court or treat the fact of removal of the child from another country as only one of the circumstances. The crucial question as to whether the Court (in the country to which the child is removed) would exercise the summary or elaborate procedure is to be determined according to the child's welfare. The summary jurisdiction to return the child is invoked, for example, if the child had been removed from its native land and removed to another country where, maybe, his native language is not spoken, or the child gets divorced from the social customs and contacts to which he has been accustomed, or if its education in his native land is interrupted and the child is being subjected to a foreign system of education, -- for these are all acts which could psychologically disturb the child. Again the summary jurisdiction is exercised only if the court to which the child has been removed is moved promptly and quickly, for in that event, the Judge may well be persuaded that it would be better for the child that those merits should be investigated in a court in his native country on the expectation that an early decision in the native country could be in the interests of the child before the child could develop roots in the country to which he had been removed. Alternatively, the said court might think of conducting an elaborate inquiry on merits and have regard to the other facts of the case and the time that has lapsed after the removal of the child and consider if it would be in the interests of the child not to have it returned to the country from which it had been removed. In that event, the unauthorised removal of the child from the native country would not come in the way of the court in the country to which the child has been removed, to ignore the removal and independently consider whether the sending back of the child to its native country would be in the paramount interests of the child. (See Rayden & Jackson, 15th Edn., 1988, pp. 1477-79; Bromley, Family law, 7th Edn., 1987.) In R. (minors) (wardship : jurisdiction), Re [(1981) 2 FLR 416 (CA)] it has been firmly held that the concept of forum conveniens has no place in wardship jurisdiction.

30. We may here state that this Court in Elizabeth Dinshaw v. Arvand M. Dinshaw [(1987) 1 SCC 42 : 1987 SCC (Crl.) 13] while dealing with a child removed by the father from USA contrary to the custody orders of the US Court directed that the child be sent back to USA to the mother not only because of the principle of comity but also because, on facts, -- which were independently considered -- it was in the interests of the child to be sent back to the native State. There the removal of the child by the father and the mother's application in India were within six months. In that context, this Court referred to H. (infants), Re which case, as pointed out by us above has been explained in L. Re as a case where the Court thought it fit to exercise its summary jurisdiction in the

interests of the child. Be that as it may, the general principles laid down in McKee v. McKee and J v. C and the distinction between summary and elaborate inquiries as stated in L. (infants), Re are today well settled in UK, Canada, Australia and the USA. The same principles apply in our country. Therefore nothing precludes the Indian courts from considering the question on merits, having regard to the delay from 1984 -- even assuming that the earlier orders passed in India do not operate as constructive res judicata."

However, in view of the fact that the child had lived with his mother in India for nearly twelve years, this Court held that it would not exercise a summary jurisdiction to return the child to United States of America on the ground that its removal from USA in 1984 was contrary to orders of U.S. Courts. It was also held that whenever a question arises before a court pertaining to the custody of a minor child, matter is to be decided not on considerations of the legal rights of the parties but on the sole and predominant criterion of what would best serve the interest of the minor.

19. In the case of Sarita Sharma v. Sushil Sharma10, this Court was seized with a matter where the mother had removed the children from U.S.A. despite the order of the American Court. It was held :

(2000) 3 SCC 14 "6. Therefore, it will not be proper to be guided entirely by the fact that the appellant Sarita had removed the children from U.S.A. despite the order of the Court of that country. So also, in view of the facts and circumstances of the case, the decree passed by the American Court though a relevant factor, cannot override the consideration of welfare of the minor children. We have already stated earlier that in U.S.A. respondent Sushil is staying along with his mother aged about 80 years. There is no one else in the family. The respondent appears to be in the habit of taking excessive alcohol. Though it is true that both the children have American citizenship and there is a possibility that in U.S.A they may be able to get better education, it is doubtful if the respondent will be in a position to take proper care of the children when they are so young. Out of them, one is a female child. She is aged about 5 years. Ordinarily, a female child should be allowed to remain with the mother so that she can be properly looked after. It is also not desirable that two children are separated from each other. If a female child has to stay with the mother, it will be in the interest of both the children that they both stay with the mother. Here in India also proper care of the children is taken and they are at present studying in good schools. We have not found the appellant wanting in taking proper care of the children. Both the children have a desire to stay with the mother. At the same time it must be said that the son, who is elder then the daughter, has good feelings for his father also. Considering all the aspects relating to the welfare of the children, we are of the opinion that in spite of the order passed by the Court in U.S.A. it was not proper for the High Court to have allowed the habeas corpus writ petition and directed the appellant to hand over custody of the children to the respondent and permit him to take them away to U.S.A. What would be in the interest of the children requires a full and thorough inquiry and, therefore, the High Court should have directed the respondent to initiate appropriate proceedings in which such an inquiry can be held. Still there is some possibility of the mother returning to U.S.A. in the interest of the children. Therefore, we do not desire to say anything more regarding entitlement of the custody of the children. The chances of the appellant returning to U.S.A. with the children would depend upon the joint efforts of the appellant and the respondent to get the arrest warrant cancelled by explaining to the Court in U.S.A. the circumstances under which she had left U.S.A. with the children without

taking permission of the Court. There is a possibility that both of them may thereafter be able to approach the Court which passed the decree to suitably modify the order with respect to the custody of the children and visitation rights."

20. While dealing with a case of custody of a child removed by a parent from one country to another in contravention to the orders of the court where the parties had set up their matrimonial home, the court in the country to which child has been removed must first consider the question whether the court could conduct an elaborate enquiry on the question of custody or by dealing with the matter summarily order a parent to return custody of the child to the country from which the child was removed and all aspects relating to child's welfare be investigated in a court in his own country. Should the court take a view that an elaborate enquiry is necessary, obviously the court is bound to consider the welfare and happiness of the child as the paramount consideration and go into all relevant aspects of welfare of child including stability and security, loving and understanding care and guidance and full development of the child's character, personality and talents. While doing so, the order of a foreign court as to his custody may be given due weight; the weight and persuasive effect of a foreign judgment must depend on the circumstances of each case. However, in a case where the court decides to exercise its jurisdiction summarily to return the child to his own country, keeping in view the jurisdiction of the Court in the native country which has the closest concern and the most intimate contact with the issues arising in the case, the court may leave the aspects relating to the welfare of the child to be investigated by the court in his own native country as that could be in the best interest of the child. The indication given in McKee v. McKee2 that there may be cases in which it is proper for a court in one jurisdiction to make an order directing that a child be returned to a foreign jurisdiction without investigating the merits of the dispute relating to the care of the child on the ground that such an order is in the best interest of the child has been explained in re. L (minors)6 and the said view has been approved by this Court in Dhanwanti Joshi9. Similar view taken by the Court of Appeal in re. H5 has been approved by this Court in Elizabeth Dinshaw8.

21. Do the facts and circumstances of the present case warrant an elaborate enquiry into the question of custody of minor Adithya and should the parties be relegated to the said procedure before appropriate forum in this country in this regard? In our judgment, this is not required. Admittedly, Adithya is an American citizen, born and brought up in United States of America. He has spent his initial years there. The natural habitat of Adithya is in United States of America. As a matter of fact, keeping in view the welfare and happiness of the child and in his best interest, the parties have obtained series of consent orders concerning his custody/parenting rights, maintenance etc. from the competent courts of jurisdiction in America. Initially, on April 18, 2005, a consent order governing the issues of custody and guardianship of minor Adithya was passed by the New York State Supreme Court whereunder the court granted joint custody of the child to the petitioner and respondent no. 6 and it was stipulated in the order to keep the other party informed about the whereabouts of the child. In a separation agreement entered into between the parties on July 28, 2005, the consent order dated April 18, 2005 regarding custody of minor son Adithya continued. In September 8, 2005 order whereby the marriage between the petitioner and respondent no. 6 was dissolved by the New York State Supreme Court, again the child custody order dated April 18, 2005 was incorporated. Then the petitioner and respondent no. 6 agreed for modification of the custody order and, accordingly, the Family Court of the State of New York on

June 18, 2007 ordered that the parties shall share joint legal and physical custody of the minor Adithya and, in this regard, a comprehensive arrangement in respect of the custody of the child has been made. The fact that all orders concerning the custody of the minor child Adithya have been passed by American courts by consent of the parties shows that the objections raised by respondent no. 6 in counter affidavit about deprivation of basic rights of the child by the petitioner in the past; failure of petitioner to give medication to the child; denial of education to the minor child; deprivation of stable environment to the minor child; and child abuse are hollow and without any substance. The objection raised by the respondent no. 6 in the counter affidavit that the American courts which passed the order/decree had no jurisdiction and being inconsistent to Indian laws cannot be executed in India also prima facie does not seem to have any merit since despite the fact that the respondent no. 6 has been staying in India for more than two years, she has not pursued any legal proceeding for the sole custody of the minor Adithya or for declaration that the orders passed by the American courts concerning the custody of minor child Adithya are null and void and without jurisdiction. Rather it transpires from the counter affidavit that initially respondent no. 6 initiated the proceedings under Guardianship and Wards Act but later on withdrew the same. The facts and circumstances noticed above leave no manner of doubt that merely because the child has been brought to India by respondent no. 6, the custody issue concerning minor child Adithya does not deserve to be gone into by the courts in India and it would be in accord with principles of comity as well as on facts to return the child back to the United States of America from where he has been removed and enable the parties to establish the case before the courts in the native State of the child, i.e. United States of America for modification of the existing custody orders. There is nothing on record which may even remotely suggest that it would be harmful for the child to be returned to his native country.

22. It is true that child Adithya has been in India for almost two years since he was removed by the mother--respondent no. 6

--contrary to the custody orders of the U.S. court passed by consent of the parties. It is also true that one of the factors to be kept in mind in exercise of summary jurisdiction in the interest of child is that application for custody/return of the child is made promptly and quickly after the child has been removed. This is so because any delay may result in child developing roots in the country to which he has been removed. From the counter affidavit that has been filed by respondent no. 6, it is apparent that in last two years child Adithya did not have education at one place. He has moved from one school to another. He was admitted in school at Dehradun by respondent no. 6 but then removed within few months. In the month of June, 2009, the child has been admitted in some school at Chennai. As a matter of fact, the minor child Adithya and respondent no. 6 could not be traced and their whereabouts could not be found for more than two years since the notice was issued by this Court. The respondent no. 6 and the child has been moving from one State to another. The parents of respondent no. 6 have filed an affidavit before this Court denying any knowledge or awareness of the whereabouts of respondent no. 6 and minor child Adithya ever since they left in September, 2007. In these circumstances, there has been no occasion for the child developing roots in this country. Moreover, the present habeas corpus petition has been filed by the petitioner promptly and without any delay, but since the respondent no. 6 has been moving from one State to another and her whereabouts were not known, the notice could not be served and child could not be

produced for more than two years.

23. In a case such as the present one, we are satisfied that return of minor Adithya to United States of America, for the time being, from where he has been removed and brought here would be in the best interest of the child and also such order is justified in view of the assurances given by the petitioner that he would bear all the traveling expenses and make living arrangements for respondent no. 6 in the United Sates of America till the necessary orders are passed by the competent court; that the petitioner would comply with the custody/parenting rights as per consent order dated June 18, 2007 till such time as the competent court in United States of America takes a further decision; that the petitioner will request that the warrants against respondent no. 6 be dropped; that the petitioner will not file or pursue any criminal charges for violation by respondent no. 6 of the consent order in the United States of America and that if any application is filed by respondent no. 6 in the competent court in United States of America, the petitioner shall cooperate in expeditious hearing of such application. The petitioner has also stated that he has obtained confirmation from Martha Hunt Elementary School, Murphy, Texas, 75094, that minor son Adithya will be admitted to school forthwith.

24. The learned Senior Counsel for respondent no. 6 sought to raise an objection regarding the maintainability of habeas corpus petition under Article 32 of the Constitution before this Court but we are not persuaded to accept the same. Suffice it to say that in the peculiar facts and circumstances of the case which have already been noticed above and the order that we intend to pass, invocation of jurisdiction of this Court under Article 32 cannot be said to be inappropriate.

25. We record our appreciation for the work done by the concerned officers/officials of CBI in tracing the minor child Adithya and producing him in less than two months of the order passed by this Court, although, the Police Officers and Officials of different States failed in tracing the child Adithya and respondent no. 6 for more than two years. But for the earnest efforts on the part of the CBI authorities, it would not have been possible for this Court to hear and decide this habeas corpus petition involving the sensitive issue concerning a child of seven years who is a foreign national.

26. In the result and for the reasons stated, we pass the following order :

> (i) The respondent no. 6 shall act as per the consent order dated June 18, 2007 passed by the Family Court of the State of New York till such time any further order is passed on the petition that may be moved by the parties henceforth and, accordingly, she will take the child Adithya of her own to the United States of America within fifteen days from today and report to that court.

(ii) The petitioner shall bear all the traveling expenses of the respondent no. 6 and minor child Adithya and make arrangements for the residence of respondent no. 6 in the United States of America till further orders are passed by the competent court.

(iii) The petitioner shall request the authorities that the warrants against respondent no. 6 be dropped. He shall not file or pursue any criminal charges for violation by respondent no. 6 of the

consent order in the United States of America.

(iv) The respondent no. 6 shall furnish her address and contact number in India to the CBI authorities and also inform them in advance the date and flight details of her departure along with child Adithya for United States of America.

(v) In the event of respondent no. 6 not taking the child Adithya of her own to United States of America within fifteen days from today, child Adithya with his passport shall be restored to the custody of the petitioner to be taken to United States of America. The child will be a ward of the concerned court that passed the consent order dated June 18, 2007. It will be open to respondent no. 6 to move that court for a review of the custody of the child, if so advised.

```
        (vi)    The parties shall bear their own costs.



                                             ..................
                ......J                      (Tarun Chatterjee)


                                             ..................
                                                       .....J
                                             (R. M. Lodha)



                                          .......................J
                                          (Dr. B.S. Chauhan)


        New Delhi
        November 17, 2009.
```

# EXHIBIT K

United India Insurance Co. Ltd. ... vs Patrica Jean Mahajan And Ors. Etc. ... on 8 July, 2002

Supreme Court of India

United India Insurance Co. Ltd. ... vs Patrica Jean Mahajan And Ors. Etc. ... on 8 July, 2002

Bench: D.P. Mohapatra, Brijesh Kumar

```
                    CASE NO.:
        Appeal (civil)  3655-58 of 2002

        PETITIONER:
        UNITED INDIA INSURANCE CO. LTD. ETC. ETC.

        RESPONDENT:
        PATRICA JEAN MAHAJAN AND ORS. ETC. ETC.

        DATE OF JUDGMENT: 08/07/2002

        BENCH:
        D.P. MOHAPATRA & BRIJESH KUMAR

        JUDGMENT:
```

JUDGMENT 2002 (3) SCR 1176 The Judgment of the Court was delivered by BRIJESH KUMAR, J. Leave granted.

The above noted four appeals arise out of the proceedings before the Motor Accident Claims Tribunal Tis Hazari, Delhi in Suit No. 325 of 1995. Since in all the appeals the judgment and order passed by the Division Bench of Delhi High Court has been challenged and the matters relate to the same accident, all these appeals have been heard together and they are being disposed of by this order.

The brief facts are that Dr. Suresh K. Mahajan aged 47-48 years a medical graduate went to America and established himself in the medical profession and became an American National. He established his own hospital in Michigan, U.S.A. He was on visit to India and on February 3, 1995 while proceeding to Jaipur from Delhi in a Maruti Car No. DL-4CB-1926 belonging to one of the two brothers travelling with him, a truck No. HR-29D-1125 hit the rear part of the Maruti Car. Dr. Mahajan was sitting on the back seat was injured and succumbed to his injuries. The Dependants of Dr. Suresh K. Mahajan filed a petition under Section 166 of the Motor Vehicles Act for compensation on account of death of Dr. Mahajan. According to the claimants Dr. Mahajan had specialized in the field of Nephrology and had set up his good practice and a hospital in Michigan U.S.A. According to the claimants, income of the deceased was progressively increasing every year out of his practice and the hospital and in the year 1994 his income was to the tune of 9 lacs US dollars. At the time of his death Dr. Suresh K. Mahajan left behind his wife Patrica Jean Mahajan, two daughters, a son and his parents residing in Delhi. According to the claimants, he was providing good education to his children and had also been sending a sum of Rs. 8,000 to his parents in Delhi. A compensation for a sum of Rs. 54 crores was claimed.

The Motor Accidents Claims Tribunal, after appreciation of the evidence and the material on the record and on detailed discussion therefore, recorded the finding that Dr. Mahajan received injuries and died because of the rash and negligent driving of the Troller No. HR 29-D-1125. So far the

amount of compensation is concerned, the Tribunal came to the conclusion that the carry home income of the deceased was 3,09204 US Dollars. Out of which, 2/3rd amount was set apart on account of self expenses of the deceased and 1/3rd amount was held to be the amount of dependency which came to 1,03068 US Dollars. A multiplier of 7 was applied to arrive at the figure of compensation, the amount came to 7,21,476 US Dollars, out of which deduction on account of benefits of social security system/LIC was deducted which included an amount of 2,50,000 US Dollars received by the claimants on account of personal life insurance of Dr. Mahajan. The other amounts paid to Mrs. Mahajan and two of her children on account of social security coming to a sum of 51,300 US Dollars were also deducted. The Tribunal deducted a total amount of 3,22,900 dollars. Applying the exchange rate of Rs. 30 a sum of Rs. 1.19 crores was awarded with interest at the rate of 12% from the date of filing of the petition up to the date of payment, the total amount thus come to about Rs. 1.62 crores.

The claimants approached the High Court in appeal. The learned Single Judge found that carry home income of the deceased was 3,39,445 US Dollars and out of the said amount, l/3rd of it instead of 2/3rd was liable to be deducted on account of self expenditure of the deceased, the amount of dependency thus, was fixed at 226297 US dollars. The learned Single Judge applied the multiplier of 10 and disallowed any deductions on account of social security system. The same rate of interest was maintained as awarded but the rate of exchange at Rs. 47/- was applied being the current rate as then prevailing. The total amount of compensation thus arrived at, came to Rs. 10.38 crores. The FAO No. 273 of 1998 preferred by the claimants was thus allowed in the manner indicated above. And the appeal preferred by the United India Insurance company Ltd. FAO No. 366 of 1998 was dismissed with an observation that there was no scope to disturb the finding of the Tribunal on the question of negligence of offending troller/driver. The parties preferred three Letters Patent Appeals before the Division Bench, which have been decided by the judgment and order dated 17.10.2001. The LPA No. 179 of 2001, preferred by Patrica Mahajan, and LPA No. 225 of 2001 and 236 of 2001 had been filed by the United Insurance Company Ltd. challenging the amount of compensation as awarded by the learned Single Judge and also the order upholding the finding of rash and negligent driving on the part of driver of the troller. By means of impugned judgment, the Division Bench maintained the order passed by the learned Single Judge but for application of multiplier and the exchange rate. In so far it related to exchange rate of Dollar, the Division Bench observed that it was a closed chapter since the amount awarded by the Tribunal at the exchange rate of Rs. 30 was withdrawn by the claimants and the exchange rate of Rs. 47 as awarded by the Single Judge was disallowed. The Division Bench applied the mutiplier of 13 according to second schedule to the Act referable to Section 163A of the Act. It was found that there was no reason not to follow the schedule which has been held by the Supreme Court to be safe guide to arrive at the amount of just compensation. In the result, the total amount i.e. principal with interest came to about Rs. 16.12 crores.

The above noted appeals have been filed against the judgment of the Division Bench, the United Insurance Company Ltd. raising a grievance against application of multiplier of 13 and disallowance of deduction on account of social security system. They also feel aggrieved by award of interest at the rate of 12% per annum. In one of the appeals preferred by the United India Insurance Company the finding of rash and negligent driving on the part of driver of the troller has also been sought to be

challenged. In the appeal preferred by the claimants, conversion rate of Dollar in terms of Rupees has been asked @ Rs. 47 as was awarded by the learned Single Judge.

We may first take up the question of application of appropriate multiplier in the facts and circumstances of this case. The multiplier of 13, has been applied by the Division Bench of the High Court strictly following the Second Schedule to the Act referable to Section 163A of the Act. The Petition was filed by the claimant for award of compensation under Section 166 of the Motor Vehicles Act. Before adverting to the case law on the point cited by the learned counsel for both the sides, it may be beneficial to peruse the two provisions indicated above. Section 163A as inserted by Act 54 of 1994 w.e.f. 14.11.1994 reads as under:-

"163A. Special Provisions as to payment of compensation on structured formula basis.-(1) Notwithstanding anything contained in this Act or in any other law for the time being in force or instrument having the force of law, the owner of the motor vehicle of the authorised insurer shall be liable to pay in the case of death or permanent disablement due to accident arising out of the use of motor vehicle, compensation, an indicated in the Second Schedule, to the legal heirs or the victim, as the case may be.

Explanation.-For the purposes of this sub-section, "permanent disability" shall have the same meaning and extent as in the Workmen's Compensation Act, 1923 (8 of the 1923).

(2) In any claim for compensation under sub-section (1), the claimant shall not be required to plead or establish that the death or permanent disablement in respect of which the claim has been made was due to any wrongful act or neglect or default of the owner of the vehicle/ or vehicles concerned or of any other person.

(3) The Central Government may, keeping in view the cost of living by notification in the Official Gazette, from time to time amend the Second Schedule."

The noticeable features of this provision are that it provides for compensation in the case of death or permanent disablement due to accident arising out of use of Motor Vehicle. The amount of compensation would be as indicated in the Second Schedule. The claimant is not required to plead or establish that the death or permanent disablement was due to any wrongful act or negligence or default of the owner of the vehicle or any other person. Award of compensation according to Schedule under this provision is also known as structured formula.

Section 166 reads as under:-

"Application for compensation-(1) An application for compensation arising out of an accident of the nature specified in sub-section (1) of section 165 may be made-

     (a)    by the person who has sustained the injury; or

     (b)    by the owner of the property; or

United India Insurance Co. Ltd. ... vs Patrica Jean Mahajan And Ors. Etc. ... on 8 July, 2002

```
(c)     where death has resulted from the accident, by all or any of the
legal representatives of the deceased; or

(d)     by any agent duly authorised by the person injured or all or any of
```

the legal representatives of the deceased, as the case may be;

Provided that where all the legal representatives of the deceased have not joined in any such application for compensation, the application shall be made on behalf of or for the benefit of all the legal representatives of the deceased and the legal representatives who have not so joined shall be impleaded as respondents to the application.

(2) Every application under sub-section (1) shall be made, at the option of the claimant, either to the Claims Tribunal having jurisdiction over the area in which the accident occurred or to the Claims Tribunal within the local limits of whose jurisdiction the claimant resides or carries on business or within the local limits of whose jurisdiction the defendant resides, and shall be in such form and contain such particulars as may be prescribed:

Provided that where no claim for compensation under section 140 is made in such application, the application shall contain a separate statement to that effect immediately before the signature of the applicant.

(4) The claims Tribunal shall treat any report of accidents forwarded to it under sub-section (6) of section 158 as an application for compensation under this Act.

It would also be necessary to peruse sub-Section 1 of Section 165 which reads as under:-

165. Claims Tribunals.-(1) A State Government may, by notification in the Official Gazette, constitute one or more Motor Accidents Claims Tribunals (hereafter in this Chapter referred to as Claims Tribunal) for such area as may be specified in the notification for the purpose of adjudicating upon claims for compensation in respect of accidents involving the death of or bodily injury to, persons arising out of the use of motor vehicles, or damages to any property of a third party so arising, or both.

Explanation.-For the removal of doubts, it is hereby declared that the expression "claims for compensation in respect of accidents involving the death of or bodily injury to persons arising out of the use of motor vehicles" includes claims for compensation under Section 140 and section 163A."

From the provisions quoted above, it is clear that a claim under Section 166 covers cases of all kinds of bodily injuries or damage to the property of third party or both. Under the explanation to sub-Section 1 of Section 165 it has been indicated that the provision includes the claims for compensation under Section 140 and Section 163A but it is nowhere provided that the amount of compensation is to be assessed or calculated according to the second Schedule. On the other hand, Section 168 provides the key leading to determination of amount of compensation under Section 166 of the Act. The relevant part of Section 168 reads as under:-

"168. Award of the Claims Tribunal.-On receipt of an application for compensation made under section 166, the Claims Tribunal shall, after giving notice of the application to the insurer and after giving the parties (including the insurer) an opportunity if being heard, hold an inquiry into the claims or as the case may be, each of the claims and, subject to the provisions of section 162 may make an award an award determining the amount of compensation which appears to it to be just and specifying the person or persons to whom compensation shall be paid and in making the award the Claims Tribunal shall specify the amount which shall be paid by the insurer of owner or driver of the vehicle involved in the accident or by all or any of them, as the case may be;

Provided that where such application makes a claims of compensation under section 140 in respect of the death or permanent disablement of any person, such claim and any other claim (whether made in such application or otherwise) for compensation in respect of such death or permanent disablement shall be disposed of in accordance with the provisions of Chapter X.

(2) The Claims Tribunal shall arrange shall arrange to deliver copies of the award to the parties concerned expeditiously and in any case within a period of fifteen days from the date of the award.

(3) When an award is made under this section. The person who is required to pay any amount in terms of such award shall, within thirty days of the date of announcing the award by the Claims Tribunal, deposit the entire amount awarded in such manner as the Claims Tribunal may direct."

It thus makes it clear that it is for the Tribunal to arrive at an amount of compensation which it may consider to be just in the facts and circumstances of the case. This Court however has been of the view that structured formula as provided under the Second Schedule would be a safe guide to calculate the amount of just compensation. Deviation though permissible may only be resorted to for some special reasons to do so. So far structured formula is concerned, it provides for a maximum multiplier of 18. The application of the multiplier depends upon the age of the deceased, age of his dependants, number of his dependents, the amount of dependency etc. Again we find that the structured formula relates to victim whose income is up to a sum of Rs. 40,000 per annum. It may be clarified that in the present case, it is not in dispute that the multiplier method, which is accepted and prevalent method, would be applicable and has been applied. The question of setting apart l/3rd of the income on account of expenditure on the self by the deceased is also not in dispute, i.e. to say that the amount of multiplicand shall be the 2/3rd of annual income of the deceased. The annual income of the deceased, as found by the learned Single Judge and the Division Bench namely $3,39445 is also not in dispute, nor the amount of dependency 2,26297 US Dollars. The only dispute is about application of 13 as multiplier as applied by a Division Bench of the High Court following the Second Schedule to the Act.

We may refer to the decision reported in [1994] 2 SCC 176 General Manager, Kerala State Road Transport Corporation, Trivandrum v. Susamma Thomas (Mrs.) and Ors.

In this case while considering the law on the subject, it was observed in para 13 of the report as follows:-

"The choice of the multiplier is determined by the age of the deceased (or that of the claimants whichever is higher) and by the calculation as to what capital sum, if invested at a rate of interest appropriate to a stable economy, would yield the multiplicand by way of annual interest. In ascertaining this, regard should also be had to the fact that ultimately the capital sum should also be consumed up over the period for which the dependency is expected to last."

It was reiterated in para 16 that the multiplier method is logically sound and legally well established as compared to other methods indicated in the other decisions in which different methods of computation was applied. It was observed that those cases cannot be said to have laid any principle of computation of compensation. The Court then further observes as follows:-

"The proper method of computation is the multiplier method. Any departure except in exceptional and extraordinary, cases, would introduce inconsistency of principle, lack of uniformity and an element of unpredictability for the assessment of compensation. Some judgments of the High Courts have justified a departure from the multiplier method on the ground that Section 110-B of the Motor Vehicles Act, 1939 in so far as it envisages the compensation to be just, the statutory determination of a just compensation would unshackle the exercise from any rigid formula. It must be borne in mind that the multiplier method is the accepted method of ensuring a just compensation which, will make for uniformity and certainty of the awards. We disapprove these decisions of the High Courts, which have taken a contrary view. We indicate that the multiplier method is the appropriate method, a departure from which can only be justified in rare and extraordinary circumstances and very exceptional cases."

In another decision reported in [1996] 4 SCC page 362 UP State Road Transport Corporation and Ors. v. Trilok Chand and Ors., the view taken in the case of Susamma Thomas (supra) has been reiterated. It has been held that in the case of Susamma Thomas maximum multiplier which could be applied was found to be 16 which according to this case can now be up to 18, in view of the Second Schedule. This part of the judgment has also been particularly relied upon by the learned counsel for the claimants. The Court has also agreed with the observations made in the case of Susamma Thomas that there should be no departure from the multiplier method, particularly on the ground of awarding just compensation, as it was provided under Section 110B of the Motor Vehicles Act 1939 corresponding to the present Section 168 of the Motor Vehicles Act 1988. It is further observed that multiplier method is accepted method for determining just compensation, which also brings about uniformity and certainty of award. In paragraph 18 it has however, been observed about Second Schedule that neither the Tribunals nor the Court can go by the ready reckner, it can only be used as guide. The Court has emphasized that in no case a multiplier should exceed 18 years purchase factor. It is however, observed as follows:-

"It can only be used as a guide. Besides the selection of multiplier, cannot in all cases be solely dependent on the age of the deceased. For example, if the deceased, a bachelor, dies at the age of 45 and his dependents are his parents, age of the parents would also be relevant in the choice of mutiplier." (emphasis supplied) What thus emerge from the above decisions is that the Court must adhere to the system of multiplier in arriving at the proper amount of compensation, and also with a view to maintain uniformity and certainty. Use of higher multiplier has been depricated and it is

emphasized that it can not exceed

18. The multiplier, as would be evident from the observations quoted earlier, may differ in the peculiar facts and circumstances of a particular case as according to the example cited where bachelor dies at the age of 45, the age of his dependent parents may be relevant for selecting a proper multiplier. Meaning thereby that a multiplier less than what is provided in the schedule could be applied in special facts and circumstances of a case. In the later cases also this Court has taken the same view that multiplier system is more appropriate and proper method for calculating the amount of compensation. [2001] 8 SCC 197 Lata Wadhwa and Ors. v. Stale of Bihar and Ors. may be referred to. Decision in the case of Sushamma Thomas (supra) and other English decision considered in the judgments referred earlier namely, Devis v. Tailor (1997) AC 207, Devis v. Paul Duffryn Associated Limited. 1942 (1) All Er. 657 (HL). Malleett v. Me Monagle (1970) AC 166 have been referred to.

In Jyoti Kaul and Ors. v. State of Madhya Pradesh, JT (2000) 7 SC page 367 this Court again referring, to the decision in the case of Susamma Thomas (supra) reiterated that multiplier system should be applied for the purposes of calculation of amount of compensation. It has also been observed that the question as to what mutiplier should be applied would depend upon various facts and circumstances of the case, hence the multiplier may change to some degree.

In the case in hand it is amply clear that it is not the case of any party that proper method of computing the amount of compensation, namely the multiplier method has not been applied. We have already seen that in the decisions referred to, in the earlier part of this judgment it is clearly stated that except in very rare cases, multiplier system should not be deviated from. The other methods, which were in vogue prior to introduction of multiplier system have been held to be no more good system. The choice of multiplier may differ to some degree as observed in the case of Jyoti Kaul (supra) depending upon various facts and circumstances of the case. Though, normally the multiplier as indicated in 2nd schedule should be applied as it is as found to be a safe guide for the purpose of calculation of amount of compensation. The Tribunal had applied the mutiplier of 7, which obviously was very low. While applying the mutiplier of 7, the Tribunal has observed that it had taken into consideration the age of the deceased and the yield, which, would have come by way of interest on the amount of compensation. The Tribunal though had also discussed that the two daughters of the deceased were age of 19 and 17 years and the age of son was 13 years, parents of the deceased were 69/ 73 years. The Tribunal was of the view that period of dependency may not be long for the children. Then in consideration of the fact that amount awarded by applying multiplier of 7 would yield an interest of about 87,000 US Dollars if invested at the rate of 12% per annum. The learned Single Judge of the High Court considering the age of the deceased and his dependants and the provisions of the Second Schedule and the decision of this Court in the case of Trilok Chand (supra) took the view that the application of mutiplier of 10 would be appropriate in the present case. The Division Bench in appeal has laid much stress on the fact that according to the decision in Susamma Thomas and Trilok Chand (supra) there should not be any deviation in the method of working out the amount of compensation applying multiplier method. There is nothing wrong in the statement of above propositions as indicated by the Division Bench. Different method can be resorted to only in rare and exceptional cases but the learned Single Judge had applied only

United India Insurance Co. Ltd. ... vs Patrica Jean Mahajan And Ors. Etc. ... on 8 July, 2002

mutiplier method and none-else, however looking to the facts and circumstances of the case, applied the multiplier of 10 instead of 13 as provided for the victims of the age group of deceased as in this case between 45 to 50 years. It is true as also noticed by the High Court that the 2nd Schedule should be taken as a guide, but it does not mean that no deviation in the figure of mutiplier itself, would be permissible in any case whatsoever. Normally, Second Schedule may provide a guide for application of multiplier but for valid and proper reasons, different mutiplier can be applied, indeed not exceeding 18 in any case on the upper side. As indicated in the case of Susamma Thomas (supra) itself the Court gave an example of a situation where the age of the victim may be 45 years, but who may be a bachelor with his parents alone as dependents, obviously, meaning thereby that lesser mutiplier could be applied in such a case. By applying a mutiplier other than the scheduled multiplier does not mean that any method other than multiplier method has been applied. For some special reasons some deviation from the scheduled multiplier can be made.

In the present case we find that the parents of the deceased were 69/ 73 years. Two daughters were aged 17 and 19 years. Main question, which strikes to us in this case is that in the given circumstances the amount of multiplicant also assumes relevance. The total amount of dependency as found by the learned Single Judge and also rightly upheld by the Division Bench comes to 226297 Dollars. Applying multiplier of 10, the amount with interest and the conversion rate of Rs. 47 comes to Rs. 10.38 crores and with multiplier of 13 at the conversion rate of Rs. 30 the amount came to Rs. 16.12 crores with interest. These amounts are huge indeed. Looking to the Indian economy, fiscal and financial situation, the amount is certainly a fabulous amount though in the background of American conditions it may not be so. Therefore, where there is so much of disparity in the economic conditions and affluence of the two places viz. the place to which the victim belongs and the place where the compensation is to be paid, a golden balance must be struck somewhere, to arrive at a reasonable and fair mesne. Looking by the Indian standards they may not be much too overcompensated and similarly not very much under compensated as well, in the background of the country where most of the dependent beneficiaries reside. Two of the dependants namely, parents aged 69/73 years live in India, but four of them are in the United States. Shri Soli J. Sorabjee submitted that the amount of multiplicand shall surely be relevant and in case it is a high amount, a lower mulitplier can appropriately be applied. We find force in this submission. Considering all the facts and factors as indicated above, to us it appears that application of multiplier of 7 is definitely on the lower side. Some deviation in the figure of multiplier would not mean that there may be a wide difference between the multiplier applied and the scheduled multiplier which in this case is 13. The difference between 7 and 13 is too wide. As observed earlier, looking to the high amount of multiplicand and the ages of the dependants and the fact that parents are residing in India in our view application of multiplier of 10 would be reasonable and would provide a fair compensation i.e. purchase factor of 10 years, We accordingly hold that multiplier of 10 as applied by the learned Single Judge should be restored instead of multiplier of 13 as applied by the Division Bench, We find no force in the submission made on behalf of the claimants that in no circumstances the amount of multiplicand would be a relevant consideration for application of appropriate multiplier. We have already given our reasons in the discussion held above.

The court can not be totally oblivion to the realities. The 2nd Schedule while prescribing the multiplier, had maximum income of Rs. 40,000 p.a. in mind , but it is considered to be a safe guide

for applying prescribed multiplier in cases of higher income also but in cases where the gap in income is so wide as in the present case income is 2,26,297$, in such a situation, it can not be said that some deviation in the multiplier, would be impermissible. Therefore, a deviation from applying the multiplier as provided in the 2nd Schedule may have to be made in this case. Apart from factors indicated earlier the amount of multiplicand also becomes a factor to be taken into account which in this case comes to 226297$ that is to say an amount of around Rs. 68 lacs per annum by converting it at the rate of Rs .30. By Indian standards it is certainly a high amount. Therefore, for the purposes of fair compensation, a lesser multiplier can be applied to a heavy amount of multiplicand. A deviation would be reasonably permissible in figure of multiplier even according to the observations made in the case of Susamma Thomas where a specific example was given about a person dying at the age of 45 leaving no heirs being a bachelor except his parents.

The purpose to compensate the dependants of the victims is that they may not be suddenly deprived of source of their maintenance and as far as possible they may be provided with the means as were available to them before the accident took place. It will be just and fair compensation, But in cases where the amount of compensation may go much higher than the amount providing the same amenities, comforts and facilities and also the way of life, in such circumstances also it may be a case where, while applying the multiplier system, the lesser multiplier may be applied. In such cases amount of multiplicand becomes relevant. The intention is not to over compensate.

We therefore hold that ordinarily while awarding comprehension, the provisions contained in the Second Schedule may be taken as a guide including the multiplier, but there may arise some cases, as one in hand, which may fall in the category having special feature or facts calling for deviation from the multiplier usually applicable.

Now we come to the next point raised by Mr. Soli J. Sorabjee, learned senior counsel appearing on behalf of the Insurance Company, about deductions, from the amount of compensation as received by the claimants on account of social security system. In this connection. It has been submitted that admittedly, the claimants had received 2,50,000 Dollars on account of life insurance policy of the deceased. Apart from that, Patricia Mahajan had also received unemployment allowance for a period of 8 and 9 months as well as two children out of the three. It may be noted here that the Tribunal had deducted the said amount, but it was disallowed by the learned Single Judge and upheld by the Division Bench.

Mr. Soli J. Sorabji submitted that while assessing the amount of compensation, the benefits which have accrued to the claimants by reason of death must also be taken into account. A kind of balancing of losses and the gains or benefit by reason of death would be necessary. In support of the above contention he has referred to a decision reported in [1962] 1 SCR 929 Gobald Motors Service Limited v. R.M.K. Veluswami and Ors. It is a decision by three judges Bench of this Court, and at page 938 the observations made by the House of Lords in Davies v. Powell Duffryn Associated Collieries Ltd., (1942 AC page 601) has been quoted which reads as follows:-

"The general rule which has always prevailed in regard to the assessment of damages under the fatal Accidents Acts is well settled, namely, that any benefit accruing to a dependant by reason of the

relevant death must be taken into account. Under those Acts the balance of loss and gain to a dependant by the death must be ascertained, the position of each dependant being considered separately."

To further elaborate the above proposition, observations made by Lord Wright in Devies case (supra) have also been quoted. It reads as follows:-

"The damages are to be based on the reasonable expectation of pecuniary benefit of benefit reducible to money value. In assessing the damages all circumstances which may be legitimately placed in diminution of the damages must be considered. The actual pecuniary loss of each individual entitled to sue can only be ascertained by balancing, on the one hand, the loss to him of the future pecuniary benefit, and on the other, any pecuniary advantage which from whatever source comes to him by reason of the death"

The learned counsel laid stress on the last part of observation made to the effect that - for the purposes of balancing losses and gains any pecuniary advantage which from whatever source come to them , has to be considered.

It is submitted in Gobald's case the principle of Devies case was referred and taken into consideration. Reliance has also been placed on a decision reported in [1971] 1 SCC page 785 M\s Shekhupura Transport Co. Ltd. v. Northern India Transport Company particularly to the observations made by the Court in paragraph 6 of judgment where the principle in the case of Gobalds Motors, (supra) has been reiterated. In this connection learned counsel for the Insurance Company has also drawn our attention to the decision in the case of Susamma thomas, (supra) particularly on paragraph 8 of the report, where it is observed that the principle in the case of Devies v. Powell was adopted, in the case of Gobald Motors (supra) It is thus submitted that principle of balancing of loss and gains, so as to arrive at a just and fair amount of compensation has been accepted by this court as well, On behalf of the Insurance company 1988 (3) All ER. 870 Hodgson v. Trapp and Anr. has been relied in which our attention has particularly been drawn to the following observations made at page 873.

"...........the basic rule is that it is the net consequential loss and expense which the Court must measure, it, in consequence of the injuries sustained, the plaintiff has enjoyed receipts to which he would not otherwise have been entitled, prima facie, those receipts are to be set against the aggregate of the plaintiff's losses and expenses in arriving at the measure of his damages. All this is elementary and has been said over and over again. To this basic rule there are of course, certain well established, though not always precisely defined and delineated, exceptions. But the Courts are, I think, sometimes in danger, in seeking to explore the rationale of the exceptions, of forgetting that they are exceptions. It is the rule which is fundamental and axiomatic and exceptions to it which are only to be admitted on grounds which clearly justify their treatment as such"

From the above passage it is clear that the deductions are admissible from the amount of compensation in case the claimant receives the benefit as a consequence of injuries sustained, which otherwise he would not have been entitled to. It does not cover cases where the payment received is

not dependent upon an injury sustained on meeting with an accident. The other observation to which our attention has been drawn at Page 876 plassitam F also does not help the contention raised on behalf of the Insurance Company for deduction of amounts in the present case. The Court was considering a situation where due to the injuries received the victim was claiming cost of care necessary in future in respect of which statutory provision, provided for attendant's allowance. It was found that the statutory benefit and the damages claimed were designed to meet the identical expenses. This is however not so at least not shown, to be so in the case in hand.

Shri Soli J. Sorabjee has also made references from ALR Digests under the heading Damages, From American Law Report 84 ALR2d. In some cases, depending upon the provisions of the Act, it was held that the amount of compensation for death by wrongful act should not be diminished on receipt of social security benefit. In general, such payments have been regarded as being in the same category as amount paid to a surviving beneficiary on a life or casualty insurance policy or as a pension, which, it is well settled, are not to be considered in mitigating all damages sustained as a result of tortious death. (It is extracted from page 765 with reference to 16 Am Jur, Death $$ 222 and 223). In some cases a different view was taken by the American Courts. But it all depended upon the terms of the provisions of the policies.

A reference was also made to the report of the Royal Commission on civil liability and compensation for personal injury under the Chairmanship of Lord Pearson Volume-1 At pages 106 and 107 it recommended for taking into account the benefits which may be deducted from the amount of damages payable to the claimants. At page 109 it has recommended as follows:-

"Benefits to be offset-

481-We agree with the principle in the 1948 Acts that the benefits deducted should be limited to those payable to the plaintiff as a result of injury for which damages are awarded. In practice, this means that such benefits as state retirement pensions, child benefits and maternity benefits should be disregarded.

482-We recommend that the full value of social security benefits payable to an injured person or his dependents as a result of an injury for which damages are awarded should be deducted in assessment of damages."

And at page 118 under para 537 our attention has also been drawn to a passage which reads as under:-

"537. Under the present law in England, Wales and Northern Ireland, pecuniary benefits derived by a dependent of a deceased person from his estate are taken into account in assessing damages under the Fatal Accidents Acts. Usually, any deduction is unimportant because, if the sum would have been paid to the plaintiff in any event in the future (for example, under a will), it is not deducted in full. Instead, an allowance may be made for accelerated payment and certainty of receipt. Nor does the rule apply to payments under a life insurance policy or to the use of a home or property. A full deduction is, however, made where the dependant receives a sum awarded to the estate of the

deceased for non pecuniary loss." A perusal of the recommendations of the Royal Commission headed by Lord Pearson as referred to and relied upon on behalf of the Insurance Company also does not indicate that, all kinds of receipts or benefits as may be payable to the claimants from whatever source and under whatever statutory provisions have to be deducted. The recommendations made specific mention about non deductibility of amount of pension the benefit on account of Life Insurance. Child benefit and maternity benefit etc. !t is also specifically provided under para 482 quoted above that the recommendation is for deducting full value of social security benefits payable as a result of injury for which damages are awarded. That is to say benefits not related to the injury are not to be taken into account for deductions.

A reference to Mac Grager on damages 16 Edition has also been made in relation to deduction of social security benefits. Our attention is drawn to page 1065 paragraph 1628 and paragraph 642 at page 1071 where reference of the decision in Hodgson case (supra) has been made. It is stated that unless receipts fell within one of the very few exceptions to the basic rules, all benefits received as a result of injuries should now be deductible in order to achieve the proper compensation, and not over compensation of the plaintiff. It is further observed that payments by way of social security are not exceptional for these purposes according to the Hodgson's case.

Shri Soli J. Sorabjee, learned senior counsel also referred to Encyclopedia America page 186(1). There seems to be social security Act 1935 in force in America, providing for different kinds of social security. It is also indicated how the social security fund is constituted and utilized for payments under the social security of unemployed, dependent children, to the needy aged and to the disabled people etc. Tax is also realizable contributing into social security fund.

Shri P.P. Rao, learned senior counsel appearing for the claimants has submitted that only such amount received on account of social security can be deducted, which becomes payable by reason of death by accident and not otherwise. We find force in the submissions of the learned counsel on this score. It is further submitted that the unemployment allowance or other such social security benefit under the social security Act etc. are not necessarily dependent upon the accidental death of the bread earner. Such allowances are payable otherwise even though the victim may not have died and may be still alive. Therefore, such payments which are unconnected and unrelated with the event of an accident resulting in injury or death, have to be disregarded for the purposes of deduction from the amount of damages. He has also referred to some American decisions one of them is 230 S.O. 2(d)(1) 1968 Flaapp Lexis 5073 Marc A. O'NEAL........Appeal No. H-303. The Court of Appeals Florida first Districts the opinion of judge Carrol was countered by the other judges and the Chief Justice. He has drawn our attention to the following observation:

"Stated broadly the general Rule founded upon decisional law as well as logic and justice seems to be that a dependent can not reduce the damages for which there was otherwise be liable by showing that the plaintiff received compensation from a Collateral source such as benefits received from welfare and pension funds."

Learned senior counsel appearing on behalf of the claimants also submits that the High Court has rightly placed reliance upon a decision of this Court reported in [ 1999] 1 SCC page 90 Helen

Rebellos' case. It is further submitted that this Court has rightly made a distinction between the claims under the Fatal Accidents Act and the Motor Vehicles Act. Both parties have relied upon and referred to the above decision. The main question for consideration of the Court was in respect to the amount of Life Insurance as to whether the same was to be deducted from the amount of compensation payable to the claimants or not.

Shri P.P. Rao, learned counsel appearing for the claimants submitted that the scope of the provisions relating to award of compensation under the Motor Vehicles Act is wider as compared to the provisions of the Fatal Accident Acts, it is further indicated that the Gobald's case (supra) is a case under the Fatal Accident Acts. For the above contention he has relied upon the observation made in the Rebello's case. It has also been submitted that only such benefits, which accrued to the claimants by reason of death, occurred due to an accident and not otherwise, can be deducted. Apart from drawing distinction between the scope of provisions of the two Acts namely, Motor Vehicles Act and the Fatal Accident Act, this Court in the Helen Rebello's case accepted the argument that amount of insurance policies would be payable to the insured, the death may be accidental or otherwise, and even where the death may not occur the amount will be payable on its maturity. The insured chooses to have insurance policy and he keeps on paying the premium for the same, during all the time till maturity or his death. It has been held that such a pecuniary benefit by reason of death would not be such as may be deductible from the amount of compensation.

It may be useful to quote paragraph 33 of the decision which reads as under:-

"Thus it would not include that which the claimant receives on account of other forms of deaths, which he would have received even apart from accidental death. Thus, such pecuniary advantage would have no correlation to the accidental death for which compensation is computed. Any amount received or receivable not only on account of the accidental death but that which would have come to the claimant even otherwise, could not be construed to be the "pecuniary advantage" liable for deduction. However, where the employer insures his employee, as against injury or death arising out of an accident, any amount received out of such insurance on the happening of such incident may be an amount liable for deduction. However, our legislature has taken note of such contingency through the proviso of Section 95. Under it the liability of the insurer is excluded in respect of injury or death, arising out of and in the course of employment of an employee."

The Court has observed in the last part of the para 34:-

"How can an amount of loss and gains of all one contract be made applicable to the loss and gain of an other contract."

Similarly, how an amount receivable under a statute has any co-relation with an amount earned by an individual. Principle of loss and gain has to be on the same line within the same sphere, of course, subject to the contract to the contrary or any provisions of law. The court has further referred to receipts of Provident Fund which is a deferred payment out of contribution made by an employee during tenure of his service Such an amount is payable irrespective of accidental death of the employee. The same is the position relating to family pension. There is no co-relation between

the compensation payable on account of accidental death and the amounts receivable irrespective of such accidental death which otherwise in the normal course one would be entitled to receive. This Court for taking the above view has also referred to certain English decisions as discussed in paragraph 18 of the judgment.

We are in full agreement with the observations made in the case of Helen Rebello (supra) that principle of balancing between losses and gains, by reason of death, to arrive at amount of compensation is a general rule, but what is more important is that such receipts by the claimants must have some co-relation with the accidental death by reason of which alone the claimants have received the amounts. We do not think it would be necessary for us to go into the question of distinction made between the provisions of the Fatal Accident Act and the Motor Vehicles Act. According to the decisions referred to in the earlier part of this Judgment, it is clear that amount on account of social security as may have been received must have nexus or relation with the accidental injury or death, so far to be deductible from the amount of compensation. There must be some co-relation between the amount received and the accidental death or it may be in the same sphere, absence the amount received shall not be deducted from the amount of compensation. Thus the amount received on account of insurance policy of the deceased cannot be deducted from the amount of compensation though no doubt the receipt of the insurance amount is accelerated due to pre-mature death of the insured. So far other items in respect of which learned counsel for the Insurance Company has vehemently urged for example some allowance paid to the children, and Mrs. Patricia Mahajan under the social security system no co-relation of those receipts with the accidental death has been shown much less established. Apart from the fact that contribution comes from different sources for constituting the fund out of which, payment on account of social security system is made one of the constituent of fund is tax which is deducted from income for the purpose. We feel that the High Court has rightly disallowed any deduction on account of receipts under the Insurance Policy and other receipts under social security system which the claimant would have also other wise entitled to receive irrespective of accidental death of Dr. Mahajan. If the proposition "receipts from whatever source" is interpreted so widely that it may cover all the receipts, which may come into the hands of the claimants, in view of the mere death of the victim, it would only defeat the purpose of the Act providing for just compensation on account of accidental death. Such gains may be on account of savings or other investment etc. made by the deceased would not go to the benefit of wrong doer and the claimant should not be left worse of, if he had never taken an Insurance Policy or had not made investments for future returns.

We therefore, do not allow any deduction as pressed by the Insurance Company an account of receipts of Insurance Policy and social security benefits received by the claimants.

We may now pass on to the next question of rate of interest payable on the amount of compensation. It has been awarded at the rate of 12%.

Learned senior counsel for the respondent Shri P.P. Rao took an objection that the question relating to rate interest was not under challenge before the High Court. He has referred to the observations made by the Division Bench in its judgment to the effect "in any case, the rate of interest is not in dispute before us". Thereafter it is observed that the Tribunal had awarded interest @ 12% per

annum which was maintained by the learned Single Judge. Consequently, the Division Bench also did not think it appropriate to interfere with the award of interest @ 12% per annum. It is however refuted by the learned for the Insurance Company that the rate of interest was not in dispute. The learned counsel for the respondent has however submitted that the factual position as recorded by the Court that the rate of interest was not in dispute before the Court, should not be allowed to be disputed and it should be treated conclusive of the fact that the rate of interest was not is dispute before the Division Bench. He has in support of his contention referred to decisions of this Court, reported in [1982] 2 SCC 463; State of Maharashtra v. Ramdas Shrinivas Nayak and Anr. and [1992] Supp. 1 SCC; Apar (P) Ltd. and Am. v. Union of India and Ors. in which it has been held that concession made by a party and an observation made to that effect in the judgment, cannot be allowed to be denied. Only the Court which recorded the statement itself was competent to rectify the error if the Court recording the statement was approached to consider the matter without delay. The position as indicated in the above-noted decisions is undoubtedly correct and cannot be doubted. But in certain cases where a stray remark or observation made by the Court which is not very clear and is vague, and a different picture emerges from other part of judgment it may be open for this Court to ascertain the correct position on the basis of totality of the observations made in the judgment itself. In that light we may see the observations of the Division Bench in its judgment. It is nowhere indicated that the counsel appearing for the Insurance Company had made any statement conceding the rate of interest nor it is indicated how the concession was made. Then the observation that the "rate of interest was not in dispute before the Court" may only lead to an inference that the rate of interest was not disputed before the Court in the arguments advanced on behalf of the party concerned. But we, on the other hand, find that, on behalf of the Insurance Company, the learned counsel had cited the decisions to indicate that the lower rate of interest was awarded in certain decisions, which had been relied upon by him. This is enough to indicate that the rate of interest was actually disputed. More than one case, a reference of which has been made in the judgment of the Division Bench itself, has been relied upon by the counsel for the Insurance Company for reducing the rate of interest. The Division Bench in its judgment observed as follows:

"It has, however, also been brought to our notice that in A. Roverl v. United Insurance Co. Ltd., [1999] 8 SCC 228 the Supreme Court awarded interest at 6% from the date of the application till actual payment to the claimant. In Kanshnuma Begum (Smt.) and Ors v. United Insurance Co. Ltd., [2001] 2 SCC 9 this Court awarded interest at the rate of 9% per annum."

Thereafter the observations made in the case of Kanshnuma Begum (Supra) have been quoted. After so much of discussion on the point of rate of interest and after mentioning the decisions relied upon by both the sides on their part, it could not be said that rate of interest was not in dispute before the Court. As indicated earlier the observation is not indicated to have been made in reference to any statement of the counsel for the party nor it comes out that the respective parties may not have advanced arguments for maintaining the rate of interest as awarded and the other party for reducing the rate of interest. In the light of the position indicated above, we do not think it will be possible to shut out the Insurance Company from urging before us that lesser rate of interest should have been awarded in place of 12% as awarded by the High Court. Before us also, learned counsel for the Insurance Company has referred the decision of this Court reported in [1999] 8 SCC 226-A Robert v. Insurance Company Limited to indicate that interest at the rate 6% was awarded in that case.

Another case cited awarding 6% interest is reported in 2001 ACC 540, particularly paragraph 34 has been referred [1970] All ER 1202 Jefford and Anr. v. Gee has also been referred to indicate that the amount awarded is on account of loss of future earnings whereas the interest is payable on being kept out of the money. It is therefore submitted that the interest may not be payable on the loss of future earning. Another decision which has been referred to is reported in [1995] 1 SCC 551-R.D. Hattangadi v. Pest Control (India) Pvt. Ltd. and Ors. more particularly Para 18 of the judgment where it has been held that no interest is awardable on the amount of future expenditure. It is further observed: "It need not be pointed out that interest is to be paid over the amount which has become payable on the date of award and not which is to be paid for expenditures to be incurred in future" But it is not indicated by the learned counsel for the appellant Insurance Company as to which is that amount out of the amount awarded which is on account of future expenditure yet to be incurred by the claimants. The interest is to be awarded on the amount which is payable on the date of the award. It is also to be noted that in some cases interest at the rate of 6% was awarded. This case however does not help the appellant Insurance Company. The next case which has been cited is reported in [2001] 2 SCC 9 Kaushnuma Begum (Smt.) and Ors. v. New India Assurance Company Ltd. In this case interest at the rate of 9% was awarded. The reason indicated in Paragraph 24 of the Judgment, we quote hereunder:

"Now, we have to fix up the rate of interest. Section 171 of the MV Act empowers the Tribunal to direct that "in addition to the amount of compensation simple interest shall also be paid at such rate and from such date not earlier than the date of making the claims as may be specified in this behalf. Earlier, 12% was found to be the reasonable rate of simple interest. With a change in economy and the policy of Reserve Bank of India the interest rate has been lowered. The nationalized banks are now granting interest at the rate of 9% on fixed deposit for one year. We, therefore, direct that the compensation amount fixed hereinbefore shall bear interest at the rate of 9% per annum from the date of the claim made by the appellants."

In our view the reason indicated in the case of Kaushnuma Begum (supra) is a valid reason and it may be noticed that the rate of interest is already on the decline. We therefore, reduce the rate of interest to 9% in place of 12% as awarded by the High Court.

The next point which remains to be considered is in relation to the exchange rate of the Dollar in Rupee. The Motor Accident Claims Tribunal allowed the exchange rate of the Dollar at Rs. 30. The learned Single Judge allowed it at the then current rate of Rs. 47. The Division Bench restored the exchange rate at Rs. 30 observing that the matter was closed since the claimants had withdrawn the amount as awarded by the Tribunal and the matter was now on the second stage relating to enhanced amount of compensation. Shri P.P. Rao, learned senior counsel appearing for the appellants has vehemently urged that it is only the current rate which should be allowed since the value of the Rupee has fallen in exchange of Dollar after the application for claim was made and award was given. Therefore, the amount of Rupees as arrived at the change rate of Rs. 47 should be allowed. In connection with this submission about rate of conversion, a reference to a case reported in 1984 Supp SCC 263-Oil and Natural Gas Commission v. Forasal has been made. This Court held that rate of conversion as on the date of passing of the decree should be taken on the basis of which conversion should be allowed. We however find that the facts in that case are different. According to

the contract itself, a part of the payment was to be made in French currency. The question then arose as to what rate of conversion should be allowed. The Court was of the view that there would be three relevant dates for the purpose, namely, the date on which the amount became payable, the date of the filing of the suit and the date of the judgment and it was further held that it would be fairer to both the parties to take the latest of these dates, namely, the date of passing the decree as the relevant date for applying the conversion rate. In the present case since the deceased was an American citizen, settled there and income accrued to him in America in terms of Dollars, details of income etc. have been given in Dollars but so far the prayer for passing a decree is concerned, it was for a sum indicated in Rupees which figure was arrived at by the claimants applying Rs. 30 as the conversion rate. Therefore, in the present case there is no such dispute as to what rate of conversion was to be applied. As a matter of fact, whatever rate may have been applied by claimants, the fact remains that the decree in terms of Rupees specified for a sum of Rs. 54 crores was prayed for. In terms of the prayer whatever amount in rupee was found to be payable to the claimants was decreed. In the present case the exchange rate of Dollar against Rupee was relevant for the purpose of arriving at a fair assessment of the loss of the dependency of the claimants at the relevant time. In such a situation we are of the view that no such question as in the case of Oil and Natural Gas Commission (supra) is involved. The decree was for a definite sum it terms of Rupees, a part of which was found admissible which amount was decreed. There is no occasion to convert the amount of decree in Rupees into Dollars applying Rs. 30 as rate of conversion and then re- convert it in Rupees at the rate of Rs. 47 The claimants cannot ask for more than what was prayed for in the claim petition. We are therefore not inclined to accede to the request made for calculation of the amount of award at the conversion rate of Rs. 47.

Shri T.R. Rajagopalan, learned senior counsel appearing for the Insurance Company in SLP (c) 20874/2001 preferred on the question of rash and negligent driving against the driver of the Trailer advanced some arguments but we do not think that the finding of fact recorded by the Courts of fact namely the Motor Accident Claims Tribunal and upheld by the learned Single Judge as well as the Division Bench can be re-opened to re-assess the evidence on the point.

In view of the discussion held above, we partly allow the appeals of the Insurance Company (SLP c Nos. 20875 and 21858/2001) and set aside the part of the judgment of the Division Bench of the High Court by which it applied the multiplier of 13 in accordance with 2nd Schedule of the Motor Vehicles Act. We restore the order of the learned Single Judge to the extent it applied the multiplier of 10. The amount of compensation shall be calculated and be payable accordingly. So far rate of interest on the enhanced amount is concerned, we set aside the order passed by the High Court awarding interest at the rate of 12% per annum and we reduce it to 9% per annum. The appeal of the Insurance Company challenging the award against the finding of negligence (S.L.P. c 20874/2001) on the part of the driver of the Troller is dismissed. So far the appeal of the claimants (SLP c No. 22304/2001) for applying the conversion rate at Rs. 47 is concerned, it is dismissed and the order passed by the Division Bench for applying conversion rate at Rs. 30 is upheld. The appeal for allowing the deduction on account of receipt of the sums received by the claimants on social security system is dismissed and the order passed by the High Court dis- allowing any deduction is upheld.

The Motor Accident Claims Tribunal Tis Hazari, Delhi shall calculate the amount of compensation in accordance with the Judgment passed above that is to say it shall take the dependency amount as $ 226297 and shall apply the multiplier of 10. The conversion rate shall be @ Rs. 30. The amount shall bear interest @ 9% per annum as awarded instead of 12%.

Parties to bear their own costs.