IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 20-1237C
(Senior Judge Firestone)

TEJA RAVI,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

DEFENDANT'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION
TO DISMISS OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

BRIAN M. BOYNTON
Acting Assistant Attorney General

MARTIN F. HOCKEY, JR.
Acting Director

ERIC P. BRUSKIN
Assistant Director

MEEN GEU OH
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-0184
Email: Meen-Geu.Oh@usdoj.gov

July 2, 2021

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................1

STATEMENT OF FACTS .....................................................................................................3

    I.      Background On Immigration Law ...................................................................3

    II.     Student Visa Schemes .....................................................................................5

    III.    Government Officials Certify Operation Paper Chase, Which Authorizes
              The Creation Of The University Of Farmington ..........................................6

    IV.    Mr. Ravi, A Citizen Of India, Enrolls In And Pays "Tuition" To
              Farmington Under A "Special Arrangement" That He Is Told Is "Illegal" ...........9

    V.     Mr. Ravi Demands That The Government Return His Money Under
              A Breach Of Contract Theory ......................................................................13

ARGUMENT ........................................................................................................................15

    I.      Standards of Review ......................................................................................15

            A.      Legal Standard For Motions To Dismiss ..................................15

            B.      Legal Standard For Motions For Summary Judgement ...........15

    II.     Operation Paper Chase Was A Certified, And Lawfully Executed,
              Undercover Law Enforcement Operation, Which Bars Mr. Ravi
              From Attempting To Hold The Government Liable For Those
              Operations Under Breach Of Contract Theory ..........................................16

    III.    There Was No Tucker Act Contract To Provide Mr. Ravi With
               Educational Services .....................................................................................20

    IV.    Mr. Ravi Cannot Seek The Aid Of This (Or Any) Court To Enforce
              An Illegal Contract .......................................................................................23

CONCLUSION ....................................................................................................................27

## <u>TABLE OF AUTHORITES</u>

**Cases**                                                                        **Page(s)**

*Aluminum Shapes, LLC v. United States*,
   139 Fed. Cl. 709 (2018) ................................................................................. 17, 18, 19

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ................................................................................. 15

*Awad v. United* States,
   61 Fed. Cl. 281 (2004) ................................................................................. 18, 19

*Baha v. United States*,
   144 Fed. Cl. 500 (2019) ................................................................................. 21

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................. 22

*Casitas Mun. Water Dist. v. United States*,
   543 F.3d 1276 (Fed. Cir. 2008) ................................................................................. 15

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ................................................................................. 15

*City of Cincinnati v. United States*,
   153 F.3d 1375 (Fed. Cir. 1998) ................................................................................. 20

*City of El Centro v. United States*,
   922 F.2d 816 (Fed. Cir. 1990) ................................................................................. 20

*Clark v. United States,*
   102 U.S. 322 (1880) ................................................................................. 24

*Collins v. United States*,
   532 F.2d 1344 (Ct. Cl. 1976) ................................................................................. 22

*Frigard v. United States*,
   862 F.2d 201 (9th Cir. 1988) ................................................................................. 17

*Ga. Cas. & Surety Co. v. United States*,
   823 F.2d 260 (8th Cir. 1987) ................................................................................. 17

*H.F. Allen Orchards v. United States*,
   749 F.2d 1571 (Fed. Cir. 1984) ................................................................................. 20

*Harriman v. Northern Securities Co.*,
   197 U.S. 244 (1905) .......................................................................................... 24

*Hercules Inc. v. United States*,
   516 U.S. 417, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996) ........................................ 22

*Illinois v. Perkins*,
   496 U.S. 292 (1990) .......................................................................................... 16

*Jumah v. United States,*
   90 Fed. Cl. 603 (2009) ...................................................................................... 22

*Kania v. United States*,
   650 F.2d 264 (Ct. Cl. 1981) .............................................................................. 18

*Kardoh v. United States*,
   572 F.3d 697 (9th Cir. 2009)......................................................................... 23, 26

*Kellogg Brown & Root Servs., Inc. v. United States*,
   99 Fed. Cl. 488, 515 (2011), *aff'd*, 728 F.3d 1348 (Fed. Cir. 2013), *opinion corrected on
   denial of reh'g*, 563 F. App'x 769 (Fed. Cir. 2014) .................................................. 21

*Lumbermens Mut. Cas. Co. v. United States*,
   654 F.3d 1305 (Fed. Cir. 2011) ........................................................................ 22

*Mantilla v. United States*,
   302 F.3d 182 (3d Cir. 2002)............................................................................... 24

*Perez v. United States*,
   156 F.3d 1366 (Fed. Cir. 1998)......................................................................... 21

*Redmond v. U.S. S.E.C.*,
   518 F.2d 811 (7th Cir. 1975).............................................................................. 17

*Sanders v. United States*,
   252 F.3d 1329 (Fed. Cir. 2001) ........................................................................ 18

*Santana-Lim v. United States*,
   No. 5-10-5, 2011 WL 121802 (S.D. Tex. Jan. 12, 2011)...................................... 26

*Seuss v. United States*,
   535 F.3d 1348 (Fed. Cir. 2008).................................................................... 20, 21

*Silva v. United States*,
   51 Fed. Cl. 374 (2002), *aff'd,* 51 F. App'x 12 (Fed. Cir. 2002) ......................... 19, 22

*Sommers Oil Co. v. United States,*
   241 F.3d 1375 (Fed. Cir. 2001) ........................................................................... 19

*Sorrells v. United States,*
   287 U.S. 435 (1932) ........................................................................................... 16

*Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.,*
   833 F.2d 1560 (Fed. Cir. 1987) ......................................................................... 15

*Trudeau v. United States,*
   68 Fed. Cl. 121 (2005), *aff'd,* 186 F. App'x 998 (Fed. Cir. 2006) ............... 17, 18, 19

*United States v. Farrell,*
   606 F.2d 1341 (D.C. Cir. 1979) .................................................................. 2, 23, 24

*United States v. Iovenelli,*
   403 F.2d 468 (7th Cir. 1968) ............................................................................. 24

*United States v. Murphy,*
   768 F.2d 1518 (7th Cir. 1985) ........................................................................... 16

*United States v. Russell,*
   411 U.S. 423 (1973) ........................................................................................... 16

*United States v. Salman,*
   378 F.3d 1266 (11th Cir. 2004) ...................................................................... 4, 16

*United States v. Smith,*
   659 F.2d 97 (8th Cir.1981) ................................................................................ 24

*United States v. Thomas,*
   75 F.2d 369 (5th Cir. 1935) ......................................................................... 24, 26

*United States v. Ward,*
   793 F.2d 551 (3d Cir. 1986) .............................................................................. 16

*Utley v. Donaldson,*
   94 U.S. 29, 24 L. Ed. 54 (1876) ........................................................................ 20

*Villars v. United States,*
   126 Fed. Cl. 626 (2016) ..................................................................................... 22

*Young Dong Kim v. Holder,*
   737 F.3d 1181 (7th Cir. 2013) ............................................................................. 3

**Statutes**

6 U.S.C. § 557 ................................................................................................................ 9

8 U.S.C. § 1101(a)(15)(F)(i) ........................................................................................ 3, 5

8 U.S.C. § 1363a .................................................................................................... *passim*

19 U.S.C. § 2081 .................................................................................................... *passim*

26 U.S.C. § 7608(c) ......................................................................................................... 8

28 U.S.C. § 533 ................................................................................................................ 8

**Rules**

RCFC 56(a) ..................................................................................................................... 15

RCFC 56(c)(1) ................................................................................................................ 15

**Regulations**

8 C.F.R. § 103.2(b)(8) .................................................................................................... 11

8 C.F.R. § 214.2(f) ................................................................................................... 3, 4, 5

<u>INTRODUCTION</u>

This is a breach of contract case that, at its core, seeks to hold the Government financially liable for the clandestine nature in which special agents lawfully executed a certified undercover law enforcement operation.  Pursuant to the Court's March 18, 2021 order, we submit this supplemental brief addressing the background of the undercover operation, as well as related contract enforceability and authority issues.

The plaintiff in this case is Teja Ravi,[1] a citizen of India who was in the United States on a student visa.  Hoping to illegally continue to work and reside in the United States, in the spring of 2018, Mr. Ravi knowingly enrolled in (and made quarterly "tuition" payments to) a fictitious university that offered no classes or curriculum in exchange for immigration documents.  He believed he was participating in what is commonly referred to as a "pay to stay" scheme.  Unbeknownst to him, however, the university was actually part of an undercover law enforcement operation whose purpose was to expose immigration fraud.  About a year after Mr. Ravi's enrollment, special agents concluded their investigation and identified a number of criminal and administrative targets, including Mr. Ravi, many of whom faced arrest for their actions.  When arrests began, Mr. Ravi left the country.

Now in India, Mr. Ravi claims that he (unlike others) enrolled in the university in the honest pursuit of higher learning.  Referring to himself as an "unwitting victim[]," he demands that the Government return his "tuition" because it breached a contract with him when it did not provide legitimate educational services.  He insists upon class-wide treatment for his case.

---

[1] Teja Ravi's legal name is "Ravi Teja Tiyagurra."  Appx231.  For consistency with his pleading, where he is disclosed only as "Teja Ravi," we will continue to refer to him as Teja Ravi or Mr. Ravi throughout this brief.

There are at least three reasons why Mr. Ravi's case cannot stand. *First*, his complaint arises out of a certified law enforcement operation, which is a sovereign action. The operation was first devised nearly eight years ago, in December 2014, after it had been vetted and approved by the U.S. Attorney's Office in the Eastern District of Michigan. Government officials reviewed and authorized the operations in September 2015, allowing operations to begin in the fall of 2016. And to ensure proper monitoring and oversight, the operation was re-reviewed and reauthorized every six months until the investigation concluded approximately three years later in January 2019. Mr. Ravi insists that he should be allowed to sue law enforcement operations under a breach of contract theory, but the lawful and certified activity he complains about is immunized from contract-based lawsuits under the sovereign capacity doctrine.

*Second*, Mr. Ravi cannot plead or prove basic elements of his contract case, such as the mutuality of intent to contract or that agents had the authority necessary to bind the United States to a contract to provide him with educational services. And *third*, Mr. Ravi was not, as he now claims, an innocent victim of the undercover operation. The evidence agents collected, which includes written correspondence and a recorded phone call involving Mr. Ravi himself, and which we provide in support of our motion, firmly establishes that Mr. Ravi knew his conduct was illegal. As a result, the doctrine of *in pari delicto* bars him from obtaining assistance from this Court to repossess "property he voluntarily surrendered as part of his attempt to violate the law." *United States v. Farrell*, 606 F.2d 1341, 1348 (D.C. Cir. 1979).

For these reasons, the Court should dismiss Mr. Ravi's lawsuit or enter judgment in favor of the United States.

<u>STATEMENT OF FACTS</u>

I.      <u>Background On Immigration Law</u>

The laws of the United States generally require foreign citizens to obtain a visa before

entering the country.  U.S. Dep't of State, Foreign Affairs Manual, § 9 FAM 102.1-2, available

at https://fam.state.gov/FAM/09FAM/09FAM010201.html (last accessed Jun. 8, 2021).  A visa is

an endorsement (within a passport) that grants the holder official permission to enter, leave, or

stay in the United States for a specified time period.  *See id*.  One specific visa the United States

offers to foreign citizens is the F-1 non-immigrant academic visa (F-1 visa), sometimes called a

student visa.  In basic terms, the F-1 visa allows nonimmigrant foreign citizens to come to the

United States for a specified time period to pursue a "full course of study" at an approved

educational institution.  *See* 8 U.S.C. § 1101(a)(15)(F)(i).[2]

The F-1 visa comes with certain requirements.  First, in order to be eligible, the foreign

citizen must apply (and be accepted) to a school certified by the Student and Exchange Visitor

Program (SEVP), which is overseen and administered by the Department of Homeland Security

(DHS).  *See* U.S. Dep't of State, Bureau of Consular Affairs, Student Visa Page, available at

https://travel.state.gov/content/travel/en/us-visas/study/student-visa.html (last accessed Jun. 11,

2021).  SEVP schools are authorized to issue students a "Certificate of Eligibility for

Nonimmigrant Student Status," or a Form I-20, which demonstrates that the holder meets all

standards of admission for the school, and has been accepted for a full course of study.  *See* 8

C.F.R. 214.2(f)(1)(i)(A).  Second, upon receiving a Form I-20, the recipient must complete an F-

1 visa application, and will generally be required to attend an interview at the United States

---

[2] *See* 8 C.F.R. § 214.2(f)(6) (defining "full course of study").

3

Embassy or Consulate in the country where the applicant resides.  1 Austin T. Fragomen &

Careen Shannon, Immigr. Proc. Handbook, Ch. 2, § 2:19 (Jun. 2021).  Third, if granted an F-1

visa, the law (subject to certain exceptions not applicable here) requires that the holder pursue a

full course of study for the entire time period specified in the visa.  *See* 8 C.F.R. § 214.2(f)(5)(i).

If the holder is no longer making normal progress toward completing a course of study, stops

attending school, or takes less than a full course load without authorization, that individual is

deemed out of status and must leave the country within 15 days.[3]  8 C.F.R. § 214.2(f)(5)(iv);

*United States v. Salman*, 378 F.3d 1266, 1267 n.1 (11th Cir. 2004) (explaining that F-1 visas are

only valid for the "'duration of status'—that is, as long as the visa holder pursues a full course of

study at an educational institution").

     Importantly, the F-1 nonimmigrant visa program does not create a direct path to

citizenship.  "Nonimmigrant" classifications generally convey permission for foreign nationals to

enter the United States temporarily, but only for a specific purpose, after which the individual

must return home.  *See generally* 1 Charles Gordon *et al.*, *Immigration Law and Procedure*

§ 1.03[2][e][iii] at 1-30 (Matthew Bender rev. ed. 2015).  In the case of an F-1 visa, the holder is

required to return to his or her home country within 60 days of when the approved course of

study is complete, or as mentioned earlier, within 15 days of when the individual ceases to

maintain a full course of study.  8 C.F.R. § 214.2(f)(5)(iv).

---

[3] DHS manages foreign citizen students through an internet-based data system called the Student and Exchange Visitor Information System (SEVIS).  SEVIS provides school and Government officials, including immigration officials, with access to current information on nonimmigrant foreign citizen students, including the school where the individual is enrolled. *See, e.g.*, *Young Dong Kim v. Holder*, 737 F.3d 1181, 1182 n.2 (7th Cir. 2013) (describing the SEVIS database); U.S. Immigration and Customs Enforcement, *SEVIS Overview* https://www.ice.gov/sevis/overview (last visited Jun. 11, 2021).

II.   <u>Student Visa Schemes</u>

Student visa "pay to stay" schemes undermine the integrity of the F-1 visa program. These schemes typically involve academic recruiters who collaborate with for-profit educational institutions to help obtain F-1 visas (or maintain F-1 visa status) for foreign "students" who have no intention of pursuing legitimate educational goals.  *See, e.g.*, *United States v. Bharath Kakireddy*, No. 19-cr-29926, Indictment, ECF No. 1 (E.D. Mich. Jan. 15, 2019), attached hereto at Appx257.  The foreign national typically pays a recruiter to make it appear as if he is paying tuition, attending classes, or pursuing a legitimate internship when he is not.  *See* Appx264-265. The collaborating educational institution, in exchange for "tuition" payments, creates false records for foreign nationals meant to deceive federal immigration authorities.  *See* Appx265.

The F-1 visa program is an oft-used vehicle for such "pay to stay" schemes because, under specified circumstances, it permits its visa holders to work for pay in addition to participating in their course of study, sometimes in the form of an arrangement called curricular practical training or CPT.  *See* 8 C.F.R. § 214.2(f)(10); Webber Decl. ¶¶ 5-7.  The CPT aspect of the F-1 visa program does not replace the requirement for the individual to be a full time student. Those deemed eligible for such an arrangement must receive a special Form I-20 from their educational institution that specifies that the holder is approved for CPT while pursuing a full course of study.  *See* Webber Decl. ¶ 6.

These pay-to-stay arrangements exploit programs meant to aid foreign students seeking an education in the United States.  They also undermine the U.S. immigration system by allowing foreign nationals that are no longer in the United States legally to avoid removal proceedings and overstay their visas.  8 U.S.C. § 1101(a)(15)(F)(i) (explaining that the F-1 visa program offers admission to the United States to only "*bona fide* student[s]" who intend to return

to their home countries once their "full course of study" is complete).  At their worst, they pose a potential national security risk by enabling foreign nationals to enter the country who do not have a legitimate interest in studying here.  *See* Appx108.

III.    **Government Officials Certify Operation Paper Chase, Which Authorizes The Creation Of The University Of Farmington**

In December 2014 (in close consultation with the United States Attorney's Office in the Eastern District of Michigan), government officials devised a three-year law enforcement strategy called Operation Paper Chase.  Webber Decl. ¶ 3.  Operation Paper Chase was a certified undercover law enforcement operation designed to target individuals and "entities who fraudulently utilize the [student visa program] to endanger national security, commit visa fraud, smuggle and harbor illegal aliens for profit, launder money, and commit other violations of federal law."  Appx49.  The day-to-day aspects of the operation were carried out by special agents of Homeland Security Investigations (HSI) in U.S. Customs and Immigration Enforcement (ICE), which is part of the Department of Homeland Security.[4]

The setting for the operation was a fictitious HSI-created university called the University of Farmington (Farmington), which agents presented "as a State of Michigan licensed and nationally accredited private university."  Appx111.  To set up the operation, HSI agents secured "an undercover [] storefront" to serve as Farmington's physical location.  *Id*.  "The storefront [wa]s in a commercial office building in the greater metropolitan Detroit area and [wa]s staffed fulltime by HSI Detroit U[nder] C[over] A[gents]."  *Id*.  Farmington had no instructors, no curriculum, no classes, and offered no educational activities.  Nevertheless, to ensure proper

---

[4] Operation Paper Chase was one part of a much larger undercover operation.  *See* Appx249.  This larger operation is a multi-programmatic undercover effort, also led by HSI, aimed at exposing a number of other related federal crimes.  *See generally* Appx249-255.

appearances, "[t]he school" assigned undercover agents to "maintain[] a website and a significant and active social media presence."  *Id.*

Because the central purpose of the operation was to identify foreign citizens (and particularly illicit recruiters) seeking to violate immigration laws, undercover agents "took efforts to ensure that individuals who enrolled at the University were aware that [Farmington] was a 'pay to stay' scheme solely to [enable them] to maintain their [] F-1 [] status and to receive employment authorization through CPT."  Webber Decl. ¶ 10.  This included telling prospective enrollees upfront that the "school is not a legitimate school and only for those seeking a student visa without requiring them to attend any classes," Appx16; *see* Webber Decl. ¶ 11, and that their "special arrangement" would be "illegal."  *See, e.g.*, Appx206 (informing Mr. Ravi that his "special arrangement" was "illegal" and should be kept secret or else those involved could "get in trouble"); Appx283 ("this arrangement is not legal, you know?").  Prospective enrollees actually interested in meeting the terms of their F-1 visa requirements were told upfront to look elsewhere and "referred to a[nother] local school which ha[d] been vetted by HSI and SEVP." Appx16; *see* Webber Decl. ¶ 10.

To ensure that the operation complied with the law, HSI followed the certification procedures laid out in two statutes: 8 U.S.C. § 1363a and 19 U.S.C. § 2081.  These statutes authorize ICE agents, in furtherance of their undercover investigative work, to lease (and sometimes purchase) commercial spaces, "establish or acquire" commercial entities, and otherwise "operate" these "entities on a commercial basis" to achieve their undercover objectives.  The statutes explain the procedural steps ICE must follow in order to exercise that

authority.[5]  For instance, under 19 U.S.C. § 2081(a), entitled "Undercover investigative operations of Customs Service," the defined undercover authority could "be exercised only upon written certification of the Commissioner of Customs" or her designee that the creation of the entity is "necessary" to conduct the "undercover operation."  Likewise, under 8 U.S.C. § 1363a(a), entitled "Undercover investigation authority," the defined undercover authority can be "exercised only upon written certification of the Commissioner, in consultation with the Deputy Attorney General," that the authority is "necessary" to conduct the "undercover operation."

Once approved, the statutes further authorize ICE to use "proceeds" retained in the operations to recoup costs expended in facilitating the undercover efforts.  Both 8 U.S.C. § 1363a(a)(4) and 19 U.S.C. § 2081(a)(3) state (identically) that "the proceeds from the undercover operation may be used to offset necessary and reasonable expenses incurred in such operation without regard to the provisions of section 3302(b) of Title 31," which normally requires law enforcement to itemize and account for retained proceeds.

Beginning in 2015, and through and including 2019, HSI received certifications to execute Operation Paper Chase.  The Executive Associate Director for Homeland Security Investigations, exercising delegated authority from the Secretary of DHS (Appx232-244), reviewed and approved (and then, where necessary, reapproved) all procedures and operations. Appx6, 31, 69, 103, 122, 141, 176.  Each authorization request explained the operation in detail,

---

[5] Various law enforcement agencies have their own statutory authority for undercover operations, which are similar to the ones at issue here.  *E.g.*, 26 U.S.C. § 7608(c) (Internal Revenue Service); 28 U.S.C. § 533 note (explaining that the Federal Bureau of Investigation and the Drug Enforcement Agency were conferred such authority in Public Law 102-395 § 102(b), and that Public Law 108-447, div. B, title I, § 116 later extended the same authority to the Bureau of Alcohol, Tobacco, Firearms and Explosives).

included mission objectives, and outlined what progress agents had made.  Appx6-194.   As part

of these procedural steps, HSI case agents also consulted with a "Workgroup" created by the

Department of Justice (DOJ) Headquarters to review proposals for certain undercover operations.

Appx245-248; Appx256.  The DOJ Workgroup consisted of relevant DOJ subject matter experts,

who were assigned to consult on investigations to ensure they complied with statutory

requirements, and to supplement HSI's internal Undercover Review Committee process.  *See*

Appx245.  In addition to this consultative process, the United States Attorney's Office in the

Eastern District of Michigan continued to provide close oversight of the undercover operation,

*e.g.*, Appx111, 164-166, 249-255, to ensure that HSI's investigative tactics were properly

reviewed and monitored.[6]

IV.    Mr. Ravi, A Citizen Of India, Enrolls In And Pays "Tuition" To Farmington Under A
       "Special Arrangement" That He Is Told Is "Illegal"

After Farmington's creation, undercover agents were approached by an individual named

Avinash Thakkallapally, an Indian citizen who came to the United States under an F-1 visa in

2015.  Appx281.  Mr. Thakkallapally attended Harrisburg University, which is an SEVP

participating school.  *Id*.  In that encounter, Mr. Thakkallapally asked whether he could enroll at

Farmington without attending classes in order to fraudulently maintain his immigration status.

Appx282.  The following conversation ensued:

---

[6] As noted, there are two statutes that independently authorize ICE's undercover
operations, 8 U.S.C. § 1363a and 19 U.S.C. § 2081.  The two statutes are substantively similar in
nearly all respects.  The title 8 statute applied to what was formerly the Immigration and
Naturalization Service (INS), which was part of DOJ, whereas the title 19 statute applied to what
was formerly the Customs Service (Customs), which was part of the Department of Treasury.
After 9/11, the investigative and enforcement functions of INS and Customs were combined and
reorganized under ICE, which is part of DHS.  As a result, neither INS, Customs, nor the
"Commissioner[s]" of those entities, exist today.  Congress, however, conveyed to DHS
whatever authority those individuals possessed when it promulgated 6 U.S.C. § 557.

> Undercover Agent: Let me ask you another question. Are you…..
> looking to actually go to classes or are you just looking to just
> maintain your status?
>
> Thakkallapally: I am just looking to maintain my status.
>
> Undercover Agent: So you don't want to go to a class or anything
> like that?
>
> Thakkallapally: Exactly.
>
> Undercover Agent: Ok. Listen I can help you out but obviously,
> you know… this arrangement is not legal, you know?
>
> Thakkallapally: Yeah.
>
> Undercover Agent: You understand that? I mean I could bring you
> in with no classes…and give you Day 1 CPT but obviously it's not
> legal so it has to stay between us. You know?
>
> Thakkallapally: Yeah. I not tell to anybody.
>
> Undercover Agent: Are you comfortable with that arrangement?
>
> Thakkallapally: Yeah.

Appx283-284.  Having received assurances that the arrangement was possible, Mr.

Thakkallapally approached Farmington again the next day, this time to ask whether it would be

willing to accept referrals in exchange for money, mentioning that he had "lot[s] of friends

coming up."  Appx284.  When asked how much he wanted, Mr. Thakkallapally stated that

Northwestern Polytechnic University and Harrisburg University paid $500 per student for

referrals.  Mr. Thakkallapally and the undercover agent agreed to a referral fee of $500 per

student.  Appx285-286 ("Thakallapally: I tell you.  In Harrisburg university . . . in

N[orthwestern] P[olytechnic] U[niversity] …. for one student its $500.  Undercover Agent: Ok, I

can do $500").

After negotiating that arrangement, Mr. Thakkallapally began referring prospective

enrollees to Farmington.  Appx286-287.  Mr. Thakkallapally frequently called Farmington to

refer his clients, "request various actions be taken on behalf of his recruits," and otherwise

"update [agents] on his recruiting efforts."  Webber Decl. ¶ 19.

10

The plaintiff, Mr. Ravi, is an associate of Mr. Thakkallapally.  *See id*. ¶ 18.  Mr. Ravi is a 28-year-old Indian citizen who came to the United States on an F-1 visa to attend Northwestern Polytechnic University in 2015.  *Id*. ¶ 17.  He then "used the services of criminal recruiter Mr. Thakkallapally" to enroll at Farmington.  *Id*. ¶¶ 17-18.  In February 2018, Mr. Thakkallapally submitted Mr. Ravi's completed application on Mr. Ravi's behalf.  *Id*. ¶ 21; *see* Appx196-197.  Undercover agents thereafter sent Mr. Ravi an admission letter for the Spring 2018 term,[7] which listed no classes or degree programs.  *Id*.; Appx199.  Mr. Ravi was also sent a Form I-20, which listed Information Technology as his major, but which lacked a CPT endorsement.  Webber Decl. ¶ 21.

Throughout March 2018, Mr. Thakkallapally emailed Farmington requesting confirmation of Mr. Ravi's enrollment and to take other actions for Mr. Ravi's benefit.  By way of example, he sent an email to Farmington to inform agents that Mr. Ravi had paid his first "tuition" payment of $2,500 but had not yet received an identification card or a Form I-20 *with a CPT endorsement*.  *Id*. ¶ 22; *compare* Appx204 (using alias "vinith errabelli") *with* Appx286-291) (identifying "vinith errabelli" as Mr. Thakkallapally).  Agents thereafter sent Mr. Ravi a Form I-20 with a CPT endorsement that was good through March 31, 2020.  Webber Decl. ¶ 22.  Over the next seven months, Mr. Ravi continued to make additional "tuition" payments of $2,500, in June and October 2018, respectively, Appx218-226, without having attended a single class or being offered any curriculum.

Then on November 8, 2018, Mr. Ravi emailed Farmington personally, informing them that his visa request "got picked in the lottery" by immigration authorities for further

---

[7] The letter actually specifies the Spring "2017" term, which is a typo, but the letter makes clear that it refers to the term Spring term beginning in 2018.  Appx199.

verification.  Appx206.  That verification, which Mr. Ravi referred to as an RFE (or Request For

Evidence), required Mr. Ravi to provide, among other things, evidence surrounding his work

status.  *Id.*; *see* 8 C.F.R. § 103.2(b)(8).[8]  Mr. Ravi attached the Request For Evidence to his email

and asked Farmington to provide him with "the concerned documentation" so that he could

respond to the verification request.  *See* Appx208-215.

The next day, an undercover agent, believing Mr. Ravi was requesting fake educational

documents, such as a fake transcript, acknowledged receiving Mr. Ravi's email and wrote:

> Because you are enrolled under the "special arrangement" and
> have not been attending any classes since your admission here, we
> have to deceitfully make up these classes/documents for you.
> Please remember to keep this "special arrangement" to yourself so
> neither you or the school gets into trouble because it is illegal.

Webber Decl. ¶ 23; Appx206.  That same day, on November 9, 2018, Mr. Ravi followed up his

email with a phone call to Farmington.  Webber Decl. ¶ 25.  Over the course of that call, Mr.

Ravi acknowledged his receipt of Farmington's email, as well as his understanding that if he

wanted a falsified transcript, Farmington would "have to make . . . up" his "grades" and

"classes" because he was under a "special arrangement."  *Id.*; Appx216 (audio recording).  Mr.

Ravi further confirmed that he understood that Farmington was not an "authorized" educational

institution, and that he and others "could get in trouble" if authorities found out:

> Undercover Agent: . . . and when you send your email to the
> transcripts [email address], please put in the classes you want to
> see on the transcripts and the grades that you want . . .
>
> Ravi:  Sure.

---

[8] *See also* Adjudicator's Field Manual, Chapter 10.5, available at: https://www.uscis.gov
/sites/default/files/policymanual/afm/afm10-external.pdf (last visited June 15, 2021) (instructing
that a request for additional evidence should: "(1) identify the eligibility requirement(s) that has
not been established and why the evidence submitted was not sufficient; (2) identify any missing
evidence specifically required by the applicable statute, regulation, or form instruction; (3)
identify examples of other evidence that may be submitted to establish eligibility; and (4) request
that evidence").

Undercover Agent: . . . because we have to make these classes up for you, so if you want certain grades on there and classes on there – put on – put it on the request.  And remember to keep this special arrangement to yourself because we could get in trouble, and so could you, because this . . .

Ravi:  Okay.

Undercover Agent:. . . is not authorized by the Department of Homeland Security.  But as long as you don't say anything and we don't say anything we'll be fine.

Ravi:  Okay.

Undercover Agent: Okay?

Ravi:  Okay.  I'll send a . . .

Undercover Agent: Alright, thank you.

Ravi: . . . grade in.

Undercover Agent: Perfect.  Do it as soon as possible because the quicker you do it, the quicker we can get things done.

Ravi: Sure.  Definitely.

Appx216 (audio recording) 1:47-2:31.

In the months that followed, Mr. Ravi continued to pay his "tuition" to Farmington, submitting his last recorded payment of $2,500 on January 6, 2019, which is the same month that HSI ceased operating Farmington.  Appx218 (showing that Mr. Ravi paid his December 2018 "tuition" invoice on January 6, 2019 in four different credit card transactions).

V.     Mr. Ravi Demands That The Government Return His Money Under A Breach Of Contract Theory

HSI ceased operating Farmington on January 1, 2019.  Four weeks later, on January 30, 2019, HSI began the next phase of Operation Paper Chase by "initiat[ing] a large-scale nationwide enforcement action operation involving the arrest of" hundreds of criminal and administrative targets spanning 38 states.  Webber Decl. ¶ 27; Appx183.  Criminal targets, like Mr. Ravi's recruiter, Mr. Thakkallapally, were immediately arrested and faced criminal charges.  Appx257-301 (Indictment and Sentencing Memorandum).  Mr. Thakkallapally pled guilty and

was ultimately convicted and sentenced to prison.  Appx273-279 (Judgment).  Mr. Ravi, on the

other hand, was among the identified administrative targets, and faced administrative arrest and

removal proceedings.  Webber Decl. ¶ 27; *see* Appx183.  Two days after enforcement operations

began, however, Mr. Ravi left the country.  Webber Decl. ¶ 28 ("February 1, 2019"); Appx228-

229.

Now back in India, Mr. Ravi brings this putative class action, claiming that he was

unaware that Farmington was not an actual educational institution.  Am. Compl. ¶ 1.

On January 8, 2021, we moved to dismiss Mr. Ravi's complaint on various grounds

highlighting the deficiencies in Mr. Ravi's pleading as well as the grounds upon which he

brought his suit.  ECF No. 7.  Mr. Ravi thereafter attempted to cure some of the deficiencies in

his complaint by amending his pleading, ECF No. 8, and then filed a response opposing our

motion, ECF No. 9.  We then filed a reply brief in support of our motion.  ECF No. 12.  In March

2021, the Court held a status conference and ordered supplemental briefing, requesting that the

parties address a variety of topics including:

> (1) the statutory basis for the University of Farmington undercover
> operation and whether that operation was certified under the
> relevant statutes; (2) whether Mr. Ravi is foreclosed from
> recovering his tuition money under those relevant statutes;[9] (3)
> whether the alleged contract between the government and Mr. Ravi
> for educational services was illegal and therefore unenforceable,
> with supporting correspondence between the University and Mr.
> Ravi; (4) whether the law enforcement agents operating the
> University of Farmington intended to enter into a contract for
> educational services with Mr. Ravi; (5) whether the law
> enforcement agents operating the University of Farmington had
> authority to bind the United States to a contract for educational
> services or to ratify such a contract.

---

[9] Based on our review, the terms of these statutes do not appear to directly preclude Mr.
Ravi from recovery.  He is, however, precluded from recovering from the Government for all of
the other reasons we identify in this brief.

ECF No. 14.  Consistent with that order, we respectfully submit this supplemental brief in support of our motion to dismiss, or in the alternative, motion for summary judgment.

ARGUMENT

I.   <u>Standards of Review</u>

    A.   <u>Legal Standard For Motions To Dismiss</u>

For the legal standard on motions to dismiss, we incorporate by reference our recitation of that standard in our opening motion to dismiss.  ECF No. 7 at 2-3.

    B.   <u>Legal Standard For Motions For Summary Judgment</u>

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a).  Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  RCFC 56(c)(1); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276, 1283 (Fed. Cir. 2008).  Ultimately, "the burden is not on the movant to produce evidence showing the absence of a genuine issue of material fact." *Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560, 1562 (Fed. Cir. 1987) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).  Rather, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the [Court]—that there is an absence of evidence to support the non-moving party's case." *Id.* (quoting *Celotex Corp.*, 477 U.S. at 325) (emphasis omitted).  Thus, where the non-moving party fails to make a sufficient showing as to the existence of an essential element for which he bears the burden of proof, summary judgment is appropriate.  *Celotex Corp.*, 477 U.S. at 322-23.

15

II.   Operation Paper Chase Was A Certified, And Lawfully Executed, Undercover Law
Enforcement Operation, Which Bars Mr. Ravi From Attempting To Hold The
Government Liable For Those Operations Under A Breach Of Contract Theory

Although this is a suit for breach of contract, Mr. Ravi's primary grievance stems from

the clandestine nature of the undercover operation itself.  Mr. Ravi alleges that Farmington

"deceiv[ingly]" presented itself as "a legitimate and authorized school" when it was actually a

"sting operation."  Am Compl. ¶¶ 3, 10, 31.  He refers to the undercover agents' actions as

"false," "misleading," and "manipulat[ive]," *id*., made in "an effort to induce students" into

believing "that the University was a legitimate and authorized school."  *Id*. ¶¶ 15, 27.  He

repeatedly calls Farmington a "fake," a "façade," a "sham," and "fraudulent," *id*. ¶¶ 4, 8, 10, 27,

and urges the Court to hold the Government "liable" for "intentional and/or negligent

misrepresentations," "false promises," and "fraud," *id*. ¶ 36(d)(viii)-(x).

Leaving aside that Mr. Ravi does not adequately plead a breach of contract case, his

amended complaint simply describes the essential characteristics of *any* effective undercover

operation.  Secrecy and concealment are an integral part of undercover work, the authority for

which has been long recognized and upheld by the courts as a "permissible means of

investigation." *United States v. Russell*, 411 U.S. 423, 432 (1973); *see also Sorrells v. United

States*, 287 U.S. 435, 441 (1932) (finding it well settled that Government officers or employees

may afford opportunities or facilities for the commission of the offense and that "[a]rtifice and

stratagem may be employed to catch those engaged in criminal enterprises").  These techniques

have been upheld in a wide variety of contexts.  *See*, *e.g.*, *Illinois v. Perkins*, 496 U.S. 292, 300

(1990) (finding an undercover officer posing as an incarcerated inmate is not required to give

*Miranda* warnings before asking a target questions that may illicit an incriminating response),

*Russell*, 411 U.S. at 432 (finding an undercover agent's production of a necessary ingredient to

16

the target's narcotics manufacturing enterprise did not violate fundamental fairness), *United States v. Ward*, 793 F.2d 551, 555 (3d Cir. 1986) (holding that the Government's involvement in and creation of undercover drug smuggling operation did not violate fundamental fairness or due process), *United States v. Murphy*, 768 F.2d 1518, 1529 (7th Cir. 1985) *cert. denied*, 475 U.S. 1012 (1986) (in which the FBI used undercover agents to create fake criminal proceedings for the purpose of accepting bribes paid by defense attorneys).[10]

Mr. Ravi's allegations regarding the Government's actions during Operation Paper Chase—such as establishing Farmington and making it appear to be a legitimate university, processing enrollments, presenting undercover agents as school officials, and having those undercover agents communicate with enrollees as school officials—fall well within the bounds of legitimate investigative tactics.  In addition, HSI followed the procedures outlined in 8 U.S.C. § 1363a and 19 U.S.C. § 2081 to have these operations "certified" (and repeatedly reauthorized) under the law.  Appx6-194.  Accordingly, when HSI agents posed as Farmington administrators and made representations in furtherance of their undercover work, they were exercising their lawful authority.

---

[10] It is noteworthy that federal courts routinely dismiss tort claims against the Government brought by persons who allege that they were innocent third parties injured as a result of an undercover operation based on the discretionary function exception and the misrepresentation exceptions in the Federal Tort Claims Act.  *See, e.g., Frigard v. United States*, 862 F.2d 201, 203 (9th Cir. 1988) (affirming dismissal of suit filed by investors who alleged that that CIA involvement with an investment company in which the investors suffered losses was an actionable misrepresentation); *Ga. Cas. & Surety Co. v. United States*, 823 F.2d 260, 263 (8th Cir. 1987) (denying tort claim arising from the FBI's decision to maintain secrecy about an undercover automobile theft operation); *Redmond v. U.S. S.E.C.*, 518 F.2d 811, 817 (7th Cir. 1975) (affirming the dismissal of a tort claim against the Government for failing to warn a plaintiff allegedly defrauded by a confidence man as barred by the misrepresentation exception to the FTCA).

The sovereign capacity doctrine bars purported contract actions that arise out of lawful "criminal" or "civil enforcement actions . . . that could only be undertaken by the sovereign." *Aluminum Shapes, LLC v. United States*, 139 Fed. Cl. 709, 714 (2018); *see Trudeau v. United States*, 68 Fed. Cl. 121, 127 (2005), *aff'd*, 186 F. App'x 998 (Fed. Cir. 2006) (citations omitted).[11]  Where the Government is acting in a uniquely sovereign function that lacks "a private analogue," this Court has held that the Government has not clearly and unequivocally waived its sovereign immunity.  *Awad v. United* States, 61 Fed. Cl. 281, 284 (2004).  Mr. Ravi, therefore, cannot assert liability under a breach of contract theory for purported representations made in the furtherance of legitimate and lawfully executed law enforcement goals.

Mr. Ravi attempts to sidestep the sovereign capacity bar in two ways.  *First*, he argues that the alleged contract for educational services under which he attempts to bring his suit was "only tangentially related to carrying out a law enforcement purpose," and that undercover agents were effectively "stepp[ing] off the throne" when they "engaged[d] in the sale of educational services."  ECF No. 9, Pl. Resp. to Gov. Mot. To Dismiss at 3-4.  However, 8 U.S.C. §1363a and 19 U.S.C. § 2081 authorize undercover agents to *appear* to act "on a commercial basis" in the furtherance of covert law enforcement activities.  They authorize agents to lease or purchase storefronts, conduct undercover operations, and even use proceeds retained as part of the operations to recoup costs they incur.  As Mr. Ravi concedes in his pleading, the entire

---

[11] Both *Aluminum Shapes* and *Trudeau* cite *Kania v. United States*, 650 F.2d 264 (Ct. Cl. 1981) and *Sanders v. United States*, 252 F.3d 1329 (Fed. Cir. 2001), to distinguish when the Government is acting in a sovereign, as opposed to proprietary, capacity.  The former actions are immune from contract-based lawsuits, while the latter are not.  In basic terms, purported "contracts that arise in criminal and quasi criminal settings" normally constitute "sovereign actions," *Aluminum Shapes*, 139 Fed. Cl. at 713-14, and the Government cannot be held susceptible to contract-based lawsuits for actions that, at their core, "protect the public" or "vindicate[ a] public interest."  *Trudeau*, 68 Fed. Cl. at 130.

purpose of Farmington—indeed, the sole purpose of the Government representations Mr. Ravi alleges in his complaint—was to effectuate an undercover law enforcement operation and "expose student visa fraud."  Am. Compl. ¶ 1.  Undercover agents, therefore, were not "engaged in the sale of educational services," as he now claims.  ECF No. 9 at 3-4.  They were conducting legitimate undercover work.  And if what appears "on [its] face to be a commercial agreement between two private parties" was actually made "for the purpose of furthering undercover law enforcement operations," those activities "without question, lie at the heart of sovereign action." *Silva v. United States*, 51 Fed. Cl. 374, 377 (2002), *aff'd*, 51 F. App'x 12 (Fed. Cir. 2002) (citation omitted).

*Second*, Mr. Ravi argues that *Sommers Oil Co. v. United States* restricts the sovereign capacity doctrine to only "active criminal cases" or to instances where the Government is being asked to "pay[] monetary damages for seized contraband."  ECF No. 9 at 4 (citing 241 F.3d 1375 (Fed. Cir. 2001)).  But that is not correct.  The doctrine has applied in cases involving neither active criminal matters nor the seizure of contraband.  *E.g.*, *Aluminum Shapes*, 139 Fed. Cl. at 714 (applying doctrine to bar suit under a civil settlement agreement); *Trudeau*, 68 Fed. Cl. at 127 (2005) (same); *Awad*, 61 Fed. Cl. at 284 (applying doctrine to bar suit regarding "granting of citizenship and passports" which are "solely governmental functions").  The central question in sovereign capacity cases is whether Government officials were performing a uniquely sovereign function when they entered into the alleged agreement.  Here, that is precisely what the undercover agents were doing, as Mr. Ravi concedes in his complaint.  Mr. Ravi, therefore, has no reasonable basis to contest that the representations officers made were in the furtherance of performing their legitimate law enforcement functions.  For this reason alone, the amended complaint must be dismissed for lack of subject matter jurisdiction.

19

III.     There Was No Tucker Act Contract To Provide Mr. Ravi With Educational Services

The complaint fails for another reason.  It claims undercover agents at Farmington

entered into a contract with Mr. Ravi, but fails to plausibly plead the elements necessary to make

that showing.  In order to plead his case, Mr. Ravi must plausibly allege basic contractual

elements including (1) mutuality of intent to contract, (2) lack of ambiguity in offer and

acceptance, and (3) consideration.  *Seuss v. United States*, 535 F.3d 1348, 1359 (Fed. Cir. 2008).

However, "[w]hen the United States is a party, a fourth requirement is added: the government

representative whose conduct is relied upon must have actual authority to bind the government in

contract."  *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed. Cir. 1998); *City of El

Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990) (same); *see also H.F. Allen

Orchards v. United States*, 749 F.2d 1571, 1575 (Fed. Cir. 1984) (explaining that plaintiff must

show "that the officer whose conduct is relied upon had actual authority to bind the government

in contract").  The complaint fails to plausibly plead the first and fourth elements.

As it relates to the first element—whether there was any mutuality of intent to enter into

an agreement—a plain reading of the pleading defeats any plausible basis for that allegation.

The pleading alleges that Farmington was a "fake," a "façade," a "sham," and "fraudulent," Am.

Compl.  ¶¶ 4, 8, 10, 27, and that the Government made "false" and "misleading" promises

designed to "manipulate" and "deceive the public," *id*. ¶ 10.  In making these allegations, Mr.

Ravi concedes (and we agree) that Farmington, and more specifically the HSI agents who

operated it, never intended to offer him any educational services.  *See* Avery Decl. ¶ 7.  The

complaint, therefore, does not allege that there was any mutuality of intent to establish the

formation of an enforceable contract.  *Utley v. Donaldson*, 94 U.S. 29, 47, 24 L. Ed. 54 (1876)

("Where there is a misunderstanding as to anything material, the requisite mutuality of assent as

to such thing is wanting; consequently the supposed contract does not exist, and neither party is

bound."); *Kellogg Brown & Root Servs., Inc. v. United States*, 99 Fed. Cl. 488, 515

(2011), *aff'd*, 728 F.3d 1348 (Fed. Cir. 2013), *opinion corrected on denial of reh'g*, 563 F. App'x

769 (Fed. Cir. 2014) (explaining circumstances where a contract can be deemed void *ab initio*

where a "false statement" "induce[s] the contract so that no mutual assent can be said to have

existed"); *see Perez v. United States*, 156 F.3d 1366, 1370 (Fed. Cir. 1998) (explaining that

courts must assume that all well-pled factual allegations are true for purposes of a motion to

dismiss for failure to state a claim).

    In addition to conceding in his complaint that HSI agents never intended to enter into a

contract for educational services, the facts show that Mr. Ravi never intended to do so either.

The evidence (which includes written correspondence, an audio recording, and proofs of

payment despite receiving no educational services, all involving Mr. Ravi himself, Appx206 (e-

mail), 216 (audio recording), 218-226 (invoices)) firmly establishes that Mr. Ravi knew that he

had not entered into a legitimate contract for educational services, but instead believed that he

was entering into a pay to stay scheme.  Mr. Ravi, therefore, cannot demonstrate that *either* party

intended to enter into a purported contract for the provision of educational services, showing that

he has no plausible basis for his purported contract claim.  *See Seuss*, 535 F.3d at 1359 (Fed. Cir.

2008) (explaining that mutuality of intent to contract is a necessary element to prove that a

contract exists).[12]

---

[12] As we explained in our reply in support of our motion to dismiss, this highlights
precisely why Mr. Ravi's case is not actually a contract case.  He seems to argue that he has
pleaded a viable contract case even absent mutuality of intent simply because, according to him,
the Government has unjustly retained some benefit.  *See* Am. Compl. ¶¶ 8, 27, 36(d)(vii) &
(xiii), 44, 50.  That merely describes an implied-in-law contract claim—such as a "quasi-
contract" claim for unjust enrichment or *quantum meruit*—which is a fictional contract claim
that is not redressable under the Tucker Act.  *Baha v. United States*, 144 Fed. Cl. 500, 507 (2019)

Apart from the issue of mutual intent, Mr. Ravi also fails to plausibly plead the fourth element of his contract case.  To establish that element, he must plausibly allege that undercover agents at Farmington were conferred the authority necessary to contractually obligate the Government to provide him with educational services.  The only allegation Mr. Ravi offers in that regard, however, is the threadbare recital that "law enforcement personnel" "had actual authority to bind the government in contract" to provide him with educational services, Am. Compl. ¶ 42, or claims that someone in the Government with that authority must have later "ratified th[os]e contracts."  *Id.* ¶ 43.  But that does little more than offer a "formulaic recitation of the elements of [the] cause of action," which is insufficient to plead his cause of action.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (explaining that a plaintiff must plead more than labels and conclusions).

Especially in cases that challenge undercover law enforcement functions, a plaintiff should "direct the Court's attention to anything that would vest in [some individual] the specific authority to bind the United States in contract."  *Silva*, 51 Fed. Cl. at 378.  Mr. Ravi makes no attempt to do that here.  He does not, for instance, identify where in "the Constitution, a statute, or regulation" a percipient Government official is granted that authority "in unambiguous terms." *Villars v. United States*, 126 Fed. Cl. 626, 635 (2016) (quoting *Jumah v. United States,* 90 Fed. Cl. 603, 612 (2009)).  Nor does he try to explain what basis he has to believe that anyone

---

(dismissing "quasi-contract" claim where "Army occupied the subject property without paying rent" because the Tucker Act does not confer the Court with jurisdiction over "implied in law contract" claims) (citing *Hercules Inc. v. United States*, 516 U.S. 417, 423, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996) and *Lumbermens Mut. Cas. Co. v. United States*, 654 F.3d 1305, 1316 (Fed. Cir. 2011)); *Collins v. United States*, 532 F.2d 1344, 1351 (Ct. Cl. 1976) (citing 1 Corbin on Contracts, s 19 (2d ed. 1963)) (explaining that, unlike genuine contract claims, where "the equivalent of mutual assent is present," "a contract implied in law is one in which a duty to make restitution is implied, *regardless of the lack of mutual assent*, for reasons of justice and equity." (emphasis added)).

involved in Farmington did or even could have later ratified the agreement he alleges.  At most, Mr. Ravi seems to suggest that undercover agents must have been authorized to enter into contracts because that authority is integral to effectuate the undercover operation.  *See* ECF No. 9 at 6.  But that confuses the authority necessary to make *representations* as part of an undercover operation with the authority it takes to actually bind the Government in contract.  In order to effectuate Operation Paper Chase, the only authority undercover HSI agents needed was the ability to *appear* to be educational administrators, which is vastly different from the authority necessary to obligate the Government via contract in that endeavor.  It should be no surprise that undercover agents possessed the former, which is clearly contemplated by statute, *see* 8 U.S.C. § 1363(a); 19 U.S.C. § 2081, but not the latter, which is not.

Indeed, to remove all doubt on the question, we include a declaration from ICE confirming that no agents associated with Farmington, "absolutely no one," possessed any authority whatsoever to bind the Government to educational services contracts.  Avery Decl. ¶ 7.  Not only does Mr. Ravi's pleading lack any supporting basis, it is demonstrably untrue and summary judgment should issue in our favor if the complaint is not dismissed.

IV.   <u>Mr. Ravi Cannot Seek The Aid Of This (Or Any) Court To Enforce An Illegal Contract</u>

Mr. Ravi's case fares no better on the merits.  At its core, Mr. Ravi's lawsuit seeks to recover upon an illegal transaction.  But "the doctrine of *in pari delicto* prevents [him] from obtaining the court's assistance in recovering money voluntarily paid in furtherance of an illegal contract."  *Kardoh v. United States*, 572 F.3d 697, 700 (9th Cir. 2009); *see Farrell*, 606 F.2d at 1348 ("It has long been 'the settled rule that property delivered under an illegal contract cannot

be recovered back by any party *in pari delicto*.'" (quoting *Harriman v. Northern Securities Co.*, 197 U.S. 244, 295 (1905)).[13]

The rationale for the doctrine is articulated in *United States v. Farrell*. There, the claimant paid an undercover officer $5,000, believing that he was purchasing heroin. Rather than receiving heroin, the claimant was immediately arrested (and later convicted) for drug crimes. *Farrell*, 606 F.2d 1343, 1350. Having never received the benefit of his bargain, the claimant sued the Government to get his money back. *Id*. The *Farrell* court refused to be used as a vehicle to enforce illegal conduct and explained that

> it is contrary to public policy to permit the courts to be used by the wrongdoer Farrell to obtain the property he voluntarily surrendered as part of his attempt to violate the law. If as the cases hold it is sound public policy to deny the use of the courts to persons *in pari delicto* who seek the return of illegally paid money, *a fortiori* it is sound public policy to deny the aid of the courts to a single violator of the law who seeks the return of money paid to a government agent in an attempt to contract for the purchase of contraband drugs.

*Id*. at 1350; *see also United States v. Smith*, 659 F.2d 97, 100 (8th Cir.1981) (applying *Farrell* rule in Eighth Circuit); *Mantilla v. United States*, 302 F.3d 182, 187 (3d Cir. 2002) (applying *Farrell* rule in Third Circuit).

Like the claimant in *Farrell*, Mr. Ravi seeks to recover the money he voluntarily paid to undercover agents to effectuate an illegal transaction—here, to violate immigration law. Mr. Ravi insists he was an "unwitting victim" in these operations, Am. Compl. ¶¶ 3, 27, but the evidence establishes otherwise. Mr. Ravi was referred to Farmington by Mr. Thakkallapally,

---

[13] The doctrine has its roots in cases involving claimants seeking the return of bribery payments made to public officials. *See Clark v. United States,* 102 U.S. 322 (1880); *United States v. Thomas,* 75 F.2d 369 (5th Cir. 1935); *United States v. Iovenelli,* 403 F.2d 468 (7th Cir. 1968).

who pled guilty to criminal charges in connection with this operation.  Mr. Thakkallapally took

numerous steps to ensure that Mr. Ravi, his client, received the sought after immigration

documentation without ever having been assigned a single class or curriculum.  Mr. Ravi

seemingly enjoyed that benefit over a period of seven months, making multiple "tuition"

payments to Farmington throughout that span despite acknowledging that he was never given a

class schedule or offered any instruction whatsoever.  *See* Am. Compl; Appx218-226 (showing

Mr. Ravi made "tuition" payments on "02/26/2018," "03/16/2018," "03/17/2018," "03/18/2018,"

"06/28/2018," "06/29/2018," "10/02/2018," and "10/03/2018").  And after those first seven

months, Mr. Ravi reached out to Farmington when immigration authorities asked for further

verification regarding the lawfulness of his employment request.  Appx206.  Mr. Ravi was told

directly by undercover agents through multiple mediums, including in an email and a recorded

phone call, that his "special arrangement" was "illegal" and must be kept "secret."  *Id*. and

Appx216.  Despite acknowledging, at the very least, that he was not receiving any educational

services from Farmington, Mr. Ravi continued to pay his "tuition" until the very month that

Farmington ceased to exist.  Appx218-219.  These are not the actions of an innocent bystander.[14]

Mr. Ravi was named an administrative target for good reason, and when other targets were

arrested (and some faced criminal charges), he left the country.

---

[14] We further note a number of inaccuracies in Mr. Ravi's pleading.  He alleges vaguely that he heard about Farmington from "a friend," Am. Compl. ¶ 28, omitting that he was recruited to Farmington by Mr. Thakkallapally.  He claims he had no clue that Farmington was not a real institution until March 2019, Am. Compl. ¶¶ 22, 31, yet undercover agents told him exactly that as early as November 2018, Appx206, 216.  Nor does he mention that, despite these communications, he continued to pay his "tuition" through January 2019, Appx218, the same month that Farmington ceased operations, Webber Decl. ¶ 27.  It is also unclear how Mr. Ravi can claim he first became suspicious of Farmington in March 2019, when facts show he left the country at least one month earlier, on February 1, 2019, Appx228-229, after he had been identified as an administrative target and faced arrest.  Webber Decl. ¶ 28.

It is irrelevant that the Government did not formally adjudicate Mr. Ravi's culpability through any administrative or criminal proceedings.  Leaving aside the obvious reason why that never occurred—Mr. Ravi left the country when arrests began—a nearly identical argument was raised and rejected in *Kardoh v. United States*.  572 F.3d 697, 701 (9th Cir. 2009).  There, the claimant, a Syrian national, paid an undercover agent posing as a corrupt immigration official $40,000 for four alien registration cards.  *Id*. at 698.  The claimant was immediately arrested and deported, but never faced indictment or criminal charges.  *Id*. at 699.  In addressing whether the doctrine of *in pari delicto* can apply absent a criminal conviction, the *Kardoh* court explained that "a conviction has not historically been required to establish the illegality of a transaction," and referenced various cases in which courts, including the Supreme Court, applied the doctrine without mentioning whether guilt had ever been established.  *Id*. at 701-702.  The *Kardoh* court found it sufficient that

> the government supported its position with the declaration of the undercover agent who met with Kardoh multiple times and who was given the $40,000 by Kardoh. The declaration described not only the transactions in sufficient detail to make their impropriety clear but also the statements by Kardoh both before and after his arrest admitting his awareness that the transactions were illegal.

*Id*. at 702.  *See Thomas*, 75 F.2d at 370-71 (holding that a conviction is not necessary to establish that a transaction involving bribery is illegal); *Santana-Lim v. United States*, No. 5-10-5, 2011 WL 121802, at *5 (S.D. Tex. Jan. 12, 2011) (same is true in undercover operations).

The evidence we provide here is even greater than what the Government provided in *Kardoh*.  In addition to a declaration from HSI's lead case agent for Farmington, who has personal knowledge of Mr. Ravi's actions and attests to the illegality of his conduct, *see* Webber Decl., we also provide written correspondence, an audio recording, and proofs of payment, all involving Mr. Ravi himself, Appx206, 216, 218-226, *see also* Appx293 (stating in sentencing

26

memorandum that Mr. Thakkallapally "informed his recruits" "[a]t the outset" "there would be no classes and no education"), which firmly establish that Mr. Ravi knew that the "special arrangement" in which he participated was "illegal."

CONCLUSION

As we establish above, Mr. Ravi cannot seek the aid of this (or any) court to return money that he voluntarily handed over to law enforcement agents to break the law.  Nor can he enforce a purported contract that neither party intended to enter or perform, and which was not agreed to by a Government representative with the requisite authority.  Whether on the pleadings, or on the merits, Mr. Ravi's claim fails.  For these reasons, we respectfully request that the Court dismiss Mr. Ravi's amended complaint, or in the alterative, enter judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

MARTIN F. HOCKEY, JR.
Acting Director

/s/ Eric P. Bruskin
ERIC P. BRUSKIN
Assistant Director

/s/ Meen Geu Oh
MEEN GEU OH
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-0184

July 2, 2021

Email: Meen-Geu.Oh@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on this 2nd day of July 2021, a copy of the

foregoing "DEFENDANT'S RESPONSE TO PLAINTIFF'S SUPPLEMENTAL BRIEF AND

SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION TO DISMISS, OR IN THE

ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT" was filed electronically. I

understand that notice of this filing will be sent to all parties by operation of the Court's

electronic filing system. Parties may access this filing through the Court's system.



<u>s/ Meen Geu Oh</u>