# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TEJA RAVI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 20-1237C |
| v. | ) | (Senior Judge Firestone) |
| | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF STEPHEN WEBBER

I, Stephen Webber, hereby make the following declaration with respect to the above-captioned matter:

1. I am a Special Agent with the Office of the Special Agent in Charge located in Detroit, Michigan for Homeland Security Investigations ("HSI"), U.S. Immigration and Customs Enforcement ("ICE"), U.S. Department of Homeland Security ("DHS"). I have been employed with HSI as a Special Agent since 2009. My duties include conducting investigations and prosecuting offenses involving violations of U.S. law within the jurisdiction of HSI, including Titles 8, 18, and 19 of the United States Code. In this capacity, I am involved in several aspects of the immigration enforcement process, including the identification and arrest, transportation, case management, and pre-prosecution of noncitizens present in violation of U.S. immigration laws or without lawful status in the United States.

1

2. I have prepared this declaration at the request of the U.S. Department of Justice, in connection with the Complaint filed with the U.S. Court of Federal Claims by Teja Ravi Tiyyagura, born October 27, 1992.  As the lead case agent for HSI's enforcement operation relating to the University of Farmington, I provide this declaration based on my personal knowledge, belief, reasonable inquiry, and information obtained from various records, systems, databases, and other DHS employees.

### The Student Visitor Process

3. Once in the United States, a nonimmigrant F-1 student visitor is permitted to transfer from one Student and Exchange Visitor Program ("SEVP") certified school to another, as long as that individual maintains valid F-1 student status and is pursuing a full course of study.  To complete such a transfer while maintaining valid status, a student visitor must first obtain a school acceptance letter and a transfer form from the SEVP-certified school to which the student intends to transfer.  The student visitor may then transfer to that school, obtain a Form I-20, Certificate of Eligibility for Nonimmigrant Student Status ("Form I-20"), and remain in the United States as long as he or she pursues a full course of study at the new SEVP-certified school.  Attached hereto as Exhibit A is a true and correct copy of the Form I-20 provided for Teja Ravi Tiyyagura.

4. In addition to taking a full course of study at an accredited institution, certain F-1 student visitors may also seek practical training, which could involve paid

employment.   However, the practical training must be directly related to the student's major and is therefore considered part of the student's program of study.

5.  One type of practical training available to certain student visitors is curricular practical training ("CPT").   CPT is an alternative work/study, internship, cooperative education, or any other type of required internship or practicum that is offered by sponsoring employers through cooperative agreements with a SEVP-certified institution.   A student visitor may be authorized by designated school officials to participate in a CPT program that is an integral part of an established curriculum.

6.  If approved, a student visitor may obtain a new Form I-20 indicating that he or she has been approved for CPT.   Generally, as long as a student visitor is properly enrolled at an SEVP-certified school, is taking classes and earning credits, and is making academic progress toward graduation, that student visitor may have the opportunity to work full or part time through CPT, in addition to taking classes.

7.  The Form I-20 is a multipurpose document.   Among other uses, the Form I-20: (1) allows an individual to apply for a student visa at a United States embassy or consulate abroad; (2) is used as identification, evidence of authorized stay, and proof of legal and academic status once a student has been admitted to the United States; (3) operates as an entry document for student visitors who travel abroad and; (4) permits a student visitor to participate in practical training related to their course of study.   The Form I-20 explicitly states on it: "You may remain in the

United States while taking a full course of study or during authorized employment after your program.  To maintain your nonimmigrant student status, you must: 1) remain a full-time student at your authorized school; 2) engage only in authorized employment; and 3) keep your passport valid.  Failure to comply with these regulations will result in the loss of your student status and subject you to deportation."

### The University of Farmington

8. In December 2014, HSI Detroit received concurrence from the U.S. Attorney's Office for the Eastern District of Michigan to begin Operation Paper Chase, an undercover operation establishing a fictitious university located in Farmington Hills, Michigan, called the University of Farmington ("University").  Attached hereto as Exhibit B is a true and correct copy of the certified undercover materials including the initial authorization and reauthorizations.  The operation targeted illicit recruiters who assisted student visitors in obtaining employment authorization via CPT without having to take courses or pursue a full course of study, as required by law and regulation.  It also targeted individuals seeking to solely maintain their student visitor status through unlawful means.

9. In Fall 2016, HSI Detroit established the University as a spurious institution with some characteristics of a real university, including a "campus" located within a commercial building, website, social media presence, state accreditation, and a listing on the DHS website of approved institutions.  At no time did the

University function as a learning institution, as it did not offer any actual courses, either on-line or in person, and had no teachers.  Rather, it was staffed by a few HSI Detroit undercover agents ("UCA").   In addition, because there was no established curriculum, the individuals who enrolled were not eligible for CPT pursuant to federal regulation, as CPT can only be authorized for employment opportunities that are "an integral part of an established curriculum." Accordingly, without an underlying program of study, there is no lawful method for an individual to maintain nonimmigrant student status.

10. As an approved law enforcement operation, the operation took efforts to ensure that individuals who enrolled at the University were aware that the arrangement was a "pay to stay" scheme solely to maintain their nonimmigrant F-1 student visitor status and to receive employment authorization through CPT.

11. There were two primary pathways that individuals took to transfer to, and obtain admission to, the University.   The first is that a prospective enrollee would contact University of Farmington directly by phone, email, or walk-in, at which time they were informed by an HSI UCA that the school did not provide any classes, but that they could be provided CPT under a "special arrangement" to maintain their student status.   An HSI UCA would email an application to the individual.   The individual would submit a completed application for admission, be accepted to the University, and were sent a letter of admission.   They would then transfer from their prior school, and finally were provided a Form I-20 and

an invoice for payment.  "Tuition" was $2,500 per quarter, and once an initial payment of $1,000 was made,  the University sent the enrollee a hard copy of a Form I-20 and student identification card. The remaining balance was due within 30-days and subsequent payments made on a quarterly basis.

12. The second way was that the prospective enrollee would correspond with a criminal recruiter, who would then forward their application materials, and sometimes their payment, to the University.  Prior to enrolling at the University, each prospective enrollee was informed about this "special arrangement" by their individual recruiter, including that there were no classes available at the University.

13. All of the individuals who enrolled with the University had experience with the student visa process.  They were all already in the United States attending other schools and were familiar with the legal requirements and obligations to maintain valid student status when they transferred to the University.  HSI UCAs took steps to ensure that each of the individuals who "enrolled" and made "tuition" payments to the University knew that they would not attend any actual classes, earn credits, or make academic progress toward an actual degree in a particular field of study – that the "special arrangement" was a "pay to stay" scheme.

14. To the extent that an honest and legitimate student seeking an education may not have known of the illegal scheme upon initial admission, the student would have quickly learned within the first weeks (but certainly within the first quarter) that

the University was a "pay to stay" scheme that did not offer classes.  By operating the University for an extended period of time – 28 months – HSI further endeavored to ensure that individuals who were seeking an education had ample time to realize that they were unable to attend actual classes at the University.

15. At that point, the student could seek immediate transfer to a legitimate institution and the return of their payment.  Individuals interested in legitimately attending classes in conformance with their student visitor status were referred to legitimate schools vetted by HSI and SEVP.  Thus, by transferring, those students aware of and unwilling to participate in the pay-to-stay scheme, HSI was able to vet out all eligible students who were truly seeking an education, and not merely seeking to prolong their stays in the U.S. by any means – hereby fraudulent means – necessary.

16. The enrollees, aside from the very few individuals that sought immediate transfer after admission, were given a Form I-20, which provided them with multiple benefits, including the ability to remain in the United States during their enrollment at the University.   Additionally, there were some long-term enrollees who did transfer or withdrew from the University prior to its closing.  In those cases, the transferees were given an opportunity to attend another school.

**Teja Ravi Tiyyagura**

17. I am familiar with Teja Ravi Tiyyagura ("Ravi"), the plaintiff in this matter. Ravi is a 28-year-old native and citizen of India who was admitted to the United

7

States on August 25, 2015, as a nonimmigrant F-1 student visitor to attend Northwestern Polytechnic University for the duration of his status.

18. Ravi used the services of criminal recruiter Avinash Thakkallapally, who was convicted in the U.S. District Court for the Eastern District of Michigan on September 11, 2019, for the offense of Conspiracy to Commit Visa Fraud and Harbor Aliens for Profit in violation of 18 U.S.C. § 371 for his actions relating to this operation.   However, Ravi also had direct communications with the University through HSI UCAs.

19. Thakkallapally arranged with the HSI UCAs to recruit and bring in new enrollees to the University for $500 per individual, as he had previously done for other universities that engage in "pay to stay" schemes.  Thakkallapally called the University frequently to request various actions be taken on behalf of his recruits. In addition, Thakkallapally updated the HSI UCAs on his recruiting efforts, asked that additional enrollees be admitted, and inquired about payment for his recruiting efforts.

20. On December 7, 2017, Ravi sent a completed application for admission via email to the University and explained that his Optional Practical Training ("OPT") was ending in January 2018.  On December 12, 2017, he sent another email seeking an update on his application for admission.  Attached hereto as Exhibit C is a true and correct copy of the application submitted by Ravi.

21. On February 14, 2018, Thakkallapally then sent an email to the University with Ravi's completed application, as well as a copy of Ravi's visa and passport. On February 15, 2018, a letter of admission to the University was sent to Thakkallapally to forward to Ravi. Ravi's admission letter contained no details about classes or specific degree programs. Ravi was enrolled for the Spring 2018 term, and on February 21, 2018, the University emailed Ravi a Form I-20 that listed Information Technology as his major. This Form I-20 did not contain an endorsement that allowed for CPT employment. Attached hereto as Exhibit D are a true and correct copy of the aforementioned documents.

22. On multiple occasions in March 2018, Thakkallapally emailed the University to confirm Ravi's enrollment. On March 21, 2018, he emailed stating that Ravi paid $2,500, but had not yet received a student ID card or a hard copy of the Form I-20 that contained a CPT endorsement. Following that email, Ravi was provided a Form I-20 with a program end date of March 31, 2020, and a CPT endorsement that would allow him to work. Attached hereto as Exhibit E is a true and correct copy of the emails from Thakkallapally.

23. Six months later, on November 8, 2018, Ravi himself emailed the University directly requesting documents, including a transcript, to assist in responding to a Request for Evidence that he received from U.S. Citizenship and Immigration Services ("USCIS") regarding a visa petition he filed to obtain H-1B

nonimmigrant specialty occupation worker status.  Attached hereto as Exhibit F
is a true and correct copy of the email sent to the University from Ravi.

24. On November 9, 2018, an HSI UCA responded to his email.  That email
    informed Ravi that because he was enrolled under the "special arrangement" the
    University would have to deceitfully make up the documents he requested.  He
    was further informed to keep the "special arrangement" to himself because it is
    illegal.  Attached hereto as Exhibit F is a true and correct copy of the email sent
    from the University from Ravi.

25. On November 9, 2018, Ravi called the University seeking an update on his email
    request for documentation and spoke to an HSI UCA posing as an admissions
    officer.  The HSI UCA explained that he would have to "make up" the classes
    and grades that he would like on his transcript and explicitly referring to it as the
    "special arrangement" and that it was illegal, to which Ravi responded "Ok."
    Attached hereto as Exhibit G is a true and correct copy of the audio recording of
    the telephone call from Ravi to the University.

26. From February 2018 through December 2018, Ravi received four separate
    invoices billing him $2,500 per semester.  Mr.  Ravi paid each of these invoices
    as they came due, paying the University $10,000 by credit card over the course
    of 2018.  Attached hereto as Exhibit H is a true and correct copy of the invoices
    from the University to Ravi.

27. In January 2019, the University shut down, and on January 30, 2019, HSI initiated a large-scale nationwide enforcement operation involving the arrest of criminal and administrative targets.   The administrative targets were the enrollees, including Ravi, who were in violation of their nonimmigrant student status during their time enrolled at the University for failing to pursue a full course of study.

28. On February 1, 2019, Ravi departed the United States prior to any administrative enforcement action.   He was never encountered by immigration officials, nor were removal proceedings initiated.   Attached hereto as Exhibit I is a true and correct copy of Ravi's departure record.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 25th day of June, 2021,


_____

Stephen Webber, Special Agent
HSI Detroit, Michigan