# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **Teja Ravi and Swetha Bachu,** | : | |
| **Individually and on Behalf of** | : | |
| **All Others Similarly Situated** | : | |
| | : | No. 20-1237C |
| **Plaintiff,** | : | (Senior Judge Firestone) |
| | : | |
| v. | : | |
| | : | |
| **The United States of America** | : | |
| | : | |
| **Defendant.** | : | |

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs Swetha Bachu and Teja Ravi and ("Plaintiffs"), by and through their attorneys, brings this action on behalf of himself and all others similarly situated against the United States. Plaintiffs hereby alleges, on information and belief, except as to those allegations which pertain to the named Plaintiffs, which allegations are based on personal knowledge, as follows:

1

## NATURE OF THE ACTION

1. The University of Farmington marketed itself as a university that "provide[s] students from throughout the world a unique educational experience" and claimed to be credited by the Michigan Department of Licensing and Regulatory Affairs and the Accrediting Commission of Career Schools and Colleges. Farmington also claimed it was authorized by the Student and Exchange Visitor Program that allows the admittance of foreign students. However, Farmington was nothing more than a façade. It is now well known that the U.S. Immigration and Customs Enforcement's Homeland Security Investigations ("HSI") created Farmington in an attempt expose student visa fraud in the United States. Yet there was no way for prospective students to distinguish Farmington from a real university. Farmington created what appeared to be a legitimate web presence through its website and Twitter. The website went so far as to have bad weather alerts for students. Ultimately, there was no reason for a student applying from abroad to know or have a suspicion that Farmington was a fake university.

2. Plaintiffs and class members applied and enrolled at Farmington with the understanding that it was an accredited university offering legitimate degrees in such programs as a Masters in Information Technology and a Masters in Computer Science. Farmington required that Plaintiff and class members pay tuition upon acceptance. All class members were informed that there would be regular classes each month, and all class members enrolled in the online program as most of the students lived outside of the state of Michigan and/or were unable to attend on campus courses due to their employment. None of the students received services in exchange for their tuition.

3. In January 2019, Defendant revealed that the University was a sham and reneged on their guarantees that Plaintiffs and Class members had properly adhered to immigration regulations and were therefore lawfully residing and working in the United States. Defendant instead had the audacity to revoke Plaintiffs and Class members visa status, accusing the enrollees of visa fraud, even though Plaintiffs and Class members were unwitting victims of Defendant's scheme, and had reasonably believed in Defendant's actions and assurances, that the University was a legitimate and authorized school.

4. The University deprived class members of millions of dollars, without providing the services that it offered and promised. Plaintiffs, therefore, brings this action on behalf of themselves and all other similarly situated persons who enrolled at the University of Farmington asserting Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing. Plaintiff seeks damages and equitable relief on behalf of the Class, which relief includes, but is not limited to, the following: refunding to Plaintiffs and class members the full amounts paid to the University of Farmington; costs and expenses, including attorneys' fees and expert fees; and any additional relief that this Court determines to be necessary to provide complete relief to Plaintiffs and the class.

## JURSIDICTION AND VENUE

5. The United States Court of Federal Claims has jurisdiction and venue over this action pursuant to 28 U.S.C. § 1491(a)(1).

**PARTIES**

6. Plaintiff Teja Ravi is a citizen of India who resided in Houston, Texas at the time he enrolled at Farmington. During the class period, in March 2018, Plaintiff was accepted and enrolled in the University. Plaintiff was told by University officials that he would have regular classes monthly. Plaintiff paid $12,500 in tuition to the University and believed the University's website and marketing material regarding its accreditation.

7. Plaintiff Swetha Bachu is a citizen of India who enrolled in the University of Farmington. During the class period, in February 2018, Plaintiff was accepted and enrolled in the University to pursue a master's degree in information technology. Plaintiff Swetha Bachu paid a total of $10,000 in tuition to the University and believed the University's website and marketing regarding its accreditation.

8. Defendant is the United States, as acting through its agencies, including the U.S. Immigration and Customs Enforcement, which is based in Washington, D.C., has field offices throughout the United States, and is a branch of DHS.

**NATURE OF THE CASE AND BACKGROUND FOR THE CONTRACT**

9. The University of Farmington was a fake university setup by ICE's Homeland Security Investigations and overseen by DHS and was setup to expose student visa fraud. Defendant authorized HSI and/ or DHS agents to setup and run the University of Farmington scheme, including to enroll students, to accept tuition payments, and to use these contracts with students as a basis to revoke their visa status.

10. Defendant offered classes and degree programs on the University of Farmington website and through letters of admission. Class members accepted defendant's offers of admission to enroll in the degree programs. Class members paid tuition money to the University. However, the Defendant did not provide class or degree programs as offered.

11. In an effort to maintain a legitimate façade, Defendant used a complex scheme of phony credentials and misleading and false statements to enrolled and prospective students. This schemed included:

- Establishing a physical location:
    - Defendant leased a physical office in Farmington Hills, Michigan. Nevertheless, all administrative interfacing between the University officials and students/ prospective students occurred digitally or telephonically as many of the enrolled students and prospective students relied on the online feature of the University.
- Enlisting recruiters to lure students:
    - Defendant enlisted the assistance of nearly a dozen recruiters to funnel Plaintiffs and Class members to enroll in the University of Farmington, rather than other, legitimate, graduate programs. These recruiters, primarily foreign students, were in similar social circles as Plaintiffs and Class members and approached Plaintiff and class members without solicitation. Defendant offered recruiters incentives for leading potential students to the University, in the form of cash or University

       credits. Recruiters helped funnel nearly six hundred (600) students to enroll at Farmington.
- Fabricating credentials:
  - Defendant went to great lengths to manipulate foreign prospective students by creating the impression that the University was legitimate. This included:
    - Undercover agents of the Department of Homeland Security registering the University of Farmington with the state of Michigan as a legitimate university (through Department of Licensing and Regulatory Affairs).
    - A national accreditation agency (Accrediting Commission of Career Schools and Colleges), at the request of DHS, listed the University of Farmington as being accredited in order to help deceive prospective students.
    - Defendant placing the University on an ICE website, listing the University as an institution approved for the Student and Exchange Visitor Program ("SEVIS").

12. The University further enticed student enrollment through what appeared to be a legitimate web presence.

13. From its web presence, it was virtually impossible for a prospective student to differentiate the University from a legitimate one. Prospective students researching schools were doing so from the internet as the majority neither lived in or near Michigan, where the University was located.

14. The University had a professional website, a red and blue coat of arms as its emblem, a Latin slogan meaning "knowledge and work" and a physical location at a commercial building in Farmington Hills, Michigan. Further, the website offered specific details related to its courses and provided tuition pricing.



One page on its website read:

> Located in the heart of the automotive and advanced manufacturing center of Southeast Michigan, the University of Farmington provides students from throughout the world a unique educational experience. Our dynamic business administration and STEM curriculum allows students to rapidly apply their knowledge; preparing them to succeed in an ever-globalizing economy.

Another page describes an educational and collaborative community enrollees could be a part of at UF:

> We are very excited about welcoming you to the UF community and helping you achieve your academic goals. You'll find UF to be a vibrant and growing institution where students, faculty and staff enjoy a challenging and collaborative environment. UF has a rolling admission process and operates on a quarterly academic calendar. Students are encouraged to apply early to ensure a smooth transition to UF.

The website also listed and described the enticing, but illusory programs, offered by Farmington. Regarding its graduate MBA program, the site stated:

> The two-year schedule offers a convenient way for you to add a master's degree to your résumé while you work. . . . Students hone their skills in project and program management, quality improvement initiatives, and creativity and problem solving. This interactive and collaborative cohort program helps stu-

dents build strong ties with their professional faculty and gain perspectives from other disciplines and leaders in industry.

The University's website went even further in an effort to induce students with statements such as the school "was accredited by the Accrediting Commission of Career Schools and Colleges (www.accsc.org) and licensed by the Michigan Department of Licensing and Regulatory Affairs as a private postsecondary college. UF is authorized by the Student and Exchange Visitor Program to admit foreign students."

15. Ultimately, it was near impossible for a prospective student to discern the legitimacy of the University through its recruitment efforts and web presence.

16. The University also engaged in individual communication via postal and electronic mail with the prospective students. Upon acceptance of an offer letter from the University, a student was enrolled and was advised that there would be regular classes monthly. The University also mailed students an I-20, Certificate of Eligibility for Nonimmigrant Student Status to students, leaving them no reason to question the University's legitimacy. (*see* **Exhibit 1**)

17. Emails from University officials continued the impression of legitimacy. In an email to prospective students an official wrote:

> Thank you for your recent interest in The University of Farmington, a nationally accredited business and STEM (science, technology, engineering, and mathematics) institution. Here at the University of Farmington we have created an innovative learning environment that combines traditional instruction with fulltime professional experiences. We offer flexible class schedules and a focus on students who do not want to interrupt their careers. (*see* **Exhibit 2**)

18. Other communication from officials reiterated the University's fabricated claims regarding its programs available to students with statements such as:

> In many instances, your prior Masters Degree's (MA) credits, combined with CPT, can be applied to a second MA in lieu of a traditional course load." And he continued to highlight the scheme's accreditation: "We are accredited by the Accrediting Commission of Career Schools and Colleges (www.accsc.org) and licensed by the Michigan Department of Licensing and Regulatory Affairs as a private postsecondary college.

19. To further strengthen its claim of legitimacy, emails from the University contained a footer with the following statement: "A nationally accredited institution authorized to enroll international students by the U.S. Department of Homeland Security."

20. Upon enrollment at the University, students would pay tuition to the University and were advised that a class schedule would be forthcoming. The class schedule never arrived. When students questioned the University regarding the lack of a class schedule and assignments, they were met with either silence or assurances from Farmington officials about the legitimacy of the school.

For example:

21. Teja Ravi paid $12,500 in tuition to Farmington after he enrolled in March 2018, after which he was enrolled and informed that he would have a regular class schedule and have regular class. But he was never enrolled in classes or given assignments. As soon as the semester commenced, and he still was not enrolled in classes, he contacted officials at the University to ask about classes and assignment. A university official advised him not worry about it as that was not an issue. It wasn't until about a year after enrollment, Teja was advised by a friend that the University was a fake. Teja contacted the University to clarify this rumor and was told by a University official that the rumor was not true. Ravi never received any educational services from the University.

22. Rajasekhar Reddy enrolled in Farmington in October 2017 after paying tuition in the amount of $10,000. Rajasekhar applied after researching the school online and reviewing Farmington's website. In January 2019, Rajasekhar learned the University was a fake. He tried several times to contact the University and received no response.

23. Naveen Kumar enrolled at University of Farmington around May 2018. Naveen visited Farmington, MI during the enrollment process, but the University was closed the day he visited. After researching the University online, Naveen ultimately submitted an application and accepted its offer to attend. When Naveen became suspicious of the University he requested a transfer of his SEVIS to another school. Farmington would only agree to the transfer in exchange for a payment of $1500, which Naveen paid.

24. Pavan Sama, a Farmington student during the time period of Defendant's unlawful acts had a similar experience to other students. He corresponded with a University official named Carey Ferrante whose email address was carey.ferrante@universityoffarmington.edu. Sama paid $15,000 in tuition to Farmington.

25. Each of these students had common facts associated with their matters: they each relied on the website; they each relied on individual communications with University staff; they each received an accepted an offer of admission; they each enrolled and paid thousands of dollars of tuition; none of them received class information after enrolling; none of them were enrolled in classes; those who inquired after enrolling received assurances; none of them received any sort of service for the thousands of dollars that they spent in tuition money.

26. In January 2019, Defendant revealed that the University was a sham and reneged on their guarantees that Plaintiffs and Class members had properly adhered to immigration regulations and were therefore lawfully residing and working in the United States. Defendant instead had the audacity to revoke Plaintiffs and Class members visa status, accusing the enrollees of visa fraud, even though Plaintiffs and Class members were unwitting victims of Defendant's scheme, and had reasonably believed in Defendant's actions and assurances, that the University was a legitimate and authorized school. Defendant had knowledge of the contractual relationship between Defendant and Plaintiffs and class members at this time, as the high ranking HSI and/ or DHS officials who authorized the University of Farmington scheme and the revocation of Farmington students' visa status knew that University of Farmington was Defendant's scheme, and knew of Plaintiffs and Class members' status as Farmington students, as this was the basis for

revoking their visa status and accusing them of visa fraud. Defendant kept all tuition money it collected from Plaintiffs and Class members.

## PLAINTIFF TEJA RAVI'S FACTS

27. Plaintiff Teja Ravi learned of the University from a friend who advised him that he could attend all classes online, which would allow him to maintain the Curricular Practical Training that allowed him to attend school and continue with employment in the United States. Plaintiff was also enticed by the University's three-month semester schedule as he traveled frequently for his contracted work, which was on a six-month basis.

28. At the time Plaintiff applied to the University in early 2018, he was enrolled in engineering curriculum at Northwestern Polytechnic University in California, and had been granted a 5-year student visa through that program from July 2015 to July 2020. Plaintiff was interested in the University of Farmington as it offered graduate programs in IT, which he hoped would make him a more attractive candidate to prospective employers. Plaintiff applied to the University in early 2018 by filling out an admission form and enrolled in the Masters in Information Technology program.

29. Upon enrollment to the University, Plaintiff paid $12,500 in tuition. He was advised by the University that he would be scheduled for regular classes every month. After commencement of the first semester, Plaintiff did not receive any classes to attend or assignments, as he had been promised by the University. Plaintiff contacted University administration to find out why and was told by University officials that the lack of classes and assignments would not be an issue. Plaintiff also re-checked the University's accreditation on its website, which indicated that his Curricular Practical Training ("CPT") was valid.

30. A year after enrolling, Plaintiff learned that the University might be fraudulent. Plaintiff contacted University administration three times. On his third attempt, Plaintiff spoke with University administrator Carrie Fernand, who advised Plaintiff that there were no issues. Shortly thereafter, however, Plaintiff discovered news of the University being a sting operation by the Department of Homeland Security, with many students either arrested or deported.

31. Plaintiff's experiences with the University are typical of the class and over 500 other University of Farmington students.

32. Plaintiff suffered injury in fact and loss of money or property. He has been damaged by, inter alia, the amounts he has paid the University of Farmington in tuition.

## PLAINTIFF SWETHA BACHU'S FACTS

33. Plaintiff Swetha Bachu wished to further her education in the United States and researched programs online. Swetha Bachu's roommate at the time told her about the University of Farmington because it was relatively inexpensive to other schools and fully accredited. After researching the University of Farmington online she reached out to the University to apply. The website stated that classes and degrees would be offered.

34. At the time Ms. Bachu applied to the University, in February 2018, she was engaged in lawful employment in the United States. Ms. Bachu was in the United States legally through a OPT program after obtaining a Master's in Computer Science.

35. After researching the University of Farmington online, Ms. Bachu confirmed that the University was fully accredited.

36. Ms. Bachu reached out to the University of Farmington to apply. In response, the Director of Admissions, Ali Milani, e-mailed Ms. Bachu and explained the information that she needed to apply.

37. After Ms. Bachu applied, she received an offer of admission signed by Mr. Milani on January 23, 2018 for her degree of choice, a Master's in Information Technology.

38. Ms. Bachu accepted and enrolled in the Master's of Information Technology program at the University.

39. The University subsequently issued invoices totaling $10,000 which Plaintiff Bachu paid with the expectation of there being classes and a full educational opportunity.

40. After enrolling in the University, she was directed by the University through e-mail to a student portal to select her classes. However, after enrolling in the classes, she never received any information on how to attend them.

41. Ms. Bachu made repeated attempts to contact the University to ask about classes, but she was unable to get ahold of them. Although she was confused, she thought it might be normal to not attend classes immediately since she was pursing her second master's degree. She therefore, continue to make requested tuition payments to not violate her agreement with the University.

42. Ms. Bachu never received the classes, and by the end of 2018, she started researching other universities in order to transfer.

43. On December 31, 2019, at 4am, without any prior notice from the University or the U.S. Immigration and Customs Enforcement ("ICE"), ICE agents showed up at her home and brought her into custody, claiming that she had violated her visa status. After spending 45 days in custody, she was granted voluntary departure back to India.

44. Plaintiff's experiences with the University are typical of the class and over 500 other University of Farmington students.

45. Plaintiff suffered injury in fact and loss of money or property. She has been damaged by, inter alia, the amounts she has paid the University of Farmington in tuition.

## CLASS ALLEGATIONS

46. Plaintiffs bring this class action on behalf of themselves individually and all others similarly situated, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

47. The proposed class consists of all persons who enrolled in and attended the University of Farmington from 2015 to 2019. Excluded from the Class are the University of Farmington, its affiliates, employees, officers, and directors, persons or entities that distributed or recruited students for the University of Farmington, the Judge(s) assigned to this case, and the attorneys of record in this case. Plaintiffs reserves the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

48. This action is properly brought as a class action for the following reasons:

   a. The proposed class is numerous and geographically dispersed through the United States and other countries, such that the joinder of all class members is impracticable. While Plaintiffs do not know the exact number and identity of all class members, Plaintiffs are informed and believes that there are hundreds of class members. The precise number of members can be ascertained through discovery.

   b. The disposition of Plaintiffs' and proposed class members' claims in a class action will provide substantial benefits to both the parties and the Court.

   c. The proposed class is ascertainable and there is a well-defined community of interest in the questions of law or fact alleged herein since the rights of each proposed class member were infringed or violated in the same fashion.

   d. There are questions of law and fact common to the proposed class which predominate over any questions that may affect particular class members. Such common questions of law and fact include, but are not limited to:

      i. Whether the conduct by the University of Farmington was unlawful or unfair;

      ii. Whether the University's advertising portrayed that it offered legitimate educational opportunities;

      iii. Whether the University's conduct portrayed it was offering legitimate educational opportunities;

      iv. Whether the University violated the Michigan Consumer Protection Act;

      v. Whether the University breached the terms of its contract with students to provide educational services;

      vi. Whether the University's actions breached the Implied Covenant of Good Faith and Fair Dealing;

      vii. Whether the University unjustly received funds from Plaintiffs or class members;

      viii. Whether the University is liable for making false promises;

      ix. Whether the Plaintiffs and proposed class members have been harmed and the proper measure of relief;

      x. Whether Plaintiffs and the proposed class members are entitled to an award of punitive damages, attorneys' fees and expenses against the Defendant; and

      xi. Whether, as a result of Defendant's misconduct, Plaintiffs are entitled to equitable relief, and if so, the nature of such relief.

e. Plaintiffs' claims are typical of the claims of the members of the proposed class. Plaintiffs' claims arise from the same practices and conduct that give rise to the claims of all class members and are based on the same legal theories. They were injured by the same wrongful practices as other class members.

f. Plaintiffs will fairly and adequately protect the interest of the proposed class in that they have no interests antagonistic to those of the other proposed class members, and Plaintiffs have retained attorneys experienced in consumer class actions and complex litigation.

g. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

      i. Given the size of individual proposed class members' claims and the expense of litigating those claims, few, if any, proposed class members could afford to or would seek legal redress individually for the wrongs Defendant committed against them, and absent proposed class members have no substantial interest in individually controlling the prosecution of individual actions;

      ii. The action will promote an orderly and expeditious administration and adjudication of the proposed class claims; economies of time, effort, and resources will be fostered; and uniformity of decisions will be insured;

      iii. Without a class action, proposed class members suffered injury will have no redress, and Defendant's violations of law will proceed without remedy while Defendant continue to reap and retain the substantial proceeds of its wrongful conduct; and

      iv. Plaintiffs knows of no difficulty that will be encountered in the management of this litigation which would preclude its maintenance as a class action.

49. Defendant has, or has access to, address information for the Class members, which may be used for the purpose of providing notice of the pendency of this class action.

50. Plaintiffs seeks damages and equitable relief on behalf of the proposed class on grounds generally applicable to the entire proposed class.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

51. Contracts existed between Plaintiffs, class members and the University of Farmington, which was controlled and operated by Defendant.

52. Defendant purported to offer admission to the University, including access to classes and advanced degrees. Plaintiffs and other students indicated their acceptance of the offer of admission and provided consideration for the contract by paying tuition and other fees in the amounts of $10,000 to more than $15,000. The United States breached the contract when it failed to provide the offered classes and degrees.

53. All conditions precedent under the contracts have been performed by Plaintiffs and the Class, including the payment of tuition, application fees, and other fees.

54. Defendant, operating and controlling the University, breached the terms of its standardized contracts with Plaintiffs and the Class by failing to provide them with the promised products and services as contracted.

55. The HSI and/ or DHS agents whose conduct bound the Defendant in contract with the Plaintiffs and the Class members had actual authority to bind the government in contract, because forming these contracts was necessary and essential to the successful performance of the agents' assigned tasks and duties regarding carrying out the Farmington scheme. Enrolling students was an integral part of the Farmington scheme authorized by Defendant.

56. Alternatively, Defendant ratified the contract. The high ranking HSI and/ or DHS officials who authorized the University of Farmington scheme and the revocation of Farmington students' visa status had knowledge of the student contracts at the time the officials authorized revoking the students' visa status and accusing them of visa fraud. HSI and/ or DHS have written records of each contract, including written communications between the students and the agents, and registration documents, invoices, and receipts sent from agents to students or displayed on the Farmington website portal. Defendant has accepted the benefit of the contracts by keeping all tuition money paid by Plaintiffs and class members under the contracts.

57. As a result of Defendant's breach of its contracts, Plaintiffs and the Class have been damaged.

## SECOND CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

58. Plaintiffs re-alleges and incorporates by reference the allegations contained in the paragraph above as if fully set forth herein.

59. The law implies a covenant of good faith and fair dealing in every contract. Defendant, operating the University of Farmington, violated this covenant of good faith and fair dealing in its contract with Plaintiffs and members of the Class by, *inter alia*, misrepresenting to

Plaintiffs and the Class the true nature of the University graduate program as alleged more fully elsewhere in the Complaint.

60. Plaintiffs and members of the Class performed all, or substantially all, of the significant duties required under their agreements with Defendant.

61. The conditions required for Defendant' performance under the contract agreements had occurred.

62. Defendant did not provide and/or unfairly interfered with the right of Plaintiffs and Class members to receive the benefit under their agreements with Defendant.

63. Plaintiffs and the Class have been damaged by Defendant's breach of the implied covenant of good faith.

## PRAYER FOR RELIEF

52. WHEREFORE, Plaintiffs prays this Court enter a judgment against Defendant that:

A. This action be certified and maintained as a class action under Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure and certify the proposed class as defined, appointing Plaintiffs as representative of the Class, and appointing the attorneys and law firms representing Plaintiffs as counsel for the Class;

B. Awards compensatory, statutory and/or punitive damages for Defendant's breach of contract, breach of the implied covenant of good faith and fair dealing, and false promises, where such relief is permitted;

C. Award Plaintiffs and proposed class members the costs of this action, including reasonable attorneys' fees and expenses;

D. Orders Defendant to immediately cease its wrongful conduct as set forth above; enjoins Defendant from continuing to falsely market and advertise, conceal material information, and conduct business via the unlawful and unfair business acts and practices complained of herein; orders Defendant to refrain from discriminating against Plaintiffs and Class members in the Plaintiffs and Class members' future applications to enter the United States, because of Plaintiff and Class members' ensnarement at the University; and requires Defendant to refund to Plaintiffs and all of the Class members the funds paid to Defendant for the subject tuition and fees;

E. Awards equitable monetary relief, including restitution and disgorgement of all ill-gotten gains, and the imposition of a constructive trust upon, or otherwise restricting the proceeds of Defendant's ill-gotten gains, to ensure that Plaintiffs and proposed class members have an effective remedy;

F. Awards pre-judgment and post-judgment interest at the legal rate; and

G. Such further legal and equitable relief as this Court may deem just and proper.

Respectfully submitted,

By: /s/*Amy E. Norris, Esq.,* (#1017140)
Amy@mwlc.org
(202) 530-0100
NORRIS LAW, PLLC
616 E Street NW
Suite 1156
Washington, DC 20004

Attorney for Teja Ravi and Swetha Bachu